UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

JAMES R. FISHER, JR.,

      Plaintiff,

   v.          9:13-CV-0213 (BKS/TWD)

FAY JENKS, *et. al.*,

      Defendants.

_____

**APPEARANCES:**        **OF COUNSEL:**

James R. Fisher, Jr., *Plaintiff pro se*
13-A-1445
Franklin Correctional Facility
P.O. Box 10
Malone, NY 12953

Sugarman Law Firm LLP      Paul V. Mullin, Esq.
211 West Jefferson Street
Syracuse, NY 13202

**Hon. Brenda K. Sannes,  United States District Judge**

## <u>ORDER</u>

### I. INTRODUCTION

  On February 26, 2013, plaintiff James R. Fisher, Jr. filed a *pro se* complaint under 42

U.S.C. § 1983 alleging that the defendant Ogdensburg police officers violated the Eighth

Amendment by subjecting him to excessive force during an arrest.  Dkt. No. 1.  Following

defendants' motion to dismiss, the Court construed plaintiff's alleged Eighth Amendment claim

as a Fourth Amendment excessive force claim.  *See* Dkt. No. 18 (dismissing plaintiff's Eighth

Amendment claim and directing defendants to respond to plaintiff's excessive force Fourth Amendment claim).

On January 20, 2015, defendants filed a motion for summary judgment. Dkt. No. 26. After United States Magistrate Judge Thérèse Wiley Dancks granted plaintiff three extensions of time to respond to the motion, plaintiff failed to file any response. Dkt. Nos. 30, 32, 34. On July 15, 2015, Magistrate Dancks issued a Report-Recommendation and Order, recommending that defendants' motion for summary judgment be granted in its entirety. Dkt. No. 35. Magistrate Dancks advised plaintiff that he had fourteen days to file written objections to the report and that the failure to object would preclude appellate review. *Id.,* p. 11 The Report-Recommendation was served on plaintiff by regular mail on July 15, 2015, and no objections to the Report and Recommendation have been filed. *Id.*

## II. REPORT-RECOMMENDATION

Since no objections to the Report-Recommendation have been filed, and the time for filing objections has expired, the Court has reviewed the Report-Recommendation for clear error. *Petersen v. Astrue*, 2 F. Supp. 3d 223, 228-29 (N.D.N.Y. 2012); Fed. R. Civ. P. 72(b) advisory committee's note to the 1983 addition. Under this standard, "the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Id.* A report is clearly erroneous only if the Court, upon reviewing the entire record, is "left with the definite and firm conviction that a mistake has been committed." *Mateo v. Bristow,* 12-cv-5052, 2015 WL 925933, at *2, 2015 U.S. Dist. LEXIS 26761, at *6 (S.D.N.Y. Mar. 4, 2015) (quoting *Easley v. Cromartie*, 532 U.S. 234, 242 (2001)). For the reasons that follow, the Report-Recommendation is adopted in part and rejected in part.

**A. Standard for Consideration of An Unopposed Motion For Summary Judgment**

As Magistrate Dancks noted, plaintiff failed to oppose defendants' motion after plaintiff had been warned of the consequences of failing to respond and after plaintiff had been granted several extensions of time to file a response. Dkt. No. 35, p. 5; *see* Dkt. Nos. 27, 30, 32, 34. Plaintiff thereby failed to comply with the local rules of the Northern District of New York which required him to file a response to the defendants' Statement of Material Facts, admitting or denying the defendants' assertions in matching numbered paragraphs. N.D.N.Y. L.R. 7.1(a)(3). Under Local Rule 7.1(a)(3), the Court "shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."

As Magistrate Dancks further noted, however, "[t]he fact that there has been no response to a summary judgment motion does not . . . mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). *See* Dkt. No. 35, p. 6. Summary judgment may only be granted "if the facts as to which there is no genuine dispute 'show that the moving party is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(c)).[1] In considering whether there are material issues of fact "[a] verified complaint is to be treated as an affidavit for summary judgment purposes . . . provided that it meets the other requirements for an affidavit" under Rule 56. *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).[2]

---

[1] This standard is now codified in Fed. R. Civ. P. 56(a). *See* Advisory Committee Notes 2010 Amendments.

[2] Affidavits in support or opposition of a motion for summary judgment must "be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

In the Report-Recommendation, Magistrate Dancks concluded that the court was "not required to consider the version of events set forth in the verified complaint as evidence" because plaintiff failed to oppose the motion for summary judgment. Dkt. 35, p. 9.  Nothing in *Colon*, however, indicates that the treatment of a verified complaint as an affidavit is dependent on the filing of an opposition to a summary judgment motion.  In *Colon*, the plaintiff opposed the defendants' motion for summary judgment with an affidavit which was "virtually devoid of facts," and the defendants argued that the plaintiff could not rely on the "more detailed factual allegations" in the complaint to defeat their motion.  *Colon*, 58 F.3d at 872.  The Second Circuit disagreed, ruling that "[a] verified complaint is to be treated as an affidavit for summary judgment purposes, and therefore will be considered in determining whether material issue of fact exist."  *Id.*  The Second Circuit in *Colon* found "sufficient evidence in the verified complaint to withstand the defendants' motion for summary judgment."  *Id.*; *cf. Jamison v. Metz*, 541 F. App'x 15, 18-19 (2d Cir. 2013) (summary order) (noting that "the verified complaint . . . [was] properly before the district court" and created an issue of fact in a case in which the plaintiff had failed to comply with the requirements in N.D.N.Y. Local Rule 7.1 for a responsive Statement of Material Facts); *see Roberson v. Hayti Police Dep't*, 241 F.3d 992, 995 (8th Cir. 2001) (reversing summary judgment ruling because district court "failed to accord the verified complaint its proper weight . . . as an affidavit for summary judgment purposes" in a case in which the plaintiff failed to respond to a defendant's summary judgment motion).

Courts in this district have considered facts in a verified complaint in determining whether there are material issues of fact, and whether facts are controverted for the purposes of deeming admitted the defendant's Statement of Facts, under Local Rule 7.1(a)(3), when a

plaintiff has failed to respond to a summary judgment motion. *See, e.g., Jones v. Fischer,* No. 9:11-cv-774, 2013 WL 4039377, at *4, 2013 U.S. Dist. LEXIS 111319, at *3 (N.D.N.Y. Mar. 21, 2013); *Rivera v. Dianardo*, No. 10-cv-1500, 2013 WL 1975437, at *1, 2013 U.S. Dist. LEXIS 68051, at *3 (N.D.N.Y. Apr. 16, 2013), report-recommendation adopted by 2013 WL 1975435, 2013 U.S. Dist. LEXIS 68051 (N.D.N.Y. May 13, 2013). Therefore, the Court declines to ignore the verified complaint in determining whether there are material issues of fact for trial. Pursuant to Local Rule 7.1(a)(3) and Fed. R. Civ. P. 56(e)(2), the Court deems all of the properly-supported facts in the defendants' Statement of Material Facts which are not controverted by the allegations in the verified complaint to be undisputed for the purposes of this motion.[3]

### B. The Uncontroverted Facts

In the early morning of January 9, 2013, defendant Polniak saw plaintiff carrying an object and attempting to leave the backyard of an area designated for the parking of police vehicles. Dkt. 26-11, ¶¶ 5-7. Polniak ordered plaintiff to stop and drop the object – later determined to be a spray can – but plaintiff threw it. *Id.*, ¶6. Polniak informed plaintiff that he was under arrest and placed him in handcuffs. *Id.*, ¶ 7. Defendant Jenks arrived to help Polniak escort plaintiff into the building. *Id.*, ¶8. Plaintiff alleged that the defendants "roughly pushed and man handled [him] into the police station . . . making disrespectful and degrading comments such as 'you piece of shit.'" Dkt. No. 1, p. 4. Plaintiff had been near patrol cars parked behind the police station; two or three of the cars had been marked with obscenities and other markings. Dkt. 26-11, ¶ 9. Jenks saw sugar falling from the inside of plaintiff's winter coat; it was later

---

[3] The defendants' Statement of Material Facts is properly supported by affidavits from the defendants. Dkt. No. 26-11.

discovered that sugar had been placed inside the gas tank of the patrol car used by the Police Chief. *Id.*, ¶¶ 10-11.

As Polniak and Jenks attempted to escort plaintiff into the police station, he became belligerent; he yelled obscenities and made verbal threats, threatening to kill the officers' families and slit their throats. *Id.*, ¶¶ 12-13. Plaintiff tripped Jenks, causing Jenks to fall and hit his head on the wall, causing minor injuries. *Id.*, ¶ 14. Plaintiff was "inebriated." Dkt. No. 1, p. 5. The defendants have provided affidavits describing how plaintiff struggled with the officers; was uncooperative; resisted them; and acted aggressively by attempting to get out of a chair and lunging at them. Dkt. No. 26-11 ¶¶ 13, 16, 19, 21-22, 24, 27, 34. Plaintiff alleges that at "no time did [he] resist," Dkt. No. 1, p. 5.

Jenks and Polniak state that they only used reasonable force to effect plaintiff's arrest and detention. Dkt. No. 26-11, ¶ 33. Plaintiff has alleged that

> Jenks threw plaintiff face first into a wall causing severe pain & swelling, which lasted approximately 2 weeks also other injuries were received bruises on upper arms bicep/tricep area, a ½ inch cut on right knee.

Dkt. 1, p. 5. Plaintiff alleges that this occurred when he was "handcuffed behind his back," and that he was thereafter placed in a holding cell. *Id.*

When he was in the holding cell plaintiff placed what appeared to be wet toilet paper over the cell's camera lens and clogged the cell's toilet with large amounts of toilet paper, socks and a t-shirt. *Id.*, ¶¶ 28- 29. Plaintiff was not booked until several hours later, after Polniak's and Jenks' shifts had ended. *Id.*, ¶ 31. Neither Polniak nor Jenks saw visible injuries on plaintiff. *Id.*, ¶ 36. Plaintiff did not complain of any pain or injuries and he did not have any visible

injuries when he was booked. *Id.*, ¶ 38.

During these events, defendant Layng was at home. *Id.*, ¶ 39. Layng arrived at the police station to conduct an investigation and process the damage that had been done, but did not at any time come in contact with plaintiff. *Id.*, ¶ 41-42.

### C. Consideration of the Allegations of the Complaint

In this case, Magistrate Dancks concluded that even if the allegations in the verified complaint were considered, "no reasonable juror would credit Plaintiff's testimony." Dkt. No. 35, p. 10. As Magistrate Dancks notes, the plaintiff's version of the events is inconsistent with that of defendants; plaintiff's injuries are not documented; and there are booking photographs which appear to depict plaintiff's face without injury. Nevertheless, assessing the credibility of the conflicting versions of this incident is a matter for the jury, not the court on summary judgment. *Jeffreys v. City of New York*, 426 F.3d 549, 553-54 (2d Cir. 2005). This is not one of the "extraordinary cases, where the 'facts alleged are so contradictory that doubt is cast upon their plausibility [and] the court may pierce the veil of the complaint's factual allegations and dismiss the claim.'" *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 106 (2d Cir. 2011) (quoting *Jeffreys*, 426 F.3d at 554). In *Rojas* and *Jeffreys*, the Second Circuit affirmed summary judgment rulings against plaintiffs whose allegations were discredited by the district court because the allegations were contradicted by and inconsistent with the plaintiffs' earlier statements. Here, there is no evidence that plaintiff has contradicted himself; there is no evidence of any statement by him other than the allegations in the complaint. The Court therefore declines to discredit plaintiff's allegations.

**D. Discussion**

While law enforcement officers have the right to use "some degree of physical coercion or threat thereof to effect" an arrest, they violate the Fourth Amendment if the amount of force they use is "objectively unreasonable in light of the facts and circumstances confronting them." *Rogoz v. City of Hartford*, 14-0876, __ F.3d __, 2015 WL 4716570, at *7, 2015 U.S. App. LEXIS 13945, at *19 (2d Cir. Aug. 10, 2015) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)) (internal quotations and marks omitted). A determination of reasonableness

> requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

*Id.* (quoting *Graham*, 490 U.S. at 396) (internal citation omitted). The doctrine of "[q]ualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct," *Rogoz*, 2015 WL 4716570, at *8, 2015 U.S. App. LEXIS 13945, at *20 (quoting *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012)).

### 1. Defendants Layng and Polniak

The Court adopts Magistrate Dancks' recommendation that summary judgment be granted as to defendants David M. Layng and Ryan H. Polniak. Plaintiff's allegations regarding the events as he was being transported into the police station – that the defendants "roughly pushed and man handled" him, while making "disrespectful and degrading comments" – are insufficient to withstand summary judgment. "Courts in the Second Circuit have consistently held that [m]ere threats, verbal harassment or profanity, without any injury or damage, are not

actionable under Section 1983." *Justice v. McGovern*, No. 11-CV-5076, 2012 WL 2155275, at *3, 2012 U.S. Dist. LEXIS 82077, at *9 (E.D.N.Y. June 12, 2012). The uncontroverted facts establish that the plaintiff was drunk, belligerent, and threatening the officers. Dkt. No. 26-11, ¶¶ 12-13; Dkt. No. 1, p. 5. Moreover, "[n]ot every push or shove, even if it may seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Graham*, 490 U.S. at 396. Plaintiff's allegation of being "roughly pushed and man handled" as he was brought into the police station, without more, is insufficient to withstand summary judgment. *See*, *e.g.*, *Breitkopf v. Gentile*, 41 F. Supp. 3d 220, 245-46 (E.D.N.Y. 2014) (collecting cases regarding *de minimis* use of force). Alternatively, the defendants' alleged conduct in bringing the plaintiff into the station would be protected by the doctrine of qualified immunity. *Id.*

With respect to the alleged incident inside the police station by Jenks, there is no evidence that either Layng or Polniak were present. "An individual may be held liable under . . . § 1983 only if that individual is 'personally involved in the alleged deprivation.'" *Littlejohn v. City of New York*, 14-1395-cv, __ F.3d __, 2015 WL 4604250, at *10, 2015 U.S. App. LEXIS 13475, at *32 (2d Cir. Aug. 3, 2015) (citation omitted). Plaintiff does not describe who, if anyone, was present when Jenks allegedly threw plaintiff into the wall. Dkt. No. 1, p. 5. Layng has submitted an affidavit explaining that he was at home when the vandalization occurred. Dkt. No. 26-16, p. 1. Layng stated that he was called in to the police station to investigate the damage to the police vehicles, and that he did not see plaintiff or come into contact with plaintiff at any point. Dkt. No. 26-16. Summary judgment is therefore appropriate as to Layng because plaintiff has failed to raise a material issue of fact regarding Layng's personal involvement in any Fourth Amendment violation.

Nor is there any evidence that Polniak was present for the alleged incident in which plaintiff was thrown into the wall. Polniak arrested plaintiff, and brought plaintiff into the police station with Jenks, but Jenks escorted Fisher towards the processing room with another officer. Dkt No. 26-11, ¶ 7-8. 15. When Polniak entered the processing room, plaintiff was face down on the ground on his stomach, being searched for weapons. *Id.*, ¶ 18; Dkt. No. 26-17, ¶ 9. Polniak has submitted an affidavit stating that "[a]t no time did either I, or any other officer I observed, strike, punch, or throw [plaintiff] into a wall." Dkt. No. 26-17, ¶ 14. There is no allegation that Polniak used excessive force or that Polniak was present during the excessive use of force, which might have created an obligation to prevent the use of excessive force by another officer. *See O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir. 1988) ("A law enforcement officer has an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated *in his presence* by other officers.") (emphasis added). Polniak is therefore entitled to summary judgment.

## 2. Defendant Jenks

Defendants' motion for summary judgment as to defendant Fay Jenks is denied because, in light of the verified complaint, there is a material issue of fact regarding whether Jenks used excessive force. While the uncontroverted facts establish that the plaintiff was drunk and belligerent, and that he tripped Jenks, plaintiff denied that he resisted the officers. There are therefore material issues of fact regarding whether plaintiff resisted the officers and whether any use of force by Jenks was objectively unreasonable. Although defendants argue that the Fourth Amendment claim is not viable because the plaintiff's alleged injuries were *de minimis*, plaintiff has alleged that he was thrown into a wall, face first, when he was handcuffed behind his back

and not resisting the officers, and that he had pain and swelling for two weeks, bruises on his upper body, and a cut on his right knee. These allegations are sufficient to raise a material issue of fact and preclude summary judgment. *See*, *e.g.*, *Robison v. Via*, 821 F.2d 913, 923-24 (2d Cir. 1987) (allegations that defendant pushed the plaintiff against the inside of a car door, yanked her out, threw her up against the fender and twisted her arm behind her back, resulting in bruises lasting a couple of weeks were sufficient to prevent the summary dismissal of a § 1983 excessive force claim).

Nor is Jenks entitled to summary judgment based upon the doctrine of qualified immunity. Actions which are less extreme than the conduct alleged here have been held sufficient to support a Fourth Amendment violation. *See*, *e.g.*, *Robison*, 821 F.2d at 923-24; *see also Maxwell v. City of New York*, 380 F.3d 106, 108 (2d Cir. 2004) (holding that summary judgment was inappropriate when plaintiff alleged that the officer's "use of force in making the arrest was sufficient to send pain into arm and lower back and leave her with a post-concussive syndrome"). Moreover, "the use of entirely gratuitous force is unreasonable and therefore excessive." *Tracy v. Freshwater*, 623 F.3d 90, 99 n.5 (2d Cir. 2010). The material issues of fact regarding whether plaintiff resisted and what, if any, force was used by Jenks preclude resolution of the issue of qualified immunity on summary judgment. *Hemphill v. Schott*, 141 F.3d 412, 418 (2d Cir. 1998).

### III. CONCLUSION

For these reasons, it is

**ORDERED** that the Report-Recommendation (Dkt. No. 35) is **ADOPTED** insofar as it recommends that defendants' motion for summary judgment (Dkt. No. 26) be granted as to

defendants David M. Layng and Ryan H. Polniak, and **REJECTED** only insofar is it recommends that summary judgment be granted as to defendant Fay Jenks; and it is further

**ORDERED** that defendants' motion for summary judgment (Dkt. No. 26) is **GRANTED** as to defendants David M. Layng and Ryan H. Polniak and **DENIED** as to defendant Fay Jenks; and it is further

**ORDERED** that the plaintiff's complaint (Dkt. No. 1) be dismissed as to defendants David M. Layng and Ryan H. Polniak; and it is further

**ORDERED** that the Clerk of the Court is directed to provide plaintiff with copies of the unpublished decisions cited in this Memorandum-Decision and Order; and it is further

**ORDERED** that the Clerk of the Court shall serve a copy of this Order upon plaintiff in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: August 17, 2015
      Syracuse, New York

Brenda K. Sannes
U.S. District Judge

2013 WL 4039377
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Robert JONES, Plaintiff,
v.
Brian FISCHER et al., Defendants.

No. 9:11–cv–774 (GLS/CFH).  |  Aug. 7, 2013.

**Attorneys and Law Firms**

Robert Jones, East Elmhurst, NY, pro se.

Hon. Eric T. Schneiderman, New York State Attorney
General, Richard Lombardo, Assistant Attorney General, of
Counsel, Albany, NY, for the Defendants.

*MEMORANDUM–DECISION AND ORDER*

GARY L. SHARPE, Chief Judge.

**I. *Introduction***

 **\*1** Plaintiff *pro se* Robert Jones commenced this action
against defendants Brian Fisher, Kenneth S. Perlman, Mr.
Phillips, Joseph Smith, William R. Steinhaus, Osbourne
McKay, and various John and Jane Does pursuant to
42 U.S.C. § 1983, the Americans with e Disabilities
Act (ADA),[1] the Rehabilitation Act,[2] New York State
Department of Corrections and Community Services
(DOCCS) Directive 2614, and the Religious Land Use
and Institutionalized Persons Act.[3] (*See* Am. Compl. ¶
12, Dkt. No. 7.) Jones' six enumerated claims pertain to:
discrimination under the ADA, Rehabilitation Act, and
DOCCS Directive 2614; the conditions of his confinement;
wrongful segregation; deliberate indifference to serious
medical needs; interference with the right of free exercise
of religion; and retaliation. (*See id.* ¶¶ 45–71.) He expressly
seeks a declaration that defendants violated his civil
rights, and compensatory and punitive damages; implicit
in his Amended Complaint is his pursuit of injunctive
relief requiring reasonable accommodations for his alleged
disability at a DOCCS facility. (*See id.* ¶ 30, at 11–12.) After
Steinhaus was dismissed as a party by the court *sua sponte,*
(*see* Dkt. No. 8), the remaining defendants interposed an
answer, and, eventually, moved for summary judgment, (*see*
Dkt. Nos. 27, 53.) Jones subsequently requested an extension
of time to file his response, which motion was granted by
text only order dated January 24, 2013; however, he failed
to timely file a response. (*See* Dkt. No. 56.) In a Report–
Recommendation and Order (R & R) dated March 21,
2013, Magistrate Judge Christian F. Hummel recommended
that defendants' motion be granted and Jones' Amended
Complaint be dismissed. (*See* Dkt. No. 57.) For the reasons
that follow, the R & R is adopted in its entirety.

| | |
|---|---|
| 1 | 42 U.S.C. §§ 12101–12300. |
| 2 | 29 U.S.C. §§ 701–796*l.* |
| 3 | 42 U.S.C. §§ 2000cc–1 to 2000cc–5. |

**II. *Background***

Jones is an inmate in the custody of DOCCS. (*See* Defs.'
Statement of Material Facts (SMF) § 3, Dkt. No. 53,
Attach. 6.) On February 24, 2011, Jones alleges that he was
transferred from Marcy Correctional to Wallkill Correctional
for the purpose of receiving vocational training in the
"Corcraft DSS/D[O]CCS Eyeglass Project Optical Lens
Laboratories," and for housing. (Am. Compl. ¶ 26; *see*
Defs.' SMF ¶ 6.) Jones further claims that, upon intake at
Wallkill, DOCCS officials noted that he needed the assistance
of crutches to ambulate, which rendered him ineligible for
housing given certain architectural limitations at that facility.
(*See* Defs.' SMF ¶ 7; Am. Compl. ¶¶ 27–31.) Because
of his "disability," Jones "was immediately transferred to
Shawangunk" Correctional. (Am. Compl. ¶ 32; *see* Defs.'
SMF ¶ 7.)

Once at Shawangunk, Jones claims that he was quarantined
in the infirmary from February 21, 2011 to April 2011, and
that while therein, he was not provided adequate heating or
clean water, which rendered the conditions of his confinement
"unfit for human habitation." (Am. Compl. ¶¶ 34–35; *see*
Defs.' SMF § 8.) In early April 2011,[4] Jones alleges that
he was transferred back to Marcy in retaliation for filing
a grievance "demanding a[r]easonable [a]ccomodation or to
be transferred to a suitable handicapped accessible facility
within five working days." (Am. Compl. ¶¶ 41–42.) Jones
commenced this action in July 2011. (*See* Dkt. No. 1.) Soon
thereafter, he filed the operative Amended Complaint. (*See*
Am. Compl.)

4    The court appreciates that Jones' Amended Complaint
     states that his transfer back to Marcy occurred "in early
     April 2001"; it is clear, given Jones' other allegations,
     that he intended to specify 2011, as opposed to 2001,
     as the year in which the transfer to Marcy occurred.
     (Am.Compl.¶ 42.)

### III. *Standard of Review*

**\*2**  Before entering final judgment, this court routinely
reviews all report and recommendation orders in cases it
has referred to a magistrate judge. If a party has objected
to specific elements of the magistrate judge's findings and
recommendations, this court reviews those findings and
recommendations *de novo.See Almonte v. N.Y. State Div. of
Parole,* No. 04–cv–484, 2006 WL 149049, at \*6–7 (N.D.N.Y.
Jan. 18, 2006). In those cases where no party has filed an
objection, or only a vague or general objection has been filed,
this court reviews the findings and recommendations of the
magistrate judge for clear error. [5] *See id.*

5    "[A] report is clearly erroneous if the court determines
     that there is a mistake of fact or law which is obvious and
     affects substantial rights."*Almonte,* 2006 W L 149049, at
     \*6.

### IV. *Discussion*

As a threshold matter, the court must determine what to make
of the document filed by Jones titled "Plaintiff[']s Objection
to Report & Recommendation" (hereinafter "the objections"),
and his late-filed response to defendants' summary judgment
motion. (*See* Dkt. Nos. 58, 59.)In the objections, Jones takes
issue with the R & R because, according to him, his claims
were "dismissed [f]or failure to respond" by February 5, 2013.
(Dkt. No. 58 ¶ 4.) Jones claims that he placed three copies
of his response in a mailbox at the facility in which he is housed
on February 5, 2013, and that, because of his indigence and
"an unwritten [prison] rule," his mail was delayed. (*Id.* at 1–
2.) [6] The objections also include a separate letter, the subject
of which is "Mail Box Rule," that reiterates Jones' contentions
and provides legal argument about the prisoner mailbox rule.
(*See* Dkt. No. 58, Attach. 1.)

6    Jones attempts to allege several new claims related to the
     supposed delay of his mail in the objections. (*See* Dkt.
     No. 58 ¶¶ 7–9.) Because the discovery deadlines
     have expired and Jones' new allegations have nothing

whatsoever to do with claims that were asserted in
the Amended Complaint, the court disregards Jones'
references to any new claims. *See Jackson v. Onondaga
Cnty.,* 549 F.Supp.2d 204, 219–20 (N.D.N.Y.2008); *see
also Wright v. Ernst & Young LLP,* 152 F.3d 169, 178
(2d Cir.1998).

The objections offer no other critique of the R & R, and can
be summarily rejected because Jones' only relevant attack
on the R & R—that his failure to respond was the basis for
dismissing his Amended Complaint, (*see* Dkt. No. 58 ¶ 4)—is
entirely mistaken. Indeed, the R & R acknowledged that Jones
failed to timely respond despite requesting and receiving an
extension of time, but, nonetheless, explained that "[e]ven
in the absence of a response, defendants [would be] entitled
to judgment only if the material facts demonstrate[d] their
entitlement to judgment as a matter of law."(Dkt. No. 57 at 3.)

Jones' response to defendants' summary judgment motion is a
more complicated matter. The cover letter to that submission,
which is dated January 5, 2013, is the same letter regarding
the prisoner mailbox rule that was filed as part of the
objections. (*Compare* Dkt. No. 59,*with* Dkt. No. 58, Attach. 1.)
The affidavit of service included with Jones' memorandum
of law in response to defendants' summary judgment motion,
indicates that, on February 5, 2013, Jones placed three copies
of his response papers in a mailbox at the facility where
he is housed. (*See* Dkt. No. 59, Attach. 1 at 26.) While the
court has some doubts about the authenticity of the affidavit
of service, [7] in an abundance of caution, it will treat Jones'
response as properly filed objections to the R & R. [8] In light
thereof, given the content of the response, the court conducts a
*de novo* review of the issues. *See Almonte,* 2006 WL 149049,
at \*6.

7    The affidavits of service accompanying Jones'
     memorandum of law, (*see* Dkt. No. 59, Attach. 1 at 26),
     affidavit, (*see* Dkt. No. 59, Attach. 2 at 4), and response
     to defendants' Statement of Material Facts, (*see* Dkt.
     No. 59, Attach. 3 at 6), are clearly photocopies of the
     same document, with the sole difference between them
     being that the affidavit of service to the memorandum
     of law indicates that "3 copies [of] Plaintiffs [ (sic) ]
     Opposition" were mailed.

8    Notably, in his response, Jones attempts to further
     augment his Amended Complaint by adding claims
     under the First Amendment, and Equal Protection and
     Due Process Clauses. (*See* Dkt. No. 59, Attach. 1 ¶¶
     34–35, 59.) Because those new allegations are made in
     response to a summary judgment motion, as opposed to

a motion to dismiss, and after discovery has concluded, they do not effectively amend the Amended Complaint, are rejected, and not considered. *See Onondaga Cnty., 549 F.Supp.2d at 220.*

**\*3** After careful consideration of the arguments advanced by Jones in his response to defendants' summary judgment motion, Judge Hummel's conclusion that dismissal is appropriate is correct largely for the reasons stated in the R & R. In addition to the analysis provided therein, two additional points ought be made.

First, as to whether or not Jones can obtain declaratory relief given the prospect that his transfer out of the facilities about which he complains would moot his claim for such relief, " '[t]he Eleventh Amendment and the principles governing the issuance of declaratory judgments prohibit the award of a declaration that state officials' prior conduct violated federal law.'" *La Scalia v. Driscoll,* No. 10–CV–5007, 2012 WL 1041456, at \*8 (E.D.N.Y. Mar. 26, 2012) (quoting *Rothenberg v. Stone,* 234 F.Supp.2d 217, 221 (E.D.N.Y.2002)); *see Ward v. Thomas,* 207 F.3d 114, 120 (2d Cir.2000). Thus, dismissal of that aspect of his Amended Complaint is undoubtedly warranted. Second, the R & R did not specifically address Jones' allegation of discrimination based upon DOCCS Directive 2614. (*See* Am. Compl. ¶¶ 45–51.) That claim, however, must be dismissed because "[v]iolations of state law do not give rise to claims under 42 U.S.C. § 1983[, and, m]ore specifically, a violation of a DOCCS directive does not state a claim for a constitutional violation under § 1983." *Tuitt v. Chase,* No. 9:11–CV–0776, 2013 WL 877439, at \*10 (N.D.N.Y. Jan. 30, 2013).

### V. *Conclusion*

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that Magistrate Judge Christian F. Hummel's ReportRecommendation and Order (Dkt. No. 57) is **ADOPTED** in its entirety; and it is further

**ORDERED** that defendants' motion for summary judgment (Dkt. No. 53) is **GRANTED;** and it is further

**ORDERED** that Jones' Amended Complaint (Dkt. No. 7) is **DISMISSED;** and it is further

**ORDERED** that the Clerk close this case; and it is further

**ORDERED** that the Clerk provide a copy of this MemorandumDecision and Order to the parties.

**IT IS SO ORDERED.**

ROBERT JONES,

Plaintiff,

v.

BRIAN FISCHER, Commissioner, DOCCS; KENNETH S. PERLMAN, Deputy Commissioner for Programs; JOSEPH SMITH, Superintendent, Shawangunk Correctional Facility; John Doe # 2–6, Employees of DOCCS; Jane Doe # 1–5, Employees of DOCCS; MR. PHILLIPS, Superintendent, Wallkill Correctional Facility; OSBOURNE McKAY, Deputy Commissioner of Industries/Accreditation Corcraft DSS/DOCCS Eyeglass Project Optical Lens Laboratory; State of New York Department of Corrections and Community Supervision,

Defendants. [1]

[1] By Decision and Order, "Mr. Phillips, Superintendent, Wallkill Correctional Facility" is a defendant in place of "John Doe # 1," "Osbourne McKay, Deputy Commissioner of Industries/Accreditation/Accreditation Corcraft DSS/ DOCCS Eyeglass Project Optical Lens Laboratory, State of New York Department of Corrections and Community Supervision," is a defendant in place of "Corcraft DSS/ DOCCS Eyeglass Project Optical Lens Laboratories," and defendant Dutchess County Executive William R. Steinhaus was dismissed without prejudice as a defendant in this action. Dkt. No. 8 at 2–3.

ROBERT JONES

Plaintiff Pro Se

3491201713

George Matchan Detention Center [2]

[2] The record reflects that the "George Matchan Detention Center" is actually spelled "George Motchan Detention Center." Dkt. No. 53–5 at 1. The latter spelling is used for this Report–Recommendation.

1515 Hazen Street

East Elmhurst, N.Y. 11370

## REPORT–RECOMMENDATION AND ORDER[3]

[3]  This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

CHRISTIAN F. HUMMEL, United States Magistrate Judge.

Plaintiff pro se Robert Jones ("Jones"), an inmate formerly in the custody of the New York State Department of Correctional and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants, five DOCCS employees, five Jane Does, four John Does, and DOCCS, violated his constitutional rights under the First, Eighth, and Fourteenth Amendments. Am. Compl. (Dkt. No. 7). Jones also asserts claims pursuant to Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., the Rehabilitation Act, 29 U.S.C. § 701 et seq., and the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc–1 et seq. Id. Presently pending is defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56. Dkt. No. 53. Jones has not opposed the motion. For the following reasons, it is recommended that defendants' motion be granted in part and denied in part.

### I. Failure to Respond

**\*4**  Jones did not oppose defendants' motion although he was granted an extension of time to do so. See Text Order dated 1/24/2013. "Summary judgment should not be entered by default against a pro se plaintiff who has not been given any notice that failure to respond will be deemed a default." Champion v. Artuz, 76 F.3d 483, 486 (2d Cir.1996). Defendants provided notice in their motion papers as required by the Second Circuit and as normally done by the office of defendants' counsel. Id.; Dkt. No. 53–1. Further, the Court provided such notice by mail. Dkt. No. 55–1. Despite both the notice and the extension of time, Jones failed to respond.

"The fact that there has been no response to a summary judgment motion does not ... mean that the motion is to be granted automatically." Champion, 76 F.3d at 486. Even in the absence of a response, defendants are entitled to judgment only if the material facts demonstrate their entitlement to judgment as a matter of law. Id.; FED. R. CIV. P. 56(c). "A verified complaint is to be treated as an affidavit ... and

therefore will be considered in determining whether material issues of fact exist...." Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir.1995) (citations omitted). The facts set forth in defendants' Rule 7.1 Statement of Material Facts (Dkt. No. 53–6) [hereinafter "Defs.' Statement"] are accepted as true as to those facts that are not disputed in Jones's verified amended complaint.[4] N.D.N.Y .L.R. 7.1(a)(3) ("The Court shall deem admitted any properly supported facts set forth in the Statement of Facts that the opposing party does not specifically controvert.") (emphasis omitted).

[4]  Generally, "[a] party shall not incorporate any portion of its prior pleading into the proposed amended pleading by reference." N.D.N.Y.L.R. 7.1(a)(4). Jones referenced three exhibits in his amended complaint that clearly refer to the exhibits attached to his original complaint. This Court considers his amended complaint as including those original exhibits.

### II. Background

On February 24, 2011, Jones was transferred from Marcy Correctional Facility ("Marcy") to Wallkill Correctional Facility ("Wallkill") for housing and vocational training. Defs.' Statement ¶ 6; Am. Compl. ¶ 26. Jones alleged that Wallkill presented architectural barriers to his alleged disabilities. Defs.' Statement ¶ 7; Am. Compl. ¶¶ 30–31. Jones was then transferred to the Shawangunk Correctional Facility ("Shawangunk"). Defs.' Statement ¶ 7; Am. Compl. ¶ 32. Upon his arrival at Shawangunk, Jones alleged that he was "quarantined" in the infirmary, which lacked adequate heating and clean drinking water from February 24, 2011 through April 2011. Defs.' Statement ¶ 8; Am. Compl. ¶¶ 34–35.

As of December 12, 2012, DOCCS's records show that Jones had filed five grievances, two of which were filed at Marcy in 2010. Defs.' Statement ¶ 16; Hale Aff. (Dkt. No. 53–3) ¶ 4; Dkt. No. 53–4. Jones is currently at the George Motchan Detention Center, which is a New York City facility. Defs.' Statement ¶ 5; Dkt. No. 53–5.

For purposes of § 1983, Jones alleged that defendants acted in their individual and official capacities. Defs.' Statement ¶ 9; Am. Compl. ¶ 21. For the ADA and Rehabilitation Act claims, Jones alleged that defendant Phillips discriminated against him generally and defendant McKay discriminated against him by denying him access to the Optics program for

vocational training. Defs.' Statement ¶ 10; Am. Compl. ¶¶ 47, 49.

**\*5** For the conditions of confinement [5] and wrongful segregation claims, Jones listed all defendants in the point-headings but did not make specific allegations as to any defendant. Defs.' Statement ¶¶ 11–12; Am. Compl. ¶¶ 52–60. For the medical indifference claim, Jones alleged that

> [5] Jones labeled this claim as a "failure to protect." Am. Compl. ¶ ¶ 52–56. However, his allegations surrounding inadequate heating and the unavailability of clean drinking water are more appropriately framed as a "conditions of confinement" claim.

[all defendants] owed a duty of care to [him] and failed in that duty, and were deliberately indifferent to [his] disability and serious medical needs by failing to provide necessary reasonable accommodations for the handicapped at Wallkill [C]orrectional [F]acility, thereby depriving [him] access to the federally funded Optics program for which he was otherwise eligible.

Defs.' Statement ¶ 13; Am. Compl. ¶ 62.

For his RLUIPA claim, Jones asserted "the defendants would not allow him to attend religious services for over thirty days, nor did they provide a Muslim chaplain to see him or conduct services." Defs.' Statement ¶ 14; Am. Compl. ¶ 67. And finally, for his First Amendment retaliation claim, Jones did not make specific allegations against any particular defendant. Defs.' Statement ¶ 15; Am. Compl. ¶¶ 70–71.

Phillips has not been served in this action. Defs.' Statement ¶ 10; Dkt. No. 11 (returning summons because Wallkill did not have a superintendent named Phillips).

### III. Service of Summon and Complaint

Defendants, though modestly, argue that since Phillips has not been served with process, he should be dismissed from this action. Defs.' Mem. of Law (Dkt. No. 7) at 4. Where a defendant has not been served with process within 120 days after the complaint is filed, the Court must, on motion or *sua sponte* after notifying the plaintiff, dismiss the complaint without prejudice as to that defendant or "order that service be made within a specified time." FED. R. CIV. P. 4(m). If, however, the plaintiff demonstrates good cause for service failures, the Court must also extend the time to serve. *Id.* Additionally, the Second Circuit has held that "district courts

have discretion to grant extensions even in the absence of good cause." *Zapata v. City of New York,* 502 F.3d 192, 196 (2d Cir.2007).

In this case, more than one year had passed since Jones filed his amended complaint on October 25, 2011, naming Phillips a defendant. Am. Compl. Even though Jones had updated the Court with his new addresses (Dkt.Nos.12, 24, 25) and requested and received an extension to respond to this instant motion, Jones has failed to provide the Court with any reasons, let alone good cause, for the service failure with Phillips. Jones failed to both seek assistance with the service failure and oppose defendants' motion. Thus, Phillips should be dismissed from this action.

Accordingly, defendants' motion on this ground should be granted.

### IV. Discussion

Jones contends that his rights were violated under the First, Eighth, and Fourteenth Amendments, the ADA, Rehabilitation Act, and RLUIPA. Defendants move for summary judgment on the issues of mootness, exhaustion, Eleventh Amendment immunity, personal involvement, and Jones's failure to state an ADA claim.

### A. Mootness

**\*6** Article III, Section 2, Clause 1 of the United States Constitution limits the jurisdiction of federal courts to resolve "cases" or "controversies." U.S. CONST. art. III, § 2, cl.1. In order "[t]o sustain ... jurisdiction in the present case, it is not enough that a dispute [be] very much alive when suit was filed, or when review was obtained...." *Lewis v. Continental Bank Corp.,* 494 U.S. 472, 477 (1990)). Thus, "throughout the litigation, the plaintiff 'must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision.' " *Spencer v. Kemna,* 523 U.S. 1, 7 (1998) (*quoting Lewis,* 494 U.S. at 477 (1990)).

In this case, although not expressly stated, the nature of Jones's claims makes out a request for injunctive relief. *See, e.g.,* Am. Compl. ¶ 30 (enumerating Wallkill's architectural barriers for inmates with disabilities, including *inter alia* the lack of handrails in the showers, wheelchair ramps, and

low level sinks), ¶¶ 34–35 (alleging Shawangunk's failure to provide adequate heating and clean water when quarantined at Shawangunk). Jones expressly seeks declaratory relief. Am. Compl. at 12. Jones was previously incarcerated at Marcy, Wallkill, and Shawangunk. Jones's transfer from a these correctional facilities to George Motchan moots any claims for injunctive or declaratory relief. Therefore, there is no live controversy and the Court no longer has jurisdiction over these potential claims for relief. *See, e.g., Salahuddin v. Goord,* 467 F.3d 263, 272 (2d Cir.2006) (holding that all injunctive and declaratory claims were mooted by the plaintiff's transfer from a prison facility); *Prins v. Coughlin,* 76 F.3d 504, 506 (2d Cir.1996) ("It is settled in this Circuit that a transfer from a prison facility moots an action for injunctive relief against the transferring facility").

Accordingly, defendants' motion on this ground should be granted.

## B. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts.*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). "Conclusory allegations or unsubstantiated speculation" may not be relied upon. *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005) (citations omitted). The non-movant "must offer some hard evidence showing that its version of the events is not wholly fanciful."*Id.* (citing *D'Amico v. City of New York,* 132 F.3d 145, 149 (2d Cir.1998)) (internal quotation marks omitted). It must be apparent that no rational finder of fact could find in favor of the non-moving

party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.* 22 F.3d 1219, 1223–24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

**\*7** When, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," ... that a pro se litigant's submissions must be construed "liberally,"... and that such submissions must be read to raise the strongest arguments that they "suggest,".... At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by pro se litigants,"... and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law...."

*Id.*(citations and footnote omitted); *see also Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 191–92 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds pro se, ... a court is obliged to construe his pleadings liberally.' " (citations omitted)). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion; the requirement is that there be no genuine issue of material fact.*Anderson,* 477 U.S. at 247–48.

## C. Exhaustion

Under the Prison Litigation Reform Act of 1995 ("PLRA"), 42 U.S .C. § 1997e(a), an inmate must exhaust all administrative remedies prior to bringing any suits challenging prison conditions, including federal civil rights cases.*Porter v. Nussle,* 534 U.S. 516, 524 (2002); *see also Woodford v. Ngo,* 548 U.S. 81, 83 (2006). This exhaustion requirement applies to all prison condition claims. *Porter,* 534 U.S. at 532. "[A]ny deprivation that does not affect the fact or duration of a prisoner's overall confinement is necessarily a condition of that confinement."*Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999). The exhaustion requirement also applies even if the administrative grievance process does not provide

for all the relief requested by the inmate. *Nussle,* 534 U.S. at 524.

Exhaustion for an inmate in DOCCS custody is generally achieved through the Inmate Grievance Program ("IGP").*See*N.Y. COMP.CODES R. & REGS. tit. 7, § 701.1, *et seq.* (2012).

> The IGP has a regular three-tiered process for adjudicating inmate complaints: (1) the prisoner files a grievance with the Inmate Grievance Resolution Committee ("IGRC") [;] (2) the prisoner may appeal an adverse decision by the IGRC to the superintendent of the facility[;] and (3) the prisoner then may appeal an adverse decision by the superintendent to the Central Officer Review Committee ("CORC").

**\*8** *Espinal v. Goord,* 588 F.3d 119, 125 (2d Cir.2009) (citing in footnote, the current N.Y. COMP.CODES R. & REGS. tit. 7, § 701.5 (2012)). Exhaustion must precede filing a lawsuit. *Neal v. Goord,* 267 F.3d 116, 122 (2d Cir.2001) ("Subsequent exhaustion after suit is filed therefore is insufficient."), *abrogated in part on other grounds by*Porter, 534 U.S. 516.

While the Supreme Court has deemed exhaustion mandatory, the Second Circuit has recognized that "certain caveats apply." *Ruggiero v. Cnty. of Orange,* 467 F.3d 170, 175 (2d Cir.2006) (citing *Giano v. Goord,* 380 F.3d 670, 677 (2d Cir.2004)). The failure to exhaust may be excused in limited circumstances.

> In determining whether such an exception is applicable, a district court must apply a three-part test: First, the court must determine whether administrative remedies in fact were available to the prisoner. Second, if such remedies were available, the court must determine whether the defendants' own actions inhibited the inmate's exhaustion of administrative remedies, thereby requiring that one or more of them be equitably estopped from raising the failure to exhaust as a defense. Finally, if administrative remedies were available and the

> defendants are not estopped, the court must determine whether any special circumstances justify the prisoner's failure to comply with administrative procedural requirements.

*Gayle v. Benware,* 716 F.Supp.2d 293, 298 (S.D.N.Y.2010) (internal citations omitted); *see generally Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004) (articulating above test as the appropriate method for excusing failure to exhaust given the present state of all Second Circuit opinions)."Unavailability of administrative remedies ... is an objective [test]: that is, would a similarly situated individual of ordinary firmness have deemed them unavailable."*Kasiem v. Switz,* 756 F.Supp.2d 570, 576–77 (S.D.N.Y.2010) (internal quotation marks and citations omitted). Estoppel occurs when "an inmate reasonably understands that pursuing a grievance through the administrative process will be futile or impossible ... [as evidenced by] prison officials' threats, beatings, ... denials of grievance forms, or by other misconduct deterring [the inmate] from fulfilling the requisite procedure."*Id.* at 577 (internal quotation marks and citations omitted). If an inmate claims estoppel and continues to file complaints and grievances, the exception is inapplicable. *Id.* Special circumstances exist when an inmate's failure to comply can be justified. *Id.* (citations omitted). Justification is found "by looking at the circumstances which might understandably lead usually uncounselled prisoners to fail to grieve in the normally required way."*Giano v. Goord,* 380 F.3d 670, 678 (2d Cir.2004) (citations omitted).

In this case, a question of fact remains with respect to whether a special circumstance justifies Jones's failure to comply with exhaustion requirements. DOCCS's records show that no grievances were filed or appealed in 2011 and none of Jones's documented grievances involved inadequate heating and water, access to programming, or participation in religious activities. On the other hand, Jones submitted a grievance dated April 12, 2011 addressed to Wallkill while he was housed at Marcy, complaining of the confinement conditions and lack of accommodations at Wallkill and Shawangunk. [6] Dkt. No. 1–1 at 3. Non-party and Wallkill employee P. Henn responded that pursuant to Directive # 4040, Jones must file the grievance at Marcy, where Jones was housed, even though the grievance was filed against Wallkill's employees. *Id.* at 9. Per these instructions, Jones submitted a grievance letter to Marcy, which was unanswered. [7] Am. Compl. ¶¶ 10, 17–18, 44. Jones explained that the silence to his complaints compelled him to file

this lawsuit. *Id.* ¶ 20. Exhaustion is an affirmative defense that defendants bear the burden of raising and proving. *Jones v. Bock,* 549 U.S. 199, 211–17 (2007). Defendants' reliance on DOCCS's records to contest Jones's allegations is insufficient to show an absence of a factual dispute because an unanswered grievance, presumably, would not be documented in DOCCS's records. Thus, based on the evidence before the Court, there remains a question of fact as to whether Jones should be excused from the exhaustion requirement. [8]

[6]　　Jones also alleged that he filed two more grievances. Jones submitted a letter dated March 13, 2011 requesting Wallkill to send his legal papers to him at Shawangunk. Dkt. No. 1–1 at 1. Jones confirmed that he received his legal work and referenced an attached exhibit containing a March 13, 2011 grievance. *Id.* However, the exhibit is a grievance dated April 12, 2011, not March 13. *Id.* at 2. The second grievance was filed on March 28, 2011, but Shawangunk did not respond, Am. Compl. ¶ 16, nor did Jones present it to the Court.

[7]　　Jones alleged that he wrote a letter to non-party Bellnier, Marcy's superintendent, which was left unanswered. Am. Compl. ¶ 19. However, this letter was not submitted to the Court.

[8]　　For the first part of the test, Jones does not contend that the grievance procedure was unavailable to him. As for the second part, Jones's unanswered grievance addressed to Marcy did not concern Marcy's employees, who are also not parties to this action. Therefore, those two steps do not present an issue of fact for the exhaustion analysis.

**\*9** Accordingly, defendants' motion on this ground should be denied.

### D. Eleventh Amendment

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. "[D]espite the limited terms of the Eleventh Amendment, a federal court [cannot] entertain a suit brought by a citizen against his [or her] own State ." *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 98 (1984) (citing *Hans v. Louisiana,* 134 U.S. 1, 21 (1890)). Regardless of the nature of the relief sought, in the absence of the State's consent

or waiver of immunity, a suit against the State or one of its agencies or departments is proscribed by the Eleventh Amendment. *Halderman,* 465 U.S. at 100. Section 1983 claims do not abrogate the Eleventh Amendment immunity of the states. *See Quern v. Jordan,* 440 U.S. 332, 340–41 (1979).

A suit against a state official in his or her official capacity is a suit against the entity that employs the official. *Farid v. Smith,* 850 F.2d 917, 921 (2d Cir.1988) (*citing Edelman v. Jordan,* 415 U.S. 651, 663 (1974)). "Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself," rendering the latter suit for money damages barred even though it was asserted against the individual officer. *Kentucky v. Graham,* 473 U.S. 159, 166 (1985). Here, Jones seeks monetary damages against defendants in their official capacities for acts occurring within the scope of their duties with DOCCS. Thus, the Eleventh Amendment bar applies and serves to prohibit Jones's claims for monetary damages against defendants in their official capacities.

Accordingly, defendants' motion on this ground should be granted.

### E. Personal Involvement

Defendants contend that, Jones failed to establish their personal involvement in the alleged constitutional violations. Defs.' Mem. of Law at 12–13. " '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.;Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered "personally involved" if:

(1) [T]he defendant participated directly in the alleged constitutional violation;

(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong; the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

**\*10**  (3) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)). [9]

[9]  Various courts in the Second Circuit have postulated how, if at all, the Iqbal decision affected the five *Colon* factors which were traditionally used to determine personal involvement. *Pearce v. Estate of Longo,* 766 F.Supp.2d 367, 376 (N.D.N.Y.2011), *rev'd* in part on *other grounds* sub *nom.,* *Pearce v. Labella,* 473 F. App'x 16 (2d Cir.2012) (recognizing that several district courts in the Second Circuit have debated *Iqbal's* impact on the five *Colon* factors); *Kleehammer v. Monroe Cnty.,* 743 F.Supp.2d 175 (W.D.N.Y.2010) (holding that "[o]nly the first and part of the third *Colon* categories pass *Iqbal's* muster...."); *D'Olimpio v. Crisafi,* 718 F.Supp.2d 340, 347 (S.D.N.Y.2010) (disagreeing that Iqbal eliminated *Colon's* personal involvement standard).

Jones essentially alleged that all defendants were directly involved in the alleged constitutional violations that occurred at Wallkill and Shawangunk. However, only two defendants allegedly worked at either facility—Superintendent Phillips at Wallkill, who was not served with process in this action, and Superintendent Smith at Shawangunk. Further, Jones's conclusory allegations with respect to defendants' direct involvement are unsubstantiated by any facts or evidence. *Jeffreys,* 426 F.3d at 554. Moreover, liberally construing Jones's amended complaint, aside for the unnamed defendants, the gravamen of Jones's complaints against the individual defendants is that they were in a position of power, thus always involved with anything occurring in conjunction with Jones's incarceration. Nevertheless, attempts to establish personal involvement based upon the supervisory role these defendants occupied is inappropriate. *Wright,* 21 F.3d at 501 (holding that a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement).

To the extent that Jones seeks to establish Phillips's knowledge of his complaints through Henn's response to his grievance, such an attempt must also fail. Merely writing letters and grievances to a defendant is insufficient to establish notice and personal involvement. *Smart v. Goord,* 441 F.Supp.2d 631, 643 (S.D.N.Y.2006) ("Commissioner ... cannot be held liable on the sole basis that he did not act in response to letters of protest sent by [plaintiff]...."). Similarly, receipt of a letter or grievance, without personally investigating or acting on the letter or grievance, is insufficient to establish personal involvement. *See, e.g., Rivera v. Fischer,* 655 F.Supp.2d 235, 238 (W.D.N.Y .2009) (citing cases); *Boddie v. Morgenthau,* 342 F.Supp.2d 193, 203 (S.D.N.Y.2004) ("While mere receipt of a letter from a prisoner is insufficient to establish individual liability ... [p]ersonal involvement will be found ... where a supervisory official receives and acts on a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint."). There is neither record evidence indicating that Jones wrote a letter or grievance to Phillips nor that Phillips investigated or acted on any of Jones's complaints. Furthermore, there is also nothing in the record indicating that any of the defendants created a policy or custom under which unconstitutional practices occurred, were grossly negligent in their supervision of subordinates, or exhibited deliberate indifference to Jones's rights.

**\*11**  Accordingly, defendants' motion on this ground should be granted.

### F. ADA and Rehabilitation Act Claims

In order to state an ADA claim, 42 U.S.C. § 12132 requires an inmate to demonstrate that:

> (1) he or she is a 'qualified individual with a disability'; (2) he or she is being excluded from participation in, or being denied the benefits of some service, program, or activity by reason of his or her disability; and (3) the entity [that] provides the service, program, or activity is a public entity.

*Id.; see also Pennsylvania Dep't of Corr.,* 524 U.S. at 209.

As to the first element, a person is an individual with a qualified disability if "(A) a physical or mental impairment... substantially limits one or more of the major life activities of such individual, (B) [there is] a record of such an impairment, or (C) [the individual is] being regarded as having such an impairment."42 U.S.C. § 12102(1)(A)-(C).

To determine if an individual meets any of the above criteria, courts apply a three part test ... First, a plaintiff must show that [he or] she suffers from a physical or mental impairment. Second, the plaintiff must establish that the activity [he or] she alleges to be impaired constitutes a "major life activity." Third, the plaintiff must show that [his or] her impairment "substantially limits" the major life activity previously identified.

*Smith v. Masterson,* 538 F.Supp.2d 653, 657 (S.D.N.Y.2008) (internal citations omitted). Major life activities are defined as "walking, standing, sitting...." 29 C.F.R. § 1630.2(i)(1).

In this case, Jones is barred from bringing an ADA claim. First, under the ADA, Jones is barred from suing the individual defendants in their individual and official capacities for monetary damages. *Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn,* 280 F.3d 98, 107 (2d Cir.2001). Second, Jones may seek monetary relief against the state if the alleged violation "was motivated by discriminatory animus or ill will based on the plaintiff's disability." *Id.* at 111.However, Jones does not allege any discriminatory animus on the part of the defendants. Thus, Jones is barred from seeking monetary relief from the state defendant. Third, as discussed above in subsection IV(A), injunctive and declaratory relief claims are mooted by Jones's transfer out of the allegedly offending prison facilities. Because Jones cannot obtain any sort of judicial relief under an ADA claim, Jones cannot proceed with the claim. Therefore, Jones's ADA claim should be dismissed.

To the extent that Jones has asserted Rehabilitation Act claims, they too, should be dismissed. The Rehabilitation Act protects any "qualified individual with a disability ... [from] be[ing] excluded from the participation in, ... [or] denied the benefits of," any federally funded program "solely by reason of his or her disability...." 29 U.S.C. § 794(a); *see also Clarkson v. Coughlin,* 898 F.Supp. 1019, 1037–38 (S.D.N.Y.1995) ("The requirements for stating a claim under the ADA are virtually identical to those under § 504 of the Rehabilitation Act."). Since Jones is barred from obtaining judicial relief under the ADA and the requirements for stating a claim are the same for the ADA and the Rehabilitation Act, Jones is also barred from obtaining judicial relief under the Rehabilitation Act claim.

**\*12** Accordingly, defendants' motion on these grounds should be granted.

### G. RLUIPA Claims

Defendants do not discuss Jones's RLUIPA claim in their motion for summary judgment. However, the Court *sua sponte* addresses the claim pursuant to 28 U.S.C. § 1915(e), which directs that when a plaintiff seeks to proceed *in forma pauperis,* [10] "the court shall dismiss the case at any time if the court determines that ... the action or appeal (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief."28 U.S.C. § 1915(e)(2)(B).

[10]    By Decision and Order dated September 23, 2011, Jones was granted in *forma pauperis* status to proceed in this action. Dkt. No. 4.

The RLUIPA provides that

[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... unless the government demonstrates that imposition of the burden on that person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc–1(a); *see also Salahuddin v. Goord,* 467 F.3d 263, 273–74 (2d Cir.2006); *Pugh v. Goord,* 571 F.Supp.2d 477, 503 (S.D.N.Y.2008). In a RLUIPA claim,

[i]f a plaintiff produces prima facie evidence to support a claim alleging a violation of the Free Exercise Clause or a violation of section 2000cc of this title, the government shall bear the burden of persuasion on any element of the claim, except that the plaintiff shall bear the burden of persuasion on whether the law (including a regulation) or government practice that is challenged by the claim

substantially burdens the plaintiff's exercise of religion.

42 U.S.C. § 2000cc–2(b); *Pugh,* 571 F.Supp.2d at 504. "The prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs. The defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct." *Salahuddin,* 467 F.3d at 274–75.

Here, Jones's RLUIPA claim must fail as a matter of law. First, Jones does not proffer any evidence to support his allegations that he was denied opportunities to attend religious services nor to visit a Muslim chaplain. 42 U.S.C. § 2000cc–2(b); *Jeffreys,* 426 F.3d at 554. The exhibits attached to his original complaint do not refer to these allegations and Jones has provided no other evidence to the Court. Thus, Jones has failed to establish a prima facie case of RLUIPA. Second, the Eleventh Amendment also serves to protect state defendants in both their official and individual capacities from RLUIPA claims for monetary damages. *See Pilgrim v.. Artus,* No. 07–CV–1001 (GLS/RFT), 2010 WL 3724883, at *15–16 (N.D.N.Y. Mar. 18, 2010) (discussing Eleventh Amendment immunity and RLUIPA decisions in this Circuit);[11] *see also Pugh v. Goord,* 571 F.Supp.2d 477, 509 (S.D.N.Y.2008). As such, defendants are immune from monetary relief. 28 U.S.C. § 1915(e)(2) (B). Third, as discussed above in subsection IV(A), claims of injunctive and declaratory relief are now moot. For these reasons, Jones cannot proceed with his RLUIPA claim.

[11]   All unpublished opinions cited to by the Court in this Report–Recommendation are, unless otherwise noted, attached to this Recommendation.

**\*13**   Accordingly, Jones's RLUIPA claim should be dismissed.

### V. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that defendants' motion for summary judgment (Dkt. No. 53) be **GRANTED** as to all claims against all defendants and Jones's amended complaint be **DISMISSED** (Dkt. No. 7) with prejudice.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

### All Citations

Slip Copy, 2013 WL 4039377

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 2155275
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Allah JUSTICE, Plaintiff,

v.

Corporal McGOVERN, Defendant.

No. 11–CV–5076 (JS)(WDW).  |  June 12, 2012.

**Attorneys and Law Firms**

Allah Justice, East Meadow, NY, pro se.

Liora M. Ben–Sorek, Esq., Nassau County Attorney's Office, Mineola, NY, for Defendant.

### *MEMORANDUM & ORDER*

SEYBERT, District Judge.

 **\*1**  Presently pending before the Court is Defendant Corporal McGovern's ("McGovern") motion to dismiss Plaintiff Allah Justice's Complaint. For the reasons that follow, McGovern's motion is GRANTED.

### *BACKGROUND*

Plaintiff commenced this *pro se* action against McGovern and the Sheriff of the Nassau County Correctional Facility [1] ("NCCC") alleging violations of his civil rights pursuant to 42 U.S.C. § 1983. The Complaint, which is handwritten on the Court's civil rights complaint form, alleges a single paragraph which states that:

[1]  The Court previously took judicial notice that the Sheriff of Nassau County is Michael J. Sposato. (Docket Entry 6, at n. 1.)

On September 8th 2011 while entering the Nassau County jail I was approached by c/o Corporal McGovern and was threatened by him that he was going to harm me the first chance he got. I was told that I would be seriously injured when the time is right. I was assaulted by Corporal McGovern and five other c/o's in August of 2008 in which a lawsuit was filed.

(Compl.¶ IV.) Plaintiff asserts that there is a grievance procedure in place at NCCC, and, in accordance with that procedure, he notified "them" [2] of the incident that took place on September 8 and was seen by "I–A–U" on October 4, 2011. (Compl.¶ II.)

[2]  The Complaint does not specify who he notified or how.

Although Plaintiff does not allege that he sustained any injuries or needed any medical treatment as a result of the incident (Compl.¶ IV.A), he seeks to recover $20,000,000 (Compl.¶ V). Plaintiff also seeks to have the Defendant "removed from his place of employment and jailed for his actions."(Compl.¶ V.)

The Complaint, filed on October 17, 2011, was accompanied by an application to proceed *in forma pauperis.*On December 6, 2011, this Court granted Plaintiff's request to proceed without prepayment of the filing fee but dismissed the claims asserted against the Nassau County Sheriff pursuant to 28 U.S.C. § 1915(e)(2)(B) because "Plaintiff's Complaint does not include any factual allegations sufficient to demonstrate any personal involvement of Defendant Sposato."(Docket Entry 6, at 6.)

On December 26, 2011, McGovern filed the pending motion to dismiss the remainder of the Complaint for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Docket Entry 8.)

### *DISCUSSION*

**I. *Standard of Review***

In deciding Rule 12(b)(6) motions to dismiss, the Court applies a "plausibility standard," which is guided by "[t]wo working principles." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009). First, although the Court must accept all of a complaint's allegations as true, this "tenet" is "inapplicable to legal conclusions;" thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."*Harris,* 572 F.3d at 72 (alteration in original) (quoting *Iqbal,* 556 U.S. at 678)

(internal quotation marks omitted). Second, only complaints that state a "plausible claim for relief" survive a motion to dismiss. *Id.* (internal quotation marks and citation omitted). Determining whether a complaint does so is "a context-specific task that requires the reviewing court to draw

on its judicial experience and common sense."*Id.* (internal quotation marks and citation omitted).

**\*2** *Pro se* plaintiffs enjoy a somewhat more liberal pleading standard. *See Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) ("[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.") (internal quotation marks and citation omitted). However, *pro se* plaintiffs must still comport with the procedural and substantive rules of law. *Colo. Capital v. Owens,* 227 F.R.D. 181, 186 (E.D.N.Y.2005).

**II.** *McGovern's Motion to Dismiss*

McGovern moves to dismiss on the grounds that: (1) Plaintiff failed to exhaust his administrative remedies prior to commencing suit and (2) Plaintiff otherwise failed to state a claim for relief.

**A.** *Failure to Exhaust Administrative Remedies*

The Prison Litigation Reform Act ("PLRA") provides, in relevant part, that: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."42 U.S.C. § 1997e(a). This exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."*Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). However, failure to exhaust is an affirmative defense, and the Supreme Court has held that "inmates are not required to specially plead or demonstrate exhaustion in their complaints."*Jones v. Bock,* 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007)."Dismissal under Rule 12(b)(6) for failure to exhaust is thus appropriate only where nonexhaustion is apparent from the face of the complaint."*Roland v. Smith,* —— F.Supp.2d ——, 2012 WL 601071, at *2 (S.D.N.Y. Feb. 22, 2012) (citing *McCoy v. Goord,* 255 F.Supp.2d 233, 251 (S.D.N.Y.2003)).

Here, Plaintiff's Complaint states that he "present[ed] the facts relating to [his] complaint in the prisoner grievance procedure" in place at NCCC by "notif [ying] them of the incident."(Compl.¶ II.B–C.) He was ultimately seen by "I–A–U" on October 4, 2011 (Compl.¶ II.C.2) and was told "that no promises would be made that any full and active investigation

would be made" (Pl. Reply 2). McGovern argues that this clearly and unequivocally demonstrates that Plaintiff "has not waited until the conclusion of the investigation, and thus the end of the grievance procedure"[3] to commence suit, so his Complaint must be dismissed for failure to exhaust the grievance procedures. (McGovern Mot. 6.) However, courts in this Circuit have held that "a *pro se* plaintiff's pleading references to various efforts that he had made to bring alleged prison violations to the attention of the prison authorities cannot be treated as tantamount to an admission that he had not exhausted his administrative remedies."*White v. Schriro,* No. 11–CV–5285, 2012 WL 1414450, at *6 (S.D.N .Y. Mar. 7, 2012) (internal quotation marks and citation omitted) (collecting cases), *adopted by* 2012 WL 1450422 (Apr. 23, 2012). Thus, "[a] ccepting [McGovern's] argument-that it is 'clear' that [P]laintiff has *not* exhausted unless he pleads that he has—would impose the very pleading burden that the Supreme Court rejected in *Jones."Id.* Accordingly, the Court declines to dismiss the Complaint at this stage of the litigation for lack of exhaustion.

[3]     McGovern asserts that there is a three-step administrative review process for inmate grievances: *first,* the inmate must submit a complaint to the Grievance Clerk, which is transferred to the inmate grievance resolution committee ("IGRC") for investigation and review; *second,* after receiving a decision from the IGRC, the inmate must appeal to the superintendent of the facility; and *finally,* the inmate must appeal the superintendent's decision to the Central Office Review Committee for a final administrative determination. (McGovern Mot. 6 (citing *Sanchez v. Fischer,* No. 03–CV–4433, 2005 WL 1021178, at *4 (S.D.N.Y. May 2, 2005)).)

**B.** *Failure to State a Claim under 42 U.S.C. § 1983*

**\*3** McGovern also argues that Plaintiff's Complaint must be dismissed for failure to state a claim under 42 U.S.C. § 1983. Section 1983 provides in relevant part that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law ....

Thus, for a plaintiff to state a claim under § 1983, the complaint must allege that "(1) the challenged conduct was attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States." *Snider v. Dylag,* 188 F.3d 51, 53 (2d Cir.1999) (citing *Dwares v. City of N.Y.,* 985 F.2d 94, 98 (2d Cir.1993)). Here, McGovern does not dispute he was acting under color of state law. The issue, therefore, is whether his conduct deprived Plaintiff of a constitutionally protected right.

The Court reads Plaintiff's Complaint broadly to assert two claims under Section 1983: one for excessive force under the Eighth Amendment and one for retaliation under the First Amendment.

**1.** *Excessive Force Claim*
McGovern argues that Plaintiff's excessive force claim—*i.e.,* his claim that McGovern's threats violated his right to be free from cruel and unusual punishment under the Eighth Amendment—must be dismissed because Plaintiff failed to plead that McGovern's threats resulted in any injury. (McGovern Mot. 4.) The Court agrees. Courts in the Second Circuit have consistently held that "[m]ere threats, verbal harassment or profanity, without any injury or damage, are not actionable under Section 1983." *Mateo v. O'Connor,* No. 10–CV–8426, 2012 WL 1075830, at *4 (S.D.N.Y. Mar. 29, 2012); *see also Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986) (dismissing defendant's claims against a guard for calling him names without alleging "any appreciable injury"); *Shabazz v. Pico,* 994 F.Supp. 460, 474 (S.D.N.Y.1998) ("[V]erbal harassment or profanity alone, unaccompanied by any injury no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and therefore is not actionable 42 U.S.C. § 1983."(internal quotation marks and citation omitted)). Because Plaintiff's Complaint fails to allege that he sustained any injury as a result of McGovern's alleged threats, he has failed to state a claim for a violation of the Eighth Amendment.

**2.** *First Amendment Retaliation*
The Court also reads Plaintiff's Complaint as asserting a cause of action for retaliation in violation of the First Amendment—*i.e* ., that McGovern's alleged threats were in retaliation for Plaintiff's commencing suit against him in 2008. While "retaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of grievances guaranteed by the First and Fourteenth Amendments and is actionable under § 1983,"*Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996) (citing *Franco v. Kelly,* 854 F.2d 584 (2d Cir.1988)), the Second Circuit has cautioned that "courts must approach prisoner claims of retaliation with skepticism and particular care."*Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). This is because such claims can be "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration."*Id.* With this in mind, the Court will address the sufficiency of Plaintiff's claim.

**\*4** To state a claim for retaliation in violation of the First Amendment, a prisoner must assert non-conclusory allegations establishing: "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action."*Dawes,* 239 F.3d at 492;*accord Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004). It is well settled that commencing a lawsuit is protected activity, so the Court will focus its discussion on the second and third elements.

**a.** *Adverse Action*
"In the prison context, '[o]nly retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation.' " *Mateo v. Fischer,* 682 F.Supp.2d 423, 433 (S.D.N.Y.2010) (alteration in original) (quoting *Dawes,* 239 F.3d at 492);*see also Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003). If the retaliatory act is not adverse, it "is simply *de minimis* and therefore outside the ambit of constitutional protection." *Davis,* 320 F.3d at 353 (quoting *Dawes,* 239 F.3d at 493). In determining whether a retaliatory act is adverse, "the court's inquiry must be 'tailored to the different circumstances in which retaliation claims arise,' bearing in mind that '[p]risoners may be required to tolerate more ... than average citizens, before a [retaliatory] action taken against them is considered adverse.' " *Id.* (alternations in original) (quoting *Thaddeus–X v. Blatter,* 175 F.3d 378, 398 (6th Cir.1999)).

McGovern argues that Plaintiff's retaliation claim must be dismissed because verbal threats do not give rise to a constitutional violation. The Court disagrees. "[S]ome verbal threats, even if not serious enough to implicate the Eighth

Amendment, can constitute an adverse action." *Mateo,* 682 F.Supp.2d at 434. However, "not all do. The less direct and specific a threat, the less likely it will deter an inmate from exercising his First Amendment rights." *Id.* at 425; *see also Dawes,* 239 F.3d at 493. The Court need not decide whether McGovern's threat was direct and specific enough to constitute adverse action, because the Court finds that Plaintiff has failed to plead causation.

**b.** *Causation*

"In order to satisfy the causation requirement, allegations must be 'sufficient to support the inference that the speech played a substantial part in the adverse action.' " *Davis,* 320 F.3d at 354 (quoting *Dawes,* 239 F.3d at 492). Here, Plaintiff's Complaint is completely void of any allegations that McGovern's alleged threat was at all related to Plaintiff's previous civil action. Accordingly, Plaintiff has failed to state a claim for retaliation in violation of the First Amendment.

**III.** *Leave to Replead*

Although Plaintiff has not specifically requested leave to replead, the Second Circuit has stated that "the court should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Mortisugu,* 222 F.3d 99, 112 (2d Cir .2000) (internal quotation marks and citation omitted); *see also* FED.R.CIV.P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires."). Accordingly, the Court grants Plaintiff leave to amend to address the pleading defects articulated above.

### *CONCLUSION*

**\*5** For the foregoing reasons, McGovern's motion to dismiss Plaintiff's Complaint is GRANTED. However, in an abundance of caution, the Court grants Plaintiff leave to replead. If Plaintiff wishes to address the pleading defects discussed above, he must file an Amended Complaint within thirty (30) days of the date of his Memorandum and Order. Failure to file an Amended Complaint in the time allotted will result in dismissal of the Complaint *with prejudice.*

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Memorandum and Order would not be taken in good faith; therefore *in forma pauperis* status is denied for the purposes of an appeal. *See Coppedge v. United States,* 369 U.S. 438, 444–45, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962).

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 2155275

---

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 4604250
Only the Westlaw citation is currently available.
United States Court of Appeals,
Second Circuit.

Dawn F. LITTLEJOHN, Plaintiff–Appellant,

v.

CITY OF NEW YORK, John B. Mattingly,
former Commissioner, Amy Baker,
Brandon Stradford, Defendants–Appellees.

No. 14–1395–cv. | Argued: Nov.
5, 2014. | Decided: Aug. 3, 2015.

**Synopsis**

**Background:** Former government employee, who was
African American, brought action against city and her former
supervisors, asserting claims of hostile work environment,
disparate treatment, and retaliation under Title VII, § 1981,
and § 1983, and a claim of sexual harassment under Title VII.
The United States District Court for the Southern District of
New York, Robert W. Sweet, J., entered an order dismissing
claims, and employee appealed.

**Holdings:** The Court of Appeals, Droney, Circuit Judge, held
that:

[1] employee's allegations were sufficient to give rise to an
inference of discrimination on her disparate treatment claims;

[2] employee's disparate treatment claims under § 1981
and § 1983 could survive only against supervisor who was
personally involved in her demotion;

[3] employee sufficiently alleged that she engaged in
protected activity;

[4] employee failed to allege a hostile work environment; and

[5] employee's sexual harassment claim was not reasonably
related to claims in her Equal Employment Opportunity
Commission (EEOC) complaint.

Affirmed in part, vacated in part, and remanded.

West Headnotes (35)

[1] **Civil Rights**
👉 Practices Prohibited or Required in General;
Elements

**Civil Rights**
👉 Effect of Prima Facie Case; Shifting
Burden

If a plaintiff alleging employment discrimination
can show (1) that she is a member of a
protected class, (2) that she was qualified for
employment in the position, (3) that she suffered
an adverse employment action, and that she
has (4) some minimal evidence suggesting
an inference that her employer acted with
discriminatory motivation, such a showing will
raise a temporary presumption of discriminatory
motivation under *McDonnell Douglas*, shifting
the burden of production to the employer and
requiring the employer to come forward with its
justification for the adverse employment action
against the plaintiff.

Cases that cite this headnote

[2] **Civil Rights**
👉 Motive or Intent; Pretext

**Civil Rights**
👉 Effect of Prima Facie Case; Shifting
Burden

Once an employer presents evidence of its
justification for a challenged adverse action,
the presumption of discriminatory motivation
drops out of the picture and the *McDonnell
Douglas* framework is no longer relevant to the
plaintiff's employment discrimination claims;
instead, the plaintiff must demonstrate that the
employer's proffered reason was not the true
reason, or, in any event, not the sole reason for
adverse action, which merges with the plaintiff's
ultimate burden of showing that the employer
intentionally discriminated against her.

Cases that cite this headnote

[3] **Civil Rights**

↪ **Prima Facie Case**

While a satisfactory explanation by an employer destroys the legally mandatory inference of discrimination arising from the plaintiff's initial evidence, the initial evidence used to establish the prima facie case of employment discrimination and the inferences properly drawn therefrom may be considered by the trier of fact on the issue of whether the defendant's explanation is pretextual.

Cases that cite this headnote

**[4]** **Civil Rights**
↪ **Pleading**

**Civil Rights**
↪ **Effect of Prima Facie Case; Shifting Burden**

The requirement that a complaint contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face applies to Title VII complaints of employment discrimination, but does not affect the benefit to plaintiffs of the *McDonnell Douglas* burden-shifting framework. Fed.Rules Civ.Proc.Rule 8(a)(2), 28 U.S.C.A.

Cases that cite this headnote

**[5]** **Civil Rights**
↪ **Disparate Treatment**

African American employee's exclusion from decision-making meetings concerning a merger involving city agency for which she worked was not an adverse employment action, as required to establish a prima facie case of disparate treatment based on race in violation of Title VII, § 1981, and § 1983, where her exclusion did not significantly diminish her job responsibilities. Civil Rights Act of 1964, § 701, 42 U.S.C.A. § 2000e; 42 U.S.C.A. §§ 1981, 1983.

Cases that cite this headnote

**[6]** **Civil Rights**
↪ **Adverse Actions in General**

An adverse employment action under Title VII is more disruptive than a mere inconvenience or an alteration of job responsibilities; it is a materially significant disadvantage with respect to the terms of the plaintiff's employment. Civil Rights Act of 1964, § 701, 42 U.S.C.A. § 2000e.

Cases that cite this headnote

**[7]** **Civil Rights**
↪ **Presumptions, Inferences, and Burden of Proof**

An inference of discrimination can arise, as required to support an employment discrimination claim, from circumstances including, but not limited to, the employer's criticism of the plaintiff's performance in ethnically degrading terms, the employer's invidious comments about others in the plaintiff's protected group, the more favorable treatment of employees not in the protected group, or the sequence of events leading to the plaintiff's discharge.

Cases that cite this headnote

**[8]** **Civil Rights**
↪ **Presumptions, Inferences, and Burden of Proof**

Adverse actions taken against employees who are not similarly situated cannot establish an inference of discrimination to support an employment discrimination claim.

Cases that cite this headnote

**[9]** **Civil Rights**
↪ **Presumptions, Inferences, and Burden of Proof**

An inference of discrimination arises, as required to support a claim of employment discrimination, when an employer replaces a terminated or demoted employee with an individual outside the employee's protected class.

Cases that cite this headnote

**[10]** **Civil Rights**
↪ **Disparate Treatment**

Allegation that African American employee of city agency was replaced by a less qualified white employee after she was demoted from her director-level position was sufficient to plausibly support conclusion that employee's demotion occurred under circumstances giving rise to an inference of discrimination, as required to establish a prima facie case of disparate treatment based on race in violation of Title VII, § 1981, and § 1983. Civil Rights Act of 1964, § 701, 42 U.S.C.A. § 2000e; 42 U.S.C.A. §§ 1981, 1983.

Cases that cite this headnote

[11]  **Civil Rights**
      👉 Individuals as "Employers"

Title VII does not create liability in individual supervisors and co-workers who are not the plaintiff's actual employer. Civil Rights Act of 1964, § 701, 42 U.S.C.A. § 2000e.

Cases that cite this headnote

[12]  **Civil Rights**
      👉 Persons Liable in General

An individual may be held liable under § 1981 and § 1983 only if that individual was personally involved in the alleged constitutional deprivation. 42 U.S.C.A. §§ 1981, 1983.

Cases that cite this headnote

[13]  **Civil Rights**
      👉 Vicarious Liability and Respondeat Superior in General; Supervisory Liability in General

A defendant's alleged personal involvement in a constitutional deprivation under § 1981 and § 1983 can be established by showing that: (1) the defendant participated directly in the alleged violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent

in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference by failing to act on information indicating that unconstitutional acts were occurring. 42 U.S.C.A. §§ 1981, 1983.

Cases that cite this headnote

[14]  **Civil Rights**
      👉 Vicarious Liability and Respondeat Superior in General; Supervisory Liability in General

A plaintiff alleging violations of § 1981 and § 1983 must establish that a supervisor's actions were the proximate cause of the plaintiff's constitutional deprivation. 42 U.S.C.A. §§ 1981, 1983.

Cases that cite this headnote

[15]  **Civil Rights**
      👉 Vicarious Liability and Respondeat Superior in General; Supervisory Liability in General

In the §§ 1981 and 1983 context, a plaintiff must establish that a supervisor's behavior constituted intentional discrimination on the basis of a protected characteristic. 42 U.S.C.A. § 1983.

Cases that cite this headnote

[16]  **Civil Rights**
      👉 Employment Practices

African American employee's disparate treatment claims under § 1981 and § 1983 arising from her demotion from a director-level position at city agency and replacement by an allegedly less qualified white employee could survive only against supervisor who was personally involved in her demotion. 42 U.S.C.A. §§ 1981, 1983.

Cases that cite this headnote

[17]  **Civil Rights**
      👉 Employment Practices

African American employee of city agency could not proceed on her disparate treatment claims against city under § 1981 and § 1983 arising from

her demotion from a director-level position and replacement by an allegedly less qualified white employee, absent allegations of a persistent or widespread municipal policy or custom that enabled her demotion. 42 U.S.C.A. §§ 1981, 1983.

Cases that cite this headnote

**[18]** **Civil Rights**
🔑 Governmental Ordinance, Policy, Practice, or Custom

When a defendant sued for discrimination under § 1981 or § 1983 is a municipality, the plaintiff is required to show that the challenged acts were performed pursuant to a municipal policy or custom. 42 U.S.C.A. §§ 1981, 1983.

Cases that cite this headnote

**[19]** **Civil Rights**
🔑 Employment Practices

A single unlawful discharge, if ordered by a person whose edicts or acts may fairly be said to represent official policy, can, by itself, support claims of employment discrimination under § 1981 and § 1983 against a municipality. 42 U.S.C.A. §§ 1981, 1983.

Cases that cite this headnote

**[20]** **Constitutional Law**
🔑 Labor, Employment, and Public Officials

The Fourteenth Amendment's Equal Protection Clause does not protect against employment retaliation due to complaints of racial discrimination. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

**[21]** **Civil Rights**
🔑 Practices Prohibited or Required in General; Elements

To establish a presumption of retaliation at the initial stage of litigation under Title VII and § 1981, a plaintiff must present evidence that shows: (1) participation in a protected activity, (2) that the defendant knew of the protected activity, (3) an adverse employment action, and (4) a causal connection between the protected activity and the adverse employment action. Civil Rights Act of 1964, § 701, 42 U.S.C.A. § 2000e; 42 U.S.C.A. § 1981.

Cases that cite this headnote

**[22]** **Civil Rights**
🔑 Activities Protected

To the extent an employee is required as part of her job duties to report or investigate other employees' complaints of discrimination, such reporting or investigating by itself is not a protected activity under Title VII's opposition clause, because merely to convey others' complaints of discrimination is not to oppose practices made unlawful by Title VII; however, if an employee, even one whose job responsibilities involve investigating complaints of discrimination, actively supports other employees in asserting their Title VII rights or personally complains or is critical about the discriminatory employment practices of her employer, that employee has engaged in a protected activity under Title VII's opposition clause and may proceed on a retaliation claim. Civil Rights Act of 1964, § 704(a), 42 U.S.C.A. § 2000e–3(a).

Cases that cite this headnote

**[23]** **Civil Rights**
🔑 Activities Protected

**Municipal Corporations**
🔑 Grounds

Allegation that African American employee, in her capacity as director of a city agency's equal employment opportunity (EEO) department, repeatedly objected and complained to her supervisors about agency's selection process and failure to abide by its anti-discrimination policies was sufficient to allege a protected activity under Title VII's opposition clause, as required to establish a prima facie case of retaliation under Title VII and § 1981. Civil Rights Act of 1964, § 704(a), 42 U.S.C.A. § 2000e–3(a); 42 U.S.C.A. § 1981.

Cases that cite this headnote

**[24]** **Civil Rights**

    Causal Connection; Temporal Proximity

**Municipal Corporations**

    Grounds

Allegation that African American employee of city agency repeatedly objected and complained to her supervisors about agency's failure to abide by its anti-discrimination policies until day she was demoted from her director-level position with agency was sufficient to allege a causal connection between a protected activity and an adverse employment action, as required to establish a prima facie case of retaliation under Title VII and § 1981. Civil Rights Act of 1964, § 704(a), 42 U.S.C.A. § 2000e–3(a); 42 U.S.C.A. § 1981.

Cases that cite this headnote

**[25]** **Constitutional Law**

    Public Employees and Officials

**Constitutional Law**

    Employment in General

Section 1983, through its application of the Equal Protection Clause of the Fourteenth Amendment, protects public employees from various forms of discrimination, including hostile work environment and disparate treatment on the basis of race. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. § 1983.

Cases that cite this headnote

**[26]** **Civil Rights**

    Hostile Environment; Severity, Pervasiveness, and Frequency

To establish a hostile work environment under Title VII, § 1981, or § 1983, a plaintiff must show that the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. Civil Rights Act of 1964, § 703(a)(1), 42 U.S.C.A. § 2000e–2(a)(1); 42 U.S.C.A. §§ 1981, 1983.

**[27]** **Civil Rights**

    Hostile Environment; Severity, Pervasiveness, and Frequency

The standard for establishing a hostile work environment under Title VII, § 1981, or § 1983 has both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive. Civil Rights Act of 1964, § 703(a)(1), 42 U.S.C.A. § 2000e–2(a)(1); 42 U.S.C.A. §§ 1981, 1983.

Cases that cite this headnote

**[28]** **Civil Rights**

    Hostile Environment; Severity, Pervasiveness, and Frequency

The incidents complained of must be more than episodic to establish a hostile work environment under Title VII, § 1981, or § 1983; rather, they must be sufficiently continuous and concerted in order to be deemed pervasive. Civil Rights Act of 1964, § 703(a)(1), 42 U.S.C.A. § 2000e–2(a)(1); 42 U.S.C.A. §§ 1981, 1983.

Cases that cite this headnote

**[29]** **Civil Rights**

    Hostile Environment; Severity, Pervasiveness, and Frequency

In determining whether a plaintiff suffered a hostile work environment under Title VII, § 1981, or § 1983, a court must consider the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance. Civil Rights Act of 1964, § 703(a)(1), 42 U.S.C.A. § 2000e–2(a)(1); 42 U.S.C.A. §§ 1981, 1983.

Cases that cite this headnote

**[30]** **Civil Rights**

👉 Hostile Environment; Severity, Pervasiveness, and Frequency

Allegations that African American employee's supervisor at city agency made negative statements about employee to another supervisor, distanced herself from employee when she was nearby, declined to meet with employee, and wrongfully reprimanded employee were insufficient to allege racial discrimination that was so severe or pervasive that it created an abusive work environment and altered conditions of her employment, as required to establish a hostile work environment under Title VII, § 1981, and § 1983. Civil Rights Act of 1964, § 703(a)(1), 42 U.S.C.A. § 2000e–2(a)(1); 42 U.S.C.A. §§ 1981, 1983.

Cases that cite this headnote

**[31]** **Civil Rights**

👉 Deferral to State Agencies; Time

**Civil Rights**

👉 Exhaustion of Administrative Remedies Before Resort to Courts

Before bringing a Title VII suit in federal court, an individual must first present the claims forming the basis of such a suit in a complaint to the Equal Employment Opportunity Commission (EEOC) or the equivalent state agency. Civil Rights Act of 1964, § 706, 42 U.S.C.A. § 2000e–5.

Cases that cite this headnote

**[32]** **Civil Rights**

👉 Scope of Administrative Proceedings; Like or Related Claims

Claims not raised in an Equal Employment Opportunity Commission (EEOC) complaint may still be part of a Title VII complaint later filed in federal court if they are reasonably related to the claim filed with the EEOC. Civil Rights Act of 1964, § 706, 42 U.S.C.A. § 2000e–5.

Cases that cite this headnote

**[33]** **Civil Rights**

👉 Scope of Administrative Proceedings; Like or Related Claims

In determining whether a claim not included in an Equal Employment Opportunity Commission (EEOC) complaint is reasonably related to a claim filed with the EEOC and may therefore be brought in a Title VII suit, a court focuses on the factual allegations made in the EEOC charge itself, describing the discriminatory conduct about which the plaintiff is grieving. Civil Rights Act of 1964, § 706, 42 U.S.C.A. § 2000e–5.

Cases that cite this headnote

**[34]** **Civil Rights**

👉 Scope of Administrative Proceedings; Like or Related Claims

Former city agency employee's claim that her supervisor sexually harassed her in violation of Title VII was not reasonably related to racial discrimination claims employee filed with Equal Employment Opportunity Commission (EEOC), and, thus, her sexual harassment claim, which was never included in an EEOC complaint, was barred for failure to exhaust administrative remedies; although employee sent letter to EEOC district office referencing additional charge of sexual harassment, that letter was unsworn and did more than simply clarify and amplify allegations made in original EEOC complaint. Civil Rights Act of 1964, § 706, 42 U.S.C.A. § 2000e–5.

Cases that cite this headnote

**[35]** **Civil Rights**

👉 Scope of Administrative Proceedings; Like or Related Claims

Unsworn letters sent to the Equal Employment Opportunity Commission (EEOC) describing additional claims of discrimination unrelated to the claims described in the EEOC charge cannot enlarge the scope of the original charge to include new claims under Title VII. Civil Rights Act of 1964, § 706, 42 U.S.C.A. § 2000e–5.

Cases that cite this headnote

Appeal from the United States District Court for the Southern District of New York. No. 13–cv–1116—Robert W. Sweet, Judge.

Appeal from a judgment of the United States District Court for the Southern District of New York (Sweet, J.) dismissing Plaintiff's hostile work environment, disparate treatment, and retaliation claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, et seq. ("Title VII"), and 42 U.S.C. §§ 1981 and 1983, and Plaintiff's sexual harassment claim under Title VII. We VACATE the district court's judgment with respect to Plaintiff's disparate treatment and retaliation claims against Defendants City of New York and Amy Baker, AFFIRM the dismissal of the other claims, and REMAND.

**Attorneys and Law Firms**

Gregory G. Smith, New York, NY, for Plaintiff–Appellant.

Susan Paulson (Francis F. Caputo, on the brief), for Zachary W. Carter, Corporation Counsel of the City of New York, New York, NY, for Defendants–Appellees.

Before LEVAL, LYNCH, and DRONEY, Circuit Judges.

**Opinion**

DRONEY, Circuit Judge:

 **\*1**  Plaintiff Dawn F. Littlejohn appeals from a judgment of the United States District Court for the Southern District of New York (Sweet, *J.*) entered on February 28, 2014. Littlejohn alleged that, while employed by the New York City Administration for Children's Services ("ACS"), she was subjected to a hostile work environment and disparate treatment based on her race, and retaliated against because of complaints about such discrimination, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. §§ 2000e *et seq.,* and 42 U.S.C. §§ 1981 and 1983. Littlejohn also alleged that she was sexually harassed in violation of Title VII. Defendants, the City of New York ("the City") and three individuals who supervised Littlejohn at ACS, moved to dismiss Littlejohn's amended complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. The district court granted Defendants' motion to dismiss in its entirety, and Littlejohn appealed.

For the reasons set forth below, we **VACATE** the district court's judgment granting Defendants' motion to dismiss with respect to (1) Littlejohn's disparate treatment and retaliation claims against the City under Title VII, (2) Littlejohn's disparate treatment claim against Defendant Amy Baker under §§ 1981 and 1983, and (3) Littlejohn's retaliation claim against Baker under § 1981; **AFFIRM** the dismissal of the other claims; and **REMAND** for proceedings consistent with this opinion.

## BACKGROUND

### I. Factual Background [1]

Littlejohn is an African–American woman with a master's degree in Industrial/Organizational Psychology from Columbia University. She began working at ACS on April 27, 2009, as the Director of its Equal Employment Opportunity ("EEO") Office. As Director, Littlejohn conducted investigations of claims of discrimination, trained staff, monitored hiring, counseled agency employees, organized diversity activities, and advised staff on EEO policy, duties which she alleges she performed satisfactorily.

From April to December 2009, Littlejohn's supervisor was ACS Deputy Commissioner Anne Williams–Isom, an African–American woman. Before Williams–Isom left ACS in December 2009, she gave Littlejohn an above-average performance review for her work over the previous eight months. Littlejohn does not allege that any discrimination or harassment occurred during the period in which she reported to Williams–Isom.

After Williams–Isom left ACS in late December 2009, Littlejohn began reporting to Defendant Amy Baker, a white woman and the Chief of Staff to ACS Commissioner and Defendant John B. Mattingly, a white man. Littlejohn's relationship with Baker quickly deteriorated. According to Littlejohn's complaint, Baker asked another employee "for negative information about [Littlejohn]"; "physically distanc[ed] herself from [Littlejohn] at meetings"; "increased [Littlejohn's] reporting schedule from an as-needed basis ... to twice-weekly"; "wrongful[ly] and unnecessar[il]y reprimand[ed]" Littlejohn; "required [Littlejohn] to re-create reasonable accommodation and EEO logs even though these logs were already in place"; became "noticeably impatient, shook her head, blew air out of her mouth when [Littlejohn] talked in the presence of other managers"; "held her head in disbelief, got red in the face, used harsh tones, removed

[Littlejohn's] name from the regularly scheduled management meeting lists"; "refused to meet with [Littlejohn] face-to-face, diminished [Littlejohn's] duties and responsibilities as EEO Director"; "changed meetings that were supposed to be scheduled as in person bi-monthly meetings to twice a week over the phone discussions with [Littlejohn]"; and "replaced [Littlejohn] at management meetings with [her] white male subordinate."Compl. ¶¶ 34, 53, 71, 74–75. Littlejohn also alleges that Baker sarcastically told her "you feel like you are being left out," and that Littlejohn did not "understand the culture" at ACS. *Id.* ¶¶ 36, 49.

**\*2** Shortly after Littlejohn began reporting to Baker, the City announced in January 2010 that ACS would merge with the City's Department of Juvenile Justice ("DJJ"). As a result of the merger, numerous employees from DJJ would be laid off, demoted, reassigned, or terminated. Littlejohn asked Baker to be included in the process of deciding which DJJ employees would be transferred or terminated "to ensure that procedures were in accordance with established ... guidelines and policies," but Baker and other white managers allegedly "impeded, stymied, and suffocated" Littlejohn's effort to become involved in those decision-making meetings. *Id.* ¶¶ 44–45. Only after an Assistant Commissioner for the Department of Citywide Administrative Services demanded that Littlejohn be included in the meetings was she allowed to attend.

According to Littlejohn, Baker and Mattingly showed preferential treatment to white DJJ employees during the ACS/DJJ merger, while at the same time terminating, demoting, or unfavorably reassigning African–American and Latino/a DJJ employees. Littlejohn alleges that she complained to Baker and Mattingly about the "selection process and failure to abide by proper anti-discrimination policies and procedures."*Id.* ¶ 64. Specifically, Littlejohn believed that Defendants were improperly and purposefully failing to conduct an "adverse impact review and analysis," which was mandated by the City's Department for Citywide Administrative Services layoff manual. *Id.* ¶ 61. Around the same time, Littlejohn also complained to Baker about the lack of African–American women in management positions, lower management levels for African–American employees compared to white employees, and pay disparities between African–American men and their white counterparts. Littlejohn's complaints, however, were "to no avail." *Id.* ¶ 64.

In March 14, 2011, Littlejohn was involuntarily transferred from the EEO Office to the Office of Personnel Services

("OPS") and was allegedly demoted to the civil service non-managerial title of Administrative Staff Analyst, incurring a pay cut of $2,000. Littlejohn was replaced as Director of the EEO Office by Fredda Monn, a white female, who allegedly had no prior EEO experience, received more pay than Littlejohn did as EEO Director, and was provided with a "deputy EEO officer" to help with her work. *Id.* ¶ 78. Littlejohn claimed that the transfer and demotion were in retaliation for her complaints to Baker and Mattingly about "racial discrimination and violations of law" during the ACS/ DJJ merger, and for her complaints about "her lack of involvement from an EEO perspective in the decision making process of DJJ and ACS Job actions."*Id.* ¶¶ 52, 68.

At OPS, Littlejohn began reporting to Brandon Stradford, the Director of Employee Relations. Stradford is an African–American man. The complaint in this action alleges that from March 2011 to September 2011, Stradford sexually harassed her through "ongoing repeated requests for dates, [requests for] sex, touching, showing of sexually explicit photographs of himself on vacation and physically exposing" himself. *Id.* ¶ 85. Littlejohn also claimed that Stradford "repeatedly threaten[ed] to further demote" her. *Id.* ¶ 87. Littlejohn alleges that she complained in April 2011 about Stradford's harassment to an Assistant Commissioner, who declined to act on her complaints. In April 2012, Littlejohn mentioned the harassment to Monn, now the Director of the EEO Office, and to an investigator at the Equal Employment Opportunity Commission ("EEOC"), with "no results." *Id.* ¶ 93. According to Littlejohn, Monn did not provide her with an administrative form on which to complain about Stradford's sexual harassment.

**\*3** On October 21, 2011, Littlejohn filed an Intake Questionnaire [2] with the EEOC, in which she alleged discrimination based on race and color as a result of Baker's and Mattingly's actions while she was EEO Director. Littlejohn's Intake Questionnaire did not claim discrimination based on sex or sexual harassment, nor did it mention Stradford. Instead, Littlejohn explained in the Intake Questionnaire that she believed Baker's and Mattingly's actions were discriminatory on the basis of race and color because they "fail[ed] to reassign" her to a position for which she was "suitably and well qualified"; "incessant[ly] harass[ed] and degrad[ed]" her; retaliated against her for "complaining about common ACS practices"; demoted her from "admin Staff Analyst M1 to Admin Staff Analyst (NM) and replaced [her with] a white female"; "deliberately froze[ ] out and excluded [her] from all deliberations, meetings and

responsibilities"; "relegate[d][her] to performing the most menial and clerical tasks"; and "strip[ped][her] of [her] pay level."Littlejohn Aff., Ex. 1.[3] On February 2, 2012, Littlejohn followed up her completed Intake Questionnaire by filing a formal Charge of Discrimination with the EEOC, claiming discrimination based on race and color, as well as retaliation for complaints about such discrimination. Despite the option on the EEOC charge form to claim discrimination based on sex, Littlejohn again did not make such a claim or mention Stradford or sexual harassment.

From April 27 to June 5, 2012, Littlejohn went on medical leave under the Family Medical Leave Act as a result of mental and physical health issues allegedly caused by her treatment at ACS. Littlejohn claimed that, while on leave, she was repeatedly asked for documentation of her medical condition, and that Stradford caused her paychecks to be improperly withheld. When Littlejohn returned from leave in June 2012, she was reassigned to a different manager, Claudette Wynter, the Director of Personnel Services and an African–American woman. However, according to her complaint, Stradford continued to sexually harass her. As a result, Littlejohn wrote a letter to Monn on August 22, 2012, in which Littlejohn thanked Monn for changing her supervisor but asked to be moved farther away from Stradford. Littlejohn sent a similar email to Wynter complaining about her close proximity to Stradford. Monn eventually followed up with Littlejohn in May 2013 regarding her original complaint of sexual harassment against Stradford; Monn stated that she had investigated the complaint and was unable to find evidence to substantiate a violation of department policy.

On September 24, 2012, Littlejohn was approved to return to medical leave as a result of a "mini stroke." Compl. ¶¶ 92, 97. It was on this date that Littlejohn initially claimed she was constructively discharged.[4] Approximately one month later, on October 23, 2012, Littlejohn wrote a letter to Kevin Berry, the Director of the EEOC New York District Office, regarding the EEOC charge she previously filed on February 2 that claimed discrimination based on race and color.[5] In this letter, Littlejohn stated that "I want to be sure that you are aware [of] my additional charge of hostile work environment-sexual harassment at the hands of my manager [Brandon Stradford] within the unit in which I was placed after being unfairly demoted."Littlejohn Aff., Ex. 11. Littlejohn explained that she suffered emotional distress due to Stradford's unwanted physical advances and his constant staring at her body. Littlejohn also asked Berry to "[p]lease

let me know what additional information you may need."*Id.* There is no indication in the complaint filed in this action that the EEOC responded to Littlejohn's October 23 letter.

**\*4** On November 19, 2012, after 180 days had elapsed since Littlejohn filed her EEOC charge alleging discrimination based on race and color, the EEOC sent Littlejohn a Notice of Right to Sue Letter. Subsequently, on November 29, 2012, she went to the ACS EEO Office and filed an internal "Complaint of Discrimination Form" alleging sexual harassment by Stradford, which she gave to Monn.

## II. Procedural History

Littlejohn commenced this lawsuit *pro se* on February 15, 2013, and filed an amended complaint on September 23, 2013, after she retained counsel. The amended complaint alleged causes of action for hostile work environment and disparate treatment based on Littlejohn's race, and retaliation because of complaints about such discrimination, in violation of Title VII and 42 U.S.C. §§ 1981 and 1983. The complaint also alleged sexual harassment in violation of Title VII. The Defendants are the City of New York, Mattingly, Baker, and Stradford.

On December 6, 2013, Defendants moved to dismiss all of Littlejohn's claims pursuant to Federal Rule of Civil Procedure 12(b)(6). The district court granted Defendants' motion in its entirety on February 28, 2014, concluding that Littlejohn failed to exhaust her administrative remedies as to her sexual harassment claim and failed to adequately plead her hostile work environment, disparate treatment, and retaliation claims. As to her §§ 1981 and 1983 claims, the district court held in the alternative that Littlejohn failed to allege personal responsibility with respect to individual Defendants Mattingly and Stradford, and did not state a claim against the City pursuant to *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

### DISCUSSION

#### I. Standard of Review

This Court reviews *de novo* a district court's grant of a motion to dismiss under Rule 12(b)(6).*Simmons v. Roundup Funding, LLC,* 622 F.3d 93, 95 (2d Cir.2010). On a motion to dismiss, all factual allegations in the complaint are accepted as true and all inferences are drawn in the plaintiff's favor.*Ofori–*

*Tenkorang v. Am. Int'l Grp., Inc.,* 460 F.3d 296, 300 (2d Cir.2006).

Determining the propriety of the dismissal of an employment discrimination complaint under Rule 12(b)(6) requires assessment of the interplay among several Supreme Court precedents. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and three subsequent Supreme Court rulings clarifying it, established the nature of a prima facie case of discrimination under Title VII. *Swierkiewicz v. Sorema N. A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002), specifically addressed the requirements for *pleading* such a case. And *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), later asserted general pleading requirements (not specifically addressed to discrimination cases), in arguable tension with the holding of *Swierkiewicz.*We discuss each of these.

 [1]  [2]  [3] *McDonnell Douglas,* together with *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), and *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), established that the requirements of a prima facie case for a plaintiff alleging employment discrimination change as the case progresses. Ultimately, the plaintiff will be required to prove that the employer-defendant acted with discriminatory motivation. However, in the first phase of the case, the prima facie requirements are relaxed. Reasoning that fairness required that the plaintiff be protected from early-stage dismissal for lack of evidence demonstrating the employer's discriminatory motivation before the employer set forth its reasons for the adverse action it took against the plaintiff, the Supreme Court ruled that, in the initial phase of the case, the plaintiff can establish a prima facie case without evidence sufficient to show discriminatory motivation. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817; *Burdine,* 450 U.S. at 253–54, 101 S.Ct. 1089 ("The prima facie case ... eliminates the most common nondiscriminatory reasons for the plaintiff's rejection.... [W]e presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors."(internal quotation marks omitted)). If the plaintiff can show (1) that she is a member of a protected class; (2) that she was qualified for employment in the position; (3) that she suffered an adverse employment action; and, in addition, has (4) some minimal evidence suggesting an inference that the employer acted with discriminatory motivation,

such a showing will raise a temporary "presumption" of discriminatory motivation, shifting the burden of production to the employer and requiring the employer to come forward with its justification for the adverse employment action against the plaintiff. *Burdine,* 450 U.S. at 253–54, 101 S.Ct. 1089; *St. Mary's Honor Ctr.,* 509 U.S. at 506–07, 113 S.Ct. 2742. However, once the employer presents evidence of its justification for the adverse action, joining issue on plaintiff's claim of discriminatory motivation, the presumption "drops out of the picture" and the *McDonnell Douglas* framework "is no longer relevant." *St. Mary's Honor Ctr.,* 509 U.S. at 510–11, 113 S.Ct. 2742. At this point, in the second phase of the case, the plaintiff must demonstrate that the proffered reason was not the true reason (or in any event not the sole reason) for the employment decision, which merges with the plaintiff's ultimate burden of showing that the defendant intentionally discriminated against her. [6] *Burdine,* 450 U.S. at 256, 101 S.Ct. 1089; *St. Mary's Honor Ctr.,* 509 U.S. at 519, 113 S.Ct. 2742.

**\*5** For the initial phase, in which the plaintiff benefited from the presumption, the Supreme Court's precedents left unclear how much evidence a plaintiff needed to shift the burden of production to the employer. It suggested in *McDonnell Douglas* that it would be sufficient for a disappointed job seeker who was a member of a protected class to show that she was qualified for the position, that the position remained open, and that the employer continued to seek applicants for the position, without need for any further evidence of discriminatory intent. 411 U.S. at 802, 93 S.Ct. 1817. In *Burdine,* the Court held that it was sufficient for the disappointed applicant to show that the job went to one who was not a member of her protected class. 450 U.S. at 253 n. 6, 101 S.Ct. 1089. The Court characterized this initial burden as "not onerous," *id.* at 253, 101 S.Ct. 1089, and as "minimal," *St. Mary's Honor Ctr.,* 509 U.S. at 506.

The next pertinent Supreme Court precedent is *Swierkiewicz.*In *Swierkiewicz,* the plaintiff was a Hungarian national, 53 years of age, who had been dismissed by his employer, a French company. 534 U.S. at 508, 122 S.Ct. 992. He brought suit alleging national origin discrimination under Title VII, and age discrimination. His complaint included little in the way of factual allegations supporting an inference of national origin discrimination, other than his Hungarian nationality in a French company, and very little to support his claim of age discrimination. *Id.* The district court granted the defendant's motion to dismiss the complaint for failure to make out a prima facie case, apparently assuming

that the requirements of the prima facie case applied to pleading as well as proof, and that the plaintiff's allegations were insufficient to meet even the reduced prima facie standards at the initial phase of the case. *See Swierkiewicz v. Sorema, N.A.,* No. 99 Civ. 12272(LAP), 2000 U.S. Dist. LEXIS 21547 (S.D.N.Y. July 26, 2000). Referring to a memorandum that was incorporated into the complaint and upon which the plaintiff relied, the district court explained that "[t]here is nothing in the memorandum from which age or national origin discrimination can be inferred."*Id.* at *4. Addressing the allegations of both age and national origin discrimination, the court characterized them as "conclusory" and "insufficient as a matter of law to raise an inference of discrimination."*Id.* at *5. Our Court affirmed.*Swierkiewicz v. Sorema, N.A.,* 5 Fed.Appx. 63 (2d Cir.2001).

The Supreme Court reversed. *Swierkiewicz,* 534 U.S. 506, 122 S.Ct. 992. The Supreme Court clarified that the standard espoused by the *McDonnell Douglas* line of cases for prima facie sufficiency was "an evidentiary standard, not a pleading requirement."*Id.* at 510, 122 S.Ct. 992. The Court characterized our ruling as unwarrantedly imposing a "heightened pleading standard in employment discrimination cases [that] conflicts with Federal Rule of Civil Procedure 8(a)(2)."*Id.* at 512, 122 S.Ct. 992. The Court explained that "under a notice pleading system, it is not appropriate to require a plaintiff to plead facts establishing a prima facie case."*Id.* at 511, 122 S.Ct. 992. The complaint needed only to " 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.' " *Id.* at 512, 122 S.Ct. 992 (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). The Court thus concluded that the plaintiff's allegation "that he had been terminated on account of his national origin in violation of Title VII and on account of his age in violation of the ADEA" gave the employer "fair notice of what [the plaintiff's] claims are and the grounds upon which they rest." *Id.* at 514, 122 S.Ct. 992. Reading *Swierkiewicz* on its face, it appears to have meant that a Title VII plaintiff is not required to plead facts supporting even a minimal inference of discriminatory intent.

**\*6** The final Supreme Court precedent that bears on the standard for determining the sufficiency of a Title VII complaint is *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). The plaintiff in *Iqbal* alleged that governmental defendants, including the Attorney General of the United States, had unconstitutionally discriminated against him by reason of his Pakistani nationality and Muslim religion, resulting in his detention under harsh conditions.

The Court found the complaint insufficient to state a claim that the defendants had acted with a "discriminatory state of mind." *Id.* at 683, 129 S.Ct. 1937. The Supreme Court had recently determined in *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), that a complaint alleging an unlawful agreement in restraint of trade must include "enough factual matter (taken as true) to suggest [plausibly] that an agreement was made,"*id.* at 556, 127 S.Ct. 1955, or otherwise include "enough facts to state a claim to relief that is plausible on its face,"*id.* at 570, 127 S.Ct. 1955. The issue in *Iqbal* was whether the earlier ruling in *Twombly* applied only in the antitrust context or more broadly. The Court decided that the *Twombly* ruling did not apply solely in the antitrust context. It ruled that, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."*Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937 (internal quotation marks omitted).

The question then arises whether *Iqbal's* requirement applies to Title VII complaints falling under the *McDonnell Douglas* framework. [7] At least two arguments can be advanced that the *Iqbal* requirement does not apply to such cases. The first is that the requirement to allege facts would appear contradictory to the Supreme Court's ruling a few years earlier in *Swierkiewicz.*The second is that the *Iqbal* ruling of otherwise general applicability might not apply to a particular area for which the Supreme Court in the *McDonnell Douglas* quartet had devised a set of special rules that deviate from the customary prima facie rules.

The best argument that the *Iqbal* requirement does apply to Title VII complaints is that the *Iqbal* ruling is broad, and the Court gave no suggestion that it should not apply to cases falling under *McDonnell Douglas.*As for whether the applicability of *Iqbal* to Title VII pleadings would be contradictory to *Swierkiewicz,* this depends on how one interprets *Swierkiewicz.*Reading that case on its face, it appears to hold that under the notice pleading regime of the Federal Rules, a Title VII discrimination complaint need not assert facts supporting an inference of discriminatory intent, but may simply use the word discrimination, thereby adequately communicating to the defendant the nature of the claim. *See Swierkiewicz,* 534 U.S. at 511–12, 122 S.Ct. 992. On the other hand, in *Twombly,* the Supreme Court cast doubt on whether *Swierkiewicz* should be interpreted as meaning that a Title VII complaint did not need to allege facts giving minimal support to an inference of discrimination. The plaintiff in *Twombly* argued against a requirement to

plead facts, asserting that such a requirement would be contrary to the *Swierkiewicz* holding. *See Twombly,* 550 U.S. at 569, 127 S.Ct. 1955 (noting that the plaintiff contended that the position adopted by the Court "runs counter to [*Swierkiewicz's*] holding] that a complaint in an employment discrimination lawsuit [need] not contain specific facts establishing a prima facie case of discrimination" (internal quotation marks omitted)). The Court rejected the plaintiff's argument. The Court characterized *Swierkiewicz* as meaning nothing more than that the plaintiff's pleadings contained sufficient factual allegations to satisfy the "liberal pleading requirements" of the Federal Rules and that our Circuit had improperly invoked a "heightened pleading standard for Title VII cases" by requiring the plaintiff "to allege certain additional facts that [he] would need at the trial stage." *Id.* at 570, 127 S.Ct. 1955. [8]

**\*7** As for the argument that the Supreme Court was unlikely to have intended in *Iqbal* to add new wrinkles to the special field of Title VII suits, which the Supreme Court had so extensively covered in the *McDonnell Douglas* quartet of cases, arguably there is no incompatibility, or even tension, between the burden-shifting framework of *McDonnell Douglas* and a requirement that the complaint include reference to sufficient facts to make its claim plausible—at least so long as the requirement to plead facts is assessed in light of the presumption that arises in the plaintiff's favor under *McDonnell Douglas* in the first stage of the litigation.

**[4]** It is uncertain how the Supreme Court will apply *Iqbal's* requirement of facts sufficient to support plausibility to Title VII complaints falling under the *McDonnell Douglas* framework. We conclude that *Iqbal's* requirement applies to Title VII complaints of employment discrimination, but does not affect the benefit to plaintiffs pronounced in the *McDonnell Douglas* quartet. To the same extent that the *McDonnell Douglas* temporary presumption reduces the facts a plaintiff would need to *show* to defeat a motion for summary judgment prior to the defendant's furnishing of a non-discriminatory motivation, that presumption also reduces the facts needed to be *pleaded* under *Iqbal*.

The *Iqbal* requirement is for facts supporting "plausibility." The Supreme Court explained that "[t]he plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937. The question we face is what, in the Title VII context, must

plausibly supported by factual allegations when the plaintiff does not have direct evidence of discriminatory intent at the outset. Answering this question requires attention to the shifting content of the prima facie requirements in a Title VII employment discrimination suit. Recapitulating what we have spelled out above, while the plaintiff ultimately will need evidence sufficient to prove discriminatory motivation on the part of the employer-defendant, at the initial stage of the litigation—prior to the employer's coming forward with the claimed reason for its action—the plaintiff does not need substantial evidence of discriminatory intent. If she makes a showing (1) that she is a member of a protected class, (2) that she was qualified for the position she sought, (3) that she suffered an adverse employment action, and (4) can sustain a *minimal* burden of showing facts suggesting an inference of discriminatory motivation, then she has satisfied the prima facie requirements and a presumption of discriminatory intent arises in her favor, at which point the burden of production shifts to the employer, requiring that the employer furnish evidence of reasons for the adverse action. *Burdine,* 450 U.S. at 253–54, 101 S.Ct. 1089; *St. Mary's Honor Ctr.,* 509 U.S. at 506–07, 113 S.Ct. 2742. At this stage, a plaintiff seeking to defeat a defendant's motion for summary judgment would not need evidence sufficient to sustain her ultimate burden of showing discriminatory motivation, but could get by with the benefit of the presumption if she has shown evidence of the factors entitling her to the presumption.

**\*8** The discrimination complaint, by definition, occurs in the first stage of the litigation. Therefore, the complaint also benefits from the temporary presumption and must be viewed in light of the plaintiff's minimal burden to show discriminatory intent. The plaintiff cannot reasonably be required to allege more facts in the complaint than the plaintiff would need to defeat a motion for summary judgment made prior to the defendant's furnishing of a non-discriminatory justification. *Cf. Swierkiewicz,* 534 U.S. at 511–12, 122 S.Ct. 992 ("It ... seems incongruous to require a plaintiff, in order to survive a motion to dismiss, to plead more facts than he may ultimately have to prove to succeed on the merits if direct evidence of discrimination is discovered.").

In other words, absent direct evidence of discrimination, what must be plausibly supported by facts alleged in the complaint is that the plaintiff is a member of a protected class, was qualified, suffered an adverse employment action, and has at least minimal support for the proposition that the employer was motivated by discriminatory intent. The facts alleged must give plausible support to the reduced requirements that

arise under *McDonnell Douglas* in the initial phase of a Title VII litigation.[9] The facts required by *Iqbal* to be alleged in the complaint need not give plausible support to the ultimate question of whether the adverse employment action was attributable to discrimination. They need only give plausible support to a minimal inference of discriminatory motivation.

We now turn to the assessment of the sufficiency of Littlejohn's several claims.

## II. Disparate Treatment Claim

Littlejohn alleges disparate treatment based on race as a result of her demotion from EEO Director to a lower-paying, non-managerial analyst position in March 2011. Littlejohn's disparate treatment claim under Title VII, § 1981, and § 1983 is subject to the burden-shifting evidentiary framework set forth in *McDonnell Douglas*. *See Ruiz v. Cnty. of Rockland, 609 F.3d 486, 491 (2d Cir.2010).* As set forth above, because this appeal involves review of a motion to dismiss, we focus only on whether the allegations in the complaint give plausible support to the reduced prima facie requirements that arise under *McDonnell Douglas* in the initial phase of a litigation.

### A. Littlejohn's Disparate Treatment Allegations

[5] [6] The parties do not dispute that Littlejohn's allegations would be sufficient to establish the first three prongs of a prima facie case of disparate treatment in the initial phase, as the complaint alleges that she belongs to a protected class (black), was qualified for the EEO Director position at issue, and suffered an adverse employment action through her demotion.[10] Rather, the parties dispute whether the allegations give plausible support to the conclusion that the demotion occurred under circumstances giving rise to an inference of discrimination.

[7] [8] An inference of discrimination can arise from circumstances including, but not limited to, "the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge." *Leibowitz v. Cornell Univ., 584 F.3d 487, 502 (2d Cir.2009)* (internal quotation marks omitted). As pleaded, none of Defendants' actions directly indicates racial bias. Additionally, to the extent Littlejohn attempts to rely on adverse employment

actions taken against other employees who worked for different agencies and who had different jobs, *see* Compl. ¶¶ 17–24, the district court correctly concluded that adverse actions taken against employees who are not similarly situated cannot establish an inference of discrimination. *See Mandell v. Cnty. of Suffolk, 316 F.3d 368, 379 (2d Cir.2003)* (explaining that a plaintiff attempting to "show[ ] that the employer treated [her] less favorably than a similarly situated employee outside [her] protected group ... must show she was similarly situated in all material respects to the individuals with whom she seeks to compare herself."(internal quotation marks omitted)).

*9 [9] However, an inference of discrimination also arises when an employer replaces a terminated or demoted employee with an individual outside the employee's protected class. *See, e.g., Carlton v. Mystic Transp., Inc., 202 F.3d 129, 135 (2d Cir.2000)* ("[A] plaintiff has demonstrated an inference of age discrimination and thus established a *prima facie* case ... where the majority of plaintiff's responsibilities were transferred to a younger co-worker."); *de la Cruz v. N.Y.C. Human Res. Admin. Dep't of Soc. Servs., 82 F.3d 16, 20 (2d Cir.1996)* ("As a Puerto Rican, de la Cruz is a member of a protected class. Because de la Cruz was replaced by a black female, he also satisfies the fourth prong of the *prima facie* case."); *Cook v. Arrowsmith Shelburne, Inc., 69 F.3d 1235, 1239 (2d Cir.1995)* ("To establish a prima facie case of gender discrimination, a female plaintiff must show that she was qualified for the position, that her employer discharged her, and that the employer sought or hired a male to replace her."). As we have explained, "the evidence necessary to satisfy th[e] initial burden" of establishing that an adverse employment action occurred under circumstances giving rise to an inference of discrimination is "minimal." *Zimmermann v. Assocs. First Capital Corp., 251 F.3d 376, 381 (2d Cir.2001).* The fact that a plaintiff was replaced by someone outside the protected class will ordinarily suffice for the required inference of discrimination at the initial prima facie stage of the Title VII analysis, including at the pleading stage. *Id.*

[10] Littlejohn alleges that she was replaced by a white ACS employee, Fredda Monn, after she was demoted from EEO Director. Littlejohn also alleges that Monn was less qualified for the position. According to Littlejohn's complaint, Monn had "no prior EEO experience," as she "was previously the Director of the Accountability/ Review Unit that had nothing to do with EEO matters" but rather "involved the comprehensive review of child

welfare case practices."Compl. ¶ 78. Littlejohn's factual allegations are more than sufficient to make plausible her claim that her demotion occurred under circumstances giving rise to an inference of discrimination. *See Zimmermann,* 251 F.3d at 381. [11] Accordingly, we hold that Littlejohn's complaint alleges sufficient facts to satisfy the requirements of *Iqbal.*The district court therefore erred in dismissing this claim.

**B. Liability of the Individual and City Defendants**

 **[11]**  We must now determine, based on these allegations, which Defendants must face Littlejohn's disparate treatment claim under Title VII and §§ 1981 and 1983. We first note that Title VII "does not create liability in individual supervisors and co-workers who are not the plaintiffs' actual employers."*Raspardo v. Carlone,* 770 F.3d 97, 113 (2d Cir.2014). Thus, Littlejohn's disparate treatment claim under Title VII fails as to Defendants Baker, Mattingly, [12] and Stradford, but survives as to her employer, the City.

 ***10** **[12]** **[13]** **[14]** **[15]** Littlejohn's disparate treatment claim under §§ 1981 and 1983 fails as to Mattingly and Stradford. An individual may be held liable under §§ 1981 and 1983 only if that individual is "personally involved in the alleged deprivation."*Back v. Hastings On Hudson Union Free Sch. Dist.,* 365 F.3d 107, 127 (2d Cir.2004) (§ 1983); *Patterson v. Cnty. of Oneida,* 375 F.3d 206, 229 (2d Cir.2004) (§ 1981); *see also Raspardo,* 770 F.3d at 116 ("[Section] 1983 requires individual, personalized liability on the part of each government defendant.... '[B]ecause vicarious liability is inapplicable to ...§ 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.' " (second ellipsis in original) (quoting *Iqbal,* 556 U.S. at 676, 129 S.Ct. 1937)). Personal involvement can be established by showing that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising

subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference ... by failing to act on information indicating that unconstitutional acts were occurring.

*Back,* 365 F.3d at 127. In addition to fulfilling one of these requirements, "a plaintiff must also establish that the supervisor's actions were the proximate cause of the plaintiff's constitutional deprivation. Finally, as with individual liability, in the § 1983 context, a plaintiff must establish that a supervisor's behavior constituted intentional discrimination on the basis of a protected characteristic...."*Raspardo,* 770 F.3d at 116 (citation omitted).

 **[16]**  Littlejohn does not allege that Mattingly or Stradford had any personal involvement in Littlejohn's demotion, as Littlejohn concedes that Baker alone made the decision to demote her. In fact, Littlejohn alleges that Mattingly "encouraged" Littlejohn to "be part of the panel of managers that implemented the intake of DJJ." Compl. ¶ 43. Nothing in the complaint could lead to an inference that Mattingly personally participated in Baker's decision to demote Littlejohn. Nor do Mattingly's statements that Baker "was hurt" and that Baker "wields a lot of power around here" create a plausible inference that Mattingly was grossly negligent as Baker's supervisor in allowing Baker to demote her. *Id.* ¶ 51. Similarly, Stradford's alleged harassment was relevant only to Littlejohn's sexual harassment claim, not to Littlejohn's demotion. Therefore, because only Baker was personally involved in the decision to demote Littlejohn, Littlejohn's disparate treatment claim under §§ 1981 and 1983 survives only against Baker.

 ***11** **[17]** **[18]** **[19]** Finally, Littlejohn's disparate treatment claim against the City fails under §§ 1981 and 1983. When a defendant sued for discrimination under §§ 1981 or 1983 is a municipality, "the plaintiff is required to show that the challenged acts were performed pursuant to a municipal policy or custom."*Patterson,* 375 F.3d at 226 (citing *Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 733–36, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989) (§ 1981); *Monell,* 436 U.S. at 692–94, 98 S.Ct. 2018 (§ 1983)). The plaintiff "need not identify an express rule or regulation," but can show that "a discriminatory practice of municipal officials was so persistent or widespread as to constitute a custom or usage with the force of law, or that a discriminatory practice of subordinate employees was so manifest as to imply the constructive acquiescence of senior policy-making

officials."*Id.* (citation and internal quotation marks omitted). Here, Littlejohn does not allege a persistent or widespread municipal policy or "custom ... with the force of law" that enabled the discrimination against her—*i.e.,* her demotion—other than her general and conclusory allegation that there was such a policy. Littlejohn's claim against the City is, at bottom, premised on a theory of *respondeat superior* for Baker's actions, which cannot be the basis of municipal defendant liability under §§ 1981 or 1983. *Id.* Additionally, Baker's decision to demote Littlejohn cannot establish that "a discriminatory practice of subordinate employees was so manifest as to imply the constructive acquiescence of senior policy-making officials."*Id.* (internal quotation marks omitted). True, a "single unlawful discharge, if ordered by a person whose edicts or acts may fairly be said to represent official policy, can, by itself, support a claim against a municipality."*Back,* 365 F.3d at 128 (internal quotation marks omitted). But Baker was not a final municipal policymaker such that her isolated personnel decision to demote Littlejohn could be said to represent official City policy. *See, e.g., Soto v. Schembri,* 960 F.Supp. 751, 759 (S.D.N.Y.1997) (noting that "[t]he New York City Charter vests final policymaking authority with respect to personnel decisions with the [City's] Personnel Director").

In sum, Littlejohn's disparate treatment claim with respect to her demotion survives against the City under Title VII, and against Defendant Baker under §§ 1981 and 1983. [13] Littlejohn's disparate treatment claim against Defendants Mattingly and Stradford was properly dismissed by the district court.

## III. Retaliation Claim

[20] [21] Littlejohn also claims she was retaliated against because of her complaints about racial discrimination in the reorganization process following the merger of ACS and DJJ. Retaliation claims under Title VII and § 1981 [14] are both analyzed pursuant to Title VII principles and the *McDonnell Douglas* burden-shifting evidentiary framework. *See Hicks v. Baines,* 593 F.3d 159, 164 (2d Cir.2010). Section 704(a) of Title VII includes an anti-retaliation provision that makes it unlawful "for an employer to discriminate against any ... employee[ ] ... because [that individual] opposed any practice" made unlawful by Title VII or "made a charge, testified, assisted, or participated in" a Title VII investigation or proceeding. 42 U.S.C. § 2000e–3(a). To establish a presumption of retaliation at the initial stage of a Title VII litigation, a plaintiff must present evidence that

shows "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action."*Hicks,* 593 F.3d at 164 (internal quotation marks omitted). As with our analysis of the disparate treatment claim, the allegations in the complaint need only give plausible support to the reduced prima facie requirements that arise under *McDonnell Douglas* in the initial phase of a Title VII litigation.

**\*12** The parties do not dispute that Littlejohn's allegations, taken as true, would suffice to establish the second and third prongs of a prima facie case of retaliation. Defendants certainly knew of Littlejohn's complaints of discrimination in the ACS/DJJ merger process, and Littlejohn's demotion constitutes an adverse employment action. [15] The parties dispute, however, whether Littlejohn's actions constitute protected activities, and whether Littlejohn has plausibly alleged a causal connection between the protected activities and the adverse employment action.

## A. Protected Activities Under § 704(a)

We first examine whether Littlejohn participated in a "protected activity" under the retaliation provisions of Title VII. For purposes of determining whether an activity is protected, § 704(a) includes "both an opposition clause and a participation clause."*Townsend v. Benjamin Enters., Inc.,* 679 F.3d 41, 48 (2d Cir.2012). The opposition clause makes it unlawful for an employer to retaliate against an individual because she "opposed any practice" made unlawful by Title VII, while the participation clause makes it unlawful to retaliate against an individual because she "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under" Title VII. *Id.* (quoting 42 U.S.C. § 2000e–3(a)). We have recently made clear that the participation clause only encompasses participation in formal EEOC proceedings; it "does not include participation in an internal employer investigation unrelated to a formal EEOC charge."*Id.* at 49.

The district court concluded that Littlejohn's complaints of racial discrimination to Mattingly and Baker during the ACS/DJJ merger were not protected activities under either § 704(a)'s participation clause or opposition clause. The court was correct to conclude that Littlejohn's internal complaints of discrimination prior to her EEOC proceedings, which commenced in October 2011, were not protected activities under the participation clause, as those complaints

were "unrelated to a formal EEOC charge."*Id.* However, the district court erred in concluding that Littlejohn's complaints were not protected activities under the opposition clause.

This Court has not addressed the extent to which an employee's complaints of discrimination are protected activities under the opposition clause when that employee's job responsibilities involve preventing and investigating discrimination within the company or agency by which she is employed. Several district courts in this Circuit, focusing largely on the scope of an employee's job responsibilities, have held that "a supervisor's involvement, as part of his routine job duties, in reporting or investigating incidents of harassment between employees under his supervision does not qualify as protected activity."*Sarkis v. Ollie's Bargain Outlet,* No. 10–CV–6382 CJS, 2013 WL 1289411, at *13 (W.D.N.Y. Mar. 26, 2013)* (emphasis omitted); *see also Adams v. Northstar Location Servs., LLC,* No. 09–CV–1063–JTC, 2010 WL 3911415, at *4 (W.D.N.Y. Oct. 5, 2010)* ("[P]laintiff's actions in investigating the complaint of race-based harassment would not constitute protected activity, as plaintiff was acting in the scope of her employment as a human resources director by interviewing the witnesses to the incident."); *Ezuma v. City Univ. of N.Y.,* 665 F.Supp.2d 116, 123–24 (E.D.N.Y.2009)* ("[I]f an academic chairperson is required as part of his job to report incidents of sexual harassment that come to his attention, as is the case here, the mere performance of that function is not 'opposition' to his employer and does not constitute protected activity.").

 **\*13** The Supreme Court, however, recently clarified in *Crawford v.Metropolitan Government of Nashville & Davidson County* that, "[w]hen an employee communicates to her employer a belief that the employer has engaged in ... a form of employment discrimination, that communication *virtually always* constitutes the employee's *opposition* to the activity."*555 U.S. 271, 276, 129 S.Ct. 846, 172 L.Ed.2d 650 (2009)* (first emphasis added) (internal quotation marks omitted).*Crawford* stated that any activity designed "to resist or antagonize ...; to contend against; to confront; resist; [or] withstand" discrimination prohibited by Title VII constitutes a protected oppositional activity. [16] *Id.* (internal quotation marks omitted).*Crawford* is consistent with our prior decisions, in which we have explained that protected activities are not limited to complaints involving discrimination against the complainant herself, but also extend to complaints of discrimination on behalf of other employees and complaints of discriminatory practices generally: "§ 704(a)'s opposition clause protects [formal] as well [as] informal protests of discriminatory employment practices, including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges."*Sumner v. U.S. Postal Serv.,* 899 F.2d 203, 209 (2d Cir.1990)*.

Significantly, neither *Crawford* nor *Sumner* restricted their holdings to non-managers or to employees whose job responsibilities are untethered to monitoring discrimination or enforcing non-discrimination policies. And for good reason: The plain language of § 704(a)'s opposition clause —which prohibits employers from "discriminat[ing] against *any*... employee [ ] ... because he has opposed any practice made an unlawful employment practice by this subchapter,"*42 U.S.C. § 2000e–3(a)* (emphasis added)—does not distinguish among entry-level employees, managers, and any other type of employee.

Defendants suggest that allowing personnel officers to bring retaliation claims under the opposition clause based on complaints lodged in connection with their official duties would create an automatic prima facie case of retaliation for any terminated human resources or EEO employee. Since such employees' daily work involves reporting on claims of discrimination in ways that could be construed as "opposing" discrimination, Defendants reason that any adverse action taken against those employees would likely be in close proximity to such opposition and could consequently risk embroiling an employer in gratuitous litigation.

Whatever the merits of that argument, we are not empowered to create exceptions to § 704(a) inconsistent with the statutory language. In any event, we do not believe that our interpretation will have any such dire effect. There is a significant distinction between merely reporting or investigating other employees' complaints of discrimination, which simply fulfills a personnel manager's daily duties, and communicating to the employer the manager's own "belief that the employer has engaged in ... a form of employment discrimination," which "virtually always constitutes" opposition notwithstanding the employee's underlying job responsibilities. *Crawford,* 555 U.S. at 276, 129 S.Ct. 846* (internal quotation marks omitted). Where the officer merely transmits or investigates a discrimination claim without expressing her own support for that claim, "the mere passing on of [a complainant's] statements by a supervisor or human resources manager is not inherently

'oppositional' in the same way as the victim's own report of that misconduct." *Ezuma,* 665 F.Supp.2d at 123.

**\*14** **[22]** Accordingly, consistent with *Crawford, Sumner*, and the plain language of § 704(a), we hold as follows: To the extent an employee is required as part of her job duties to report or investigate other employees' complaints of discrimination, such reporting or investigating by itself is not a protected activity under § 704(a)'s opposition clause, because merely to convey others' complaints of discrimination is not to oppose practices made unlawful by Title VII. But if an employee—even one whose job responsibilities involve investigating complaints of discrimination—actively "support[s]" other employees in asserting their Title VII rights or personally "complain[s]" or is "critical" about the "discriminatory employment practices" of her employer, that employee has engaged in a protected activity under § 704(a)'s opposition clause. *Sumner,* 899 F.2d at 209.

**[23]** Here, Littlejohn alleges that she, "in her capacity as Director of EEO [,] repeatedly objected and complained to defendants Mattingly and Baker about defendants' selection process and failure to abide by proper anti-discrimination policies and procedures."Compl. ¶ 64. Littlejohn also alleges that she "objected to defendants Mattingly and Bakers' discriminatory policies during scheduled meetings with them" over the course of more than a year. *Id.* ¶ 65. Littlejohn argues on appeal that she stepped outside her role as EEO Director when she advocated for minority DJJ employees, but regardless of whether she made these complaints in her capacity as EEO Director, "§ 704(a)'s opposition clause protects" such "complaints to management" and "protest[s] against discrimination." *Sumner,* 899 F.2d at 209. Littlejohn was not simply conveying others' complaints of discrimination to Mattingly and Baker or alerting them to Title VII's mandates; she was complaining about what she believed was unlawful discrimination in the personnel decision-making process during the ACS/DJJ merger. Her complaints of discrimination were protected activities under § 704(a)'s opposition clause.

## B. Causal Connection Between the Protected Activity and the Adverse Employment Action

We next consider whether Littlejohn pleaded a causal connection between the protected activities and her demotion. Although the district court cabined Littlejohn's protected activities to two discrete time periods—between January and April 2010, and after October 2010—Littlejohn in fact alleges

that "[d]uring the above stated time period [between January 2010 and March 2011], Plaintiff in her capacity as Director of EEO repeatedly objected and complained to defendants Mattingly and Baker about defendants' selection process and failure to abide by proper policies and procedures."Compl. ¶¶ 63–64. Littlejohn also claimed that "[f]rom on or about January 2010 to *March 14, 2011* Plaintiff objected to defendants Mattingly and Bakers' discriminatory policies during scheduled meetings with them."*Id.* ¶ 65 (emphasis added). Accordingly, Littlejohn alleges that her complaints about racial discrimination began around the time of the ACS/DJJ merger and continued until she was demoted from EEO Director.

**\*15** A causal connection in retaliation claims can be shown either "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant."*Gordon v. N.Y.C. Bd. of Educ.,* 232 F.3d 111, 117 (2d Cir.2000). As discussed above, none of Defendants' actions directly indicates racial bias, nor do those actions directly establish retaliatory animus based on Littlejohn's complaints of discrimination during the ACS/DJJ merger.

**[24]** However, Littlejohn sufficiently pleaded facts that would indirectly establish causation. According to Littlejohn's complaint, her demotion closely followed her protests of discrimination. Although the district court concluded that Littlejohn's complaints of discrimination began over a year before her March 2011 demotion, Littlejohn alleges that she "objected and complained" to Defendants through March 14, 2011—the day of her demotion—and described in her complaint specific instances in which she objected to discrimination during the year preceding her demotion. Compl. ¶¶ 48–51, 65. At the motion to dismiss stage, we accept these allegations as true and draw all inferences in Littlejohn's favor. *See Ofori–Tenkorang,* 460 F.3d at 300. We have "not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action."*Gorman–Bakos v. Cornell Coop. Extension of Schenectady Cnty.,* 252 F.3d 545, 554 (2d Cir.2001). But Littlejohn's allegations that the demotion occurred within days after her complaints of discrimination

are sufficient to plausibly support an indirect inference of causation.[17]

Because Littlejohn's complaint alleges that her "protected activity was followed closely by discriminatory treatment,"*Gordon,* 232 F.3d at 117, and because Littlejohn alleges facts that would be sufficient to establish the other elements of a prima facie case of retaliation, her allegations were more than sufficient to withstand the instant motion to dismiss. The district court erred in dismissing this claim. Littlejohn's retaliation claim therefore survives against the City under Title VII and survives against Defendant Baker under § 1981. As with her disparate treatment claim, Littlejohn's retaliation claim against Defendants Mattingly and Stradford was properly dismissed because they were not involved in her demotion.

## IV. Hostile Work Environment Claim

[25] Littlejohn alleges that individual Defendants Mattingly and Baker created a hostile work environment based on Littlejohn's race from January 2010 to September 2012 in violation of Title VII, § 1981, and § 1983. Title VII prohibits an employer from discriminating in "compensation, terms, conditions, or privileges of employment, because of [an] individual's race, color, religion, sex or national origin."42 U.S.C. § 2000e–2(a)(1)."The phrase terms, conditions, or privileges of employment evinces a congressional intent to strike at the entire spectrum of disparate treatment ..., which includes requiring people to work in a discriminatorily hostile or abusive environment."*Redd v. N.Y. Div. of Parole,* 678 F.3d 166, 175 (2d Cir.2012) (internal quotation marks omitted).Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State ... to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens."42 U.S.C. § 1981. Section 1981 has been interpreted to "provide[ ] a cause of action for race-based employment discrimination based on a hostile work environment."*Whidbee v. Garzarelli Food Specialties, Inc.,* 223 F.3d 62, 69 (2d Cir.2000). Finally, § 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law."42 U.S.C. § 1983. Section 1983, through its application of the Equal Protection Clause

of the Fourteenth Amendment, "protect[s] public employees from various forms of discrimination, including hostile work environment and disparate treatment" on the basis of race. *Demoret v. Zegarelli,* 451 F.3d 140, 149 (2d Cir.2006).

*16 [26] [27] [28] [29] To establish a hostile work environment under Title VII, § 1981, or § 1983, a plaintiff must show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."*Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (citations and internal quotation marks omitted)."This standard has both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive."*Raspardo,* 770 F.3d at 114 (citing *Harris,* 510 U.S. at 21–22, 114 S.Ct. 367)."The incidents complained of must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive."*Id.* (internal quotation marks omitted). In determining whether a plaintiff suffered a hostile work environment, we must consider the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."*Harris,* 510 U.S. at 23, 114 S.Ct. 367.

Littlejohn's hostile work environment claim is predicated on the following allegations[18]: Baker made negative statements about Littlejohn to Mattingly; Baker was impatient and used harsh tones with Littlejohn; Baker distanced herself from Littlejohn when she was nearby; Baker declined to meet with Littlejohn; Baker required Littlejohn to recreate reasonable accommodation logs; Baker replaced Littlejohn at meetings; Baker wrongfully reprimanded Littlejohn; and Baker increased Littlejohn's reporting schedule. Baker also sarcastically told Littlejohn "you feel like you are being left out," and that Littlejohn did not "understand the culture" at ACS. Compl. ¶¶ 49, 77.

[30] These allegations could not support a finding of hostile work environment that is so severe or pervasive as to have altered the conditions of Littlejohn's employment. *See, e.g., Fleming v. MaxMara USA, Inc.,* 371 Fed.Appx. 115, 119 (2d Cir.2010) (concluding that no hostile work environment existed even though "defendants wrongly excluded [the

plaintiff] from meetings, excessively criticized her work, refused to answer work-related questions, arbitrarily imposed duties outside of her responsibilities, threw books, and sent rude emails to her"); *see also Davis–Molina v. Port Auth. of N.Y. & N.J.,* No. 08 CV 7586(GBD), 2011 WL 4000997, at *11 (S.D.N.Y., Aug. 19, 2011) (finding that "diminished [job] responsibilities," "exclu[sion] from staff meetings," deliberate "avoid[ance]," "yell[ing] and talk[ing] down to," and an increased workload of menial tasks, among other factors, was not enough to show that defendants' conduct was sufficiently severe or pervasive), *aff'd,* 488 Fed.Appx. 530 (2d Cir.2012). The claim was therefore properly dismissed.

## V. Sexual Harassment Claim

**\*17** Littlejohn alleges that Defendant Stradford continuously sexually harassed her in violation of Title VII. The district court found that Littlejohn did not exhaust her administrative remedies with respect to this claim and dismissed it for lack of jurisdiction.[19] We agree that Littlejohn's sexual harassment claim was properly dismissed for failure to exhaust her administrative remedies.

**[31]** **[32]** **[33]** Before bringing a Title VII suit in federal court, an individual must first present "the claims forming the basis of such a suit ... in a complaint to the EEOC or the equivalent state agency." *Williams v. N.Y.C. Hous. Auth.,* 458 F.3d 67, 69 (2d Cir.2006) (per curiam) (citing 42 U.S.C. § 2000e–5). The complainant must file the complaint with the relevant agency "within 300 days of the alleged discriminatory conduct and, before bringing suit, must receive a 'Notice of Right to Sue' letter from the EEOC." *Id.* Nevertheless, claims not raised in an EEOC complaint may still be part of the complaint later filed in federal court "if they are 'reasonably related' to the claim filed with the agency." *Id.* at 70. A claim is reasonably related to the filed claim "if the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge that was made." *Deravin v. Kerik,* 335 F.3d 195, 200–01 (2d Cir.2003) (internal quotation marks omitted). In making such a determination, we focus "on the factual allegations made in the [EEOC] charge itself, describing the discriminatory conduct about which a plaintiff is grieving." *Id.* at 201 (alteration in original) (internal quotation marks omitted). For instance, if the factual allegations in the EEOC charge "suggest [two] forms of discrimination"—even though the charge itself specifies only one—"so that the agency receives adequate notice to investigate discrimination on both bases,"

the claims are reasonably related to each other. *Id.* at 202. This exception to the exhaustion requirement for reasonably related claims is "based on the recognition that EEOC charges frequently are filled out by employees without the benefit of counsel and that their primary purpose is to alert the EEOC to the discrimination that a plaintiff claims [she] is suffering." *Id.* at 201 (internal quotation marks omitted); *cf. Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 167 L.Ed.2d 1081, (2007) (per curiam) (observing that "a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers" (internal quotation marks omitted)).

In Littlejohn's Intake Questionnaire and Charge of Discrimination filed with the EEOC on October 21, 2011, and February 2, 2012, respectively, Littlejohn claimed discrimination based on race and color. In the Charge of Discrimination, Littlejohn also claimed retaliation based on her complaints about such discrimination. Yet on neither of these forms did Littlejohn claim discrimination based on sex, even though there is a box to indicate discrimination based on sex located directly next to those for race and color. Nor did she reference Stradford or any of his alleged acts of sexual harassment in those completed forms or in her supplemental statements describing why she believed she was being discriminated against. Indeed, Littlejohn's Intake Questionnaire and Charge of Discrimination do not include any factual allegations whatsoever describing the alleged sexual harassment by Stradford, even though the harassment allegedly began in March 2011, well before she completed these forms.

**\*18** **[34]** We agree with the district court that Littlejohn's sexual harassment claim is not "reasonably related" to her EEOC discrimination claims, which were based solely on race and color. Stradford's alleged sexual harassment does not "fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge[s]" of race discrimination Littlejohn levied against Baker and Mattingly, *Deravin,* 335 F.3d at 200–01, as Stradford had no involvement in the race discrimination that allegedly occurred during the ACS/DJJ merger.

**[35]** Littlejohn argues that the letter she sent to Kevin Berry, the Director of the EEOC New York District Office, in which she referenced an "additional charge of hostile work environment-sexual harassment at the hands of [Stradford]," Littlejohn Aff., Ex. 11, itself constituted a charge of discrimination sufficient to fulfill Title VII's

exhaustion requirements. However, we have made clear that unsworn letters sent to the EEOC describing additional claims of discrimination unrelated to the claims described in the EEOC charge cannot "enlarge [the] scope [of the original charge] to include new claims." *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 83 (2d Cir.2001). Although "EEOC regulations do allow 'written statements' of fact to amend a charge," those regulations allow such amendments "only insofar as they 'clarify and amplify allegations made' in the original charge or 'alleg[e] additional acts which constitute unlawful employment practices related to or growing out of the subject matter of the original charge.' " *Id.* (quoting 29 C.F.R. § 1601.12(b) [20]) (alteration in original). A letter sent to the EEOC regarding a charge of discrimination is therefore "entitled to consideration only to the extent that it could be deemed an amendment to the original charge within the meaning of § 1601.12(b)." *Id.*It cannot "enlarge the scope of the [original EEOC] charge to encompass new unlawful employment practices or bases for discrimination." *Id.*

Here, Littlejohn's letter to Berry did not simply "clarify and amplify allegations made in the original [EEOC] charge," which claimed discrimination based solely on race and color, but rather included a "new unlawful employment practice[ ] or bas[i]s for discrimination" based on sexual harassment. *Id.* (internal quotation marks omitted). [21] Littlejohn could have filed a separate charge with the EEOC alleging an additional basis of discrimination within the appropriate limitations period, but she could not amend prior unrelated charges to add this additional basis simply by sending Berry an unsworn letter. [22] *See id.*; 29 C.F.R. § 1601.12(b). Accordingly, Littlejohn did not present "the claims forming the basis" of her sexual harassment suit "in a complaint to the EEOC or the equivalent state agency,"*Williams,* 458 F.3d at 69, and she therefore failed to exhaust her administrative remedies as to that claim. The district court properly dismissed her sexual harassment claim.

## CONCLUSION

**\*19** For the foregoing reasons, we **VACATE** the district court's judgment granting Defendants' motion to dismiss with respect to (1) Littlejohn's disparate treatment and retaliation claims against the City under Title VII, (2) Littlejohn's disparate treatment claim against Defendant Baker under §§ 1981 and 1983, and (3) Littlejohn's retaliation claim against Baker under § 1981; **AFFIRM** the dismissal of the other

claims; [23] and **REMAND** for proceedings consistent with this opinion.

[1] Because this appeal involves review at the motion to dismiss stage, we base these facts on the allegations contained in Littlejohn's amended complaint ("Compl."), which we accept as true at this stage, and the documents incorporated by reference therein. *See DiFolco v. MSNBC Cable L.L.C.,* 622 F.3d 104, 110–11 (2d Cir.2010).

[2] An "Intake Questionnaire" allows an employee to provide the EEOC with basic preliminary information about herself, her employer, and the reason for her claim of discrimination, and begins the process of filing a charge of discrimination. When the Intake Questionnaire manifests intent to have the agency initiate its investigatory processes, the questionnaire can itself constitute a charge of discrimination. *See Holowecki v. Fed. Express Corp.,* 440 F.3d 558, 566–67 (2d Cir.2006).

[3] In reviewing a Rule 12(b)(6) motion to dismiss, "it is proper for this court to consider the plaintiff['s relevant filings with the EEOC" and other documents related to the plaintiff's claim, even if they are not attached to the complaint, so long as those filings are either "incorporate[d] by reference" or are "integral to" and "solely relie[d] upon" by the complaint. *Holowecki,* 440 F.3d at 565–66.

[4] Littlejohn has abandoned her constructive discharge claim on appeal.

[5] Littlejohn's letter was in response to a September 19, 2012 letter that she received from Berry in which Berry purportedly informed Littlejohn that her request for a right to sue letter had been forwarded to the U.S. Department of Justice for action. Littlejohn does not appear to have submitted Berry's letter to the district court and it is not part of the record on appeal.

[6] Of course, while a "satisfactory explanation by the defendant destroys the legally mandatory inference of discrimination arising from the plaintiff's initial evidence," the initial "evidence [used to establish the prima facie case] and inferences properly drawn therefrom may be considered by the trier of fact on the issue of whether the defendant's explanation is pretextual."*Burdine,* 450 U.S. at 255 n. 10, 101 S.Ct. 1089.

[7] We note that in *E.E.O.C. v. Port Authority of New York & New Jersey,* 768 F.3d 247 (2d Cir.2014), our Court found that the *Iqbal* requirement was applicable to a complaint

alleging a violation of the Equal Pay Act. *See id.* at 254. That case does not answer the question whether the *Iqbal* rule applies to Title VII complaints governed by *McDonnell Douglas.*Under the Equal Pay Act, liability turns on whether lesser pay is given for equivalent work-discriminatory motivation is not an element of the claim. *See Lavin–McEleney v. Marist Coll.,* 239 F.3d 476, 480 (2d Cir.2001). Moreover, the Equal Pay Act does not fall under the burden-shifting framework of *McDonnell Douglas. See Belfi v. Prendergast,* 191 F.3d 129, 135 (2d Cir.1999).

8    *Twombly* also pointed to *Swierkiewicz* for the unrelated point that courts must assume the truth of sufficiently detailed factual allegations in passing upon a 12(b)(6) motion. *Twombly,* 550 U.S. at 555–56, 127 S.Ct. 1955.

9    The First Circuit perhaps intended to convey a similar understanding of the interplay between *Iqbal* and the *McDonnell Douglas* quartet when it stated that "the elements of a prima facie case may be used as a prism to shed light upon the plausibility of the claim."*Rodriguez–Reyes v. Molina–Rodriguez,* 711 F.3d 49, 54 (1st Cir.2013).

10   To the extent Littlejohn attempts to point to exclusion from meetings involving the ACS/DJJ merger as part of her disparate treatment claim, such exclusion does not constitute an adverse employment action within the meaning of Title VII. An adverse employment action is "more disruptive than a mere inconvenience or an alteration of job responsibilities."*Galabya v. N.Y.C. Bd. of Educ.,* 202 F.3d 636, 640 (2d Cir.2000) (internal quotation marks omitted). It is "a *materially significant disadvantage* with respect to the terms of [the plaintiff's] employment."*Williams v. R.H. Donnelley, Corp.,* 368 F.3d 123, 128 (2d Cir.2004) (emphasis added) (internal quotation marks omitted). Examples of materially significant disadvantages include termination, demotion, "a less distinguished title, a material loss of benefits, [or] significantly diminished material responsibilities."*Galabya,* 202 F.3d at 640. Baker's failure to include Littlejohn in the decision-making process of the merger did not "significantly diminish[ ]" Littlejohn's responsibilities. *Id.*

11   Defendants, citing *Harding v. Wachovia Capital Markets, LLC,* 541 Fed.Appx. 9 (2d Cir.2013), argue that Littlejohn needed to plead factual allegations indicating that her qualifications were "so superior" to those of Monn that no reasonable employer could have chosen Monn over Littlejohn for the position. Defs.' Br. 27. *Harding,* however, involved a plaintiff's failure to demonstrate that the defendants' non-discriminatory

reasons for not promoting him were pretextual on a motion for summary judgment. 541 Fed.Appx. at 12–13. At the prima facie stage, "the mere fact that a plaintiff was replaced by someone outside the protected class will suffice for the required inference of discrimination."*Zimmermann,* 251 F.3d at 381.

12   Although the complaint also alleges suit against Mattingly in his official capacity, Littlejohn does not argue on appeal that the district court erred in dismissing her claims against Mattingly in his official capacity. We therefore deem the argument forfeited. *See Norton v. Sam's Club,* 145 F.3d 114, 117 (2d Cir.1998) ("Issues not sufficiently argued in the briefs are considered waived and normally will not be addressed on appeal.").

13   It is uncontested at this stage that Baker was acting under color of state law when she demoted Littlejohn, as is required for § 1983 liability. *See, e.g., Annis v. Cnty. of Westchester,* 36 F.3d 251, 254 (2d Cir.1994) ("There can be no question that defendants ... are, in their personal capacities, amenable to suit under [§ 1983], inasmuch as they were conducting themselves as supervisors for a public employer and thus were acting under color of state law [when they allegedly discriminated against the plaintiff].").

14   The Equal Protection Clause does not protect against retaliation due to complaints of racial discrimination. *Bernheim v. Litt,* 79 F.3d 318, 323 (2d Cir.1996). Littlejohn's retaliation claim therefore fails under § 1983. Section 1981, however, does encompass retaliation claims. *See CBOCS W., Inc. v. Humphries,* 553 U.S. 442, 446, 128 S.Ct. 1951, 170 L.Ed.2d 864 (2008).

15   As described above, only Littlejohn's demotion constitutes an adverse employment action, not her exclusion from meetings involving the ACS/DJJ merger. *See Galabya,* 202 F.3d at 640. In any case, Littlejohn was excluded from meetings before she began complaining about discrimination in the merger process, so that exclusion could not have been in retaliation for her complaints.

16   Prior to *Crawford,* certain Circuits had applied the so-called "manager rule" to retaliation claims under the Fair Labor Standards Act, which other courts, in turn, imported to claims under Title VII. This rule provided that complaints of discrimination within the scope of a manager's job duties are not protected activities, and that, in order to engage in protected activity, the employee must "step outside his or her role of representing the company" and take action adverse to the company.*McKenzie v. Renberg's Inc.,* 94 F.3d 1478, 1486 (10th Cir.1996); *see also Brush v. Sears Holdings*

*Corp.,* 466 Fed.Appx. 781, 787 (11th Cir.2012); *Hagan v. Echostar Satellite, L.L.C.,* 529 F.3d 617, 627–28 (5th Cir.2008). It is unclear whether *Crawford* superseded the manager rule. *See Weeks v. Kansas,* 503 Fed.Appx. 640, 643 (10th Cir.2012) (explaining that "one might perhaps argue that *McKenzie's* rule itself has been superseded" by *Crawford* ).*But see Brush,* 466 Fed.Appx. at 787 ("While Brush argues that *Crawford* has foreclosed the 'manager rule,' we cannot agree."(footnote omitted)); *Collazo v. Bristol–Myers Squibb Mfg., Inc.,* 617 F.3d 39, 49 (1st Cir.2010) ("assum [ing]," post-*Crawford,* that "to engage in protected conduct under Title VII's retaliation provision, an employee must step outside his ordinary employment role of representing the company and take action adverse to the company"). In any event, we decline to adopt the manager rule here. The manager rule's focus on an employee's job duties, rather than the oppositional nature of the employee's complaints or criticisms, is inapposite in the context of Title VII retaliation claims.

17    Littlejohn's formal EEOC proceedings beginning in October 2011, however, are not causally connected to her demotion because those proceedings began more than six months after her demotion in March. Thus, her demotion cannot have occurred in retaliation for them. Similarly, Littlejohn's participation as a witness for fellow employee Tonia Haynes in Haynes's discrimination suit against ACS occurred in December 2011, well after Littlejohn's demotion.

18    Because there is nothing in Littlejohn's EEOC charge that would have put the agency on notice that she was alleging hostile work environment on the basis of sex or sexual harassment, the EEOC cannot reasonably have been expected to investigate whether she experienced a hostile work environment based on sex. We therefore do not consider Littlejohn's sexual harassment allegations against Stradford in our analysis, as such allegations are not "reasonably related" to her hostile work environment claim based on race and color, as discussed below.*Williams v. N.Y.C. Hous. Auth.,* 458 F.3d 67, 70 (2d Cir.2006) (per curiam).

19    The district court held that Littlejohn's failure to exhaust administrative remedies precluded the court from asserting jurisdiction. While Littlejohn's failure

to exhaust her administrative remedies did justify the dismissal of the claim, it was not for lack of jurisdiction. *See Francis v. City of New York,* 235 F.3d 763, 768 (2d Cir.2000) (holding that exhaustion of administrative remedies is not a "jurisdictional prerequisite" to a Title VII claim).

20    Section 1601.12(b) provides, in relevant part, that "[a] charge may be amended to cure technical defects or omissions, including failure to verify the charge, or to clarify and amplify allegations *made therein.*Such amendments and amendments alleging additional acts which constitute unlawful employment practices *related* to or growing out of the subject matter of the original charge will relate back to the date the charge was first received."29 C.F.R. § 1601.12(b) (emphases added).

21    Furthermore, one of the purposes of an EEOC charge is to "provide [ ] the EEOC with an opportunity to notify the prospective defendants and seek conciliation."*Holowecki,* 440 F.3d at 567. Littlejohn did not send Berry the letter attempting to add a sexual harassment charge until after she received a letter from Berry stating that her request that the EEOC grant her leave to bring a federal civil action with respect to her race and color discrimination charges had been forwarded to the Department of Justice, which effectively terminated that conciliatory process.

22    This is hardly an unreasonable burden to impose, especially on Littlejohn, whose previous job duties as ACS's Director of EEO included investigating charges of discrimination and counseling other employees on the procedures for making such claims.

23    Littlejohn also raises, for the first time on appeal, a *Monell* claim against the City for violating her First Amendment rights, as well as an equal protection claim against Stradford for his alleged sexual harassment. Neither of these claims were included in Littlejohn's complaint or raised below, and we therefore do not address them further.

**All Citations**

--- F.3d ----, 2015 WL 4604250

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 925933
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Cesar MATEO, Plaintiff,

v.

C.O. C. BRISTOW, et al., Defendants.

No. 12–cv–5052 (RJS)
(GWG). | Signed March 4, 2015.

*OPINION AND ORDER ADOPTING
REPORT AND RECOMMENDATION*

RICHARD J. SULLIVAN, District Judge.

**\*1** Plaintiff Cesar Mateo ("Plaintiff"), proceeding *pro se*, brings this action pursuant to 42 U.S.C. § 1983 against various corrections officers at the Sing Sing Correctional Facility ("Sing Sing"), in Ossining, New York, asserting claims for First Amendment retaliation, deprivation of property, wrongful confinement, and harassment. (*See* Doc. No. 1 ("Compl.")) Now before the Court is the Report and Recommendation of the Honorable Gabriel W. Gorenstein, Magistrate Judge, recommending that the Court grant Defendants' motion for summary judgment as to the sole remaining claim—the First Amendment retaliation claim—for failure to exhaust administrative remedies as required by the Prison Litigation Reform Act ("PLRA"). (Doc. No. 54 ("Report" or "Rep.").) For the reasons set forth below, the Court adopts the Report in its entirety.

**A. Background**

The Court assumes the parties' familiarity with the facts of this case, which are set forth thoroughly in the Report. (Rep. at 3–9.) Plaintiff filed this action on June 26, 2012, alleging constitutional violations stemming from incidents that occurred during his incarceration at Sing Sing. (*See* Compl.) Plaintiff alleges that on June 36, 2012, when he was getting ready for his wedding—scheduled to take place later that day at the facility—corrections officers Dean and Maldonado, in retaliation for Plaintiff having previously filed grievances and lawsuits against other corrections officers, searched his cell, deprived him of his property, and confined

him to his cell in "keeplock." [1] (Rep. at 3–4.) Plaintiff also claims that the day after his wedding, which occurred as planned, he was served with an incident report written by corrections officer Bristow and co-signed by corrections officer Ramos, alleging that Plaintiff had played his radio without headphones and refused to turn the radio over upon request. (*Id.* at 6–7.) Plaintiff asserts that the incident itself never took place, and that the report, which was later dismissed, was filed by Defendants to retaliate against him. (*Id.* at 7.)

[1] "Keeplock is a form of administrative segregation in which the inmate is confined to his cell, deprived of participation in normal prison routine, and denied contact with other inmates." *Holland v. Goord*, 758 F.3d 215, 218 n. 2 (2d Cir.2014) (citation and internal quotation marks omitted).

On July 16, 2013, the Court issued an Order dismissing Plaintiff's claims for deprivation of property, wrongful confinement, and harassment pursuant to Federal Rule of Civil Procedure 12(b)(6), but holding that Plaintiff had stated a claim for retaliation. (Doc. No. 22.) The Court also noted that Plaintiff had not pursued any administrative avenue of relief prior to filing the lawsuit, but concluded that nonexhaustion was not clear from the face of the Complaint because the Complaint alleged "facts that, if true, could establish that administrative remedies were functionally unavailable to him."(*Id.* at 4.) On August 2, 2013, the Court referred this action to Judge Gorenstein for general pretrial supervision and dispositive motions requiring a report and recommendation. (Doc. No. 24.) On March 28, 2014, Defendants filed the instant motion (Doc. No. 40), arguing that summary judgment should be granted in their favor because (1) Plaintiff has not demonstrated that he is excused from the exhaustion requirement; (2) there is no genuine dispute of material fact as to the retaliation claim; and (3) Dean and Maldonado are entitled to qualified immunity. (Rep. at 12; Doc. No. 41.) Defendants' motion was fully briefed following Defendants' reply on May 23, 2014 (Doc. No. 51). On September 16, 2014, Judge Gorenstein issued the Report, which recommends that the Court grant Defendants' motion for summary judgment based on Plaintiff's failure to exhaust. The Report thoroughly examines the record and the law of exhaustion under the PLRA and concludes that Plaintiff's admitted failure to exhaust is not excused by any of the three exceptions recognized in this Circuit. *See Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir.2004); (Rep. at 15–21). On October 2, 2014, Plaintiff timely filed objections to the Report, asserting that, in fact, all three of the *Hemphill*

exceptions apply in this case, and that he is entitled to a trial on his claims. (Doc. No. 56 ("Objections" or "Objs.").) On October 14, 2014, Defendants filed their response to Plaintiff's Objections. (Doc. No. 57.)

## B. Legal Standard

**\*2** Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment should be rendered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."Fed.R.Civ.P. 56(a). There is "no genuine dispute as to any material fact" where (1) the parties agree on all facts (that is, there are no disputed facts); (2) the parties disagree on some or all facts, but a reasonable fact-finder could never accept the nonmoving party's version of the facts (that is, there are no genuinely disputed facts), *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); or (3) the parties disagree on some or all facts, but even on the nonmoving party's version of the facts, the moving party would win as a matter of law (that is, none of the factual disputes are material), *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

In determining whether a fact is genuinely disputed, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments."*Weyant v. Okst,* 101 F.3d 845, 854 (2d Cir.1996). Nevertheless, to show a genuine dispute, the nonmoving party must provide "hard evidence," *D'Amico v. City of N.Y.,* 132 F.3d 145, 149 (2d Cir.1998), "from which a reasonable inference in [its] favor may be drawn,"*Binder & Binder PC v. Barnhart,* 481 F.3d 141, 148 (2d Cir.2007) (internal quotation marks omitted). "Conclusory allegations, conjecture, and speculation," *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998), as well as the existence of a mere "scintilla of evidence in support of the [nonmoving party's] position,"*Anderson,* 477 U.S. at 252, are insufficient to create a genuinely disputed fact. A moving party is "entitled to judgment as a matter of law" on an issue if (1) it bears the burden of proof on the issue and the undisputed facts meet that burden; or (2) the nonmoving party bears the burden of proof on the issue and the moving party " 'show[s]'—that is, point[s] out ...—that there is an absence of evidence [in the record] to support the nonmoving party's [position],"*see Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).

The standard for reviewing a magistrate judge's report and recommendation is well settled. When no party objects, the Court may adopt the report if there is no clear error on the face of the record. *See Adee Motor Cars, LLC v. Amato,* 388 F.Supp.2d 250, 253 (S.D.N.Y.2005). A magistrate judge's decision is "clearly erroneous" only if the district court is "left with the definite and firm conviction that a mistake has been committed."*Easley v.. Cromartie,* 532 U.S. 234, 242 (2001) (quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 395 (1948)). When a party objects, the objections "must be specific and clearly aimed at particular findings in the magistrate judge's proposal."*Harden v. LaClaire,* No. 07–cv–4592 (LTS)(JCF), 2008 WL 4735231, at \*1 (S .D.N.Y. Oct. 27, 2008)."[I]f the party makes only conclusory or general objections, or simply reiterates his original arguments, the Court reviews the Report and Recommendation only for clear error."*Dawson v. Phillips,* No. 03–CV–8632 (RJS)(THK), 2008 WL 818539, at \*1 (S.D.N.Y. Mar. 25, 2008) (internal quotation marks omitted); *see also Forsberg v. Always Consulting, Inc.,* No. 06–cv–13488 (CS), 2008 WL 5449003, at \*4 (S.D.N.Y. Dec. 31, 2008) ("[E]ven a pro se party's objections to a Report and Recommendation must be specific and clearly aimed at particular findings in the magistrate's proposal, such that no party be allowed a second bite at the apple by simply relitigating a prior argument."). However, "[t]he district judge must determine *de novo* any part of the magistrate judge's disposition that has been properly objected to."Fed.R.Civ.P. 72(b)(3); 28 U.S.C. § 636(b)(1); *see also Grassia v. Scully,* 892 F.2d 16, 19 (2d Cir.1989) (explaining that § 636(b)(1)"affords the district court broad latitude" in reviewing the magistrate judge's recommendation).

## C. Discussion

**\*3** For the most part, Plaintiff's Objections are generalized assertions not aimed at specific findings in the Report, and simply reiterate the arguments previously made to Judge Gorenstein. These purported objections are thus improper, merely seeking a "second bite at the apple." *Thomas v. Astrue,* 674 F.Supp.2d 507, 511 (S.D.N.Y.2009). The sole possible exception—construed liberally—is Plaintiff's contention that the Report "underestimate[d] the special circumstances of the day of the events," insofar as a person of "ordinary firmness" would be more shaken by being badly mistreated on his or her wedding day than on an ordinary day, and would find the ability to file grievances subsequently foreclosed. (Objs.¶¶ 9–11.) Accordingly, the Court reviews the Report only for clear

error, with the exception of Judge Gorenstein's conclusion that no reasonable factfinder could determine that a person of "ordinary firmness" in Plaintiff's position would have found the Sing Sing grievance procedures unavailable. As to this conclusion, the Court had little difficulty concluding on *de novo* review that Judge Gorenstein's recommendation was correct, for substantially the reasons set forth in the Report. (*See* Rep. at 15–19.)

In order for the exhaustion requirement to be relieved on grounds of unavailability, Plaintiff's "fear that disciplinary actions will be taken against him if he proceeds with a grievance process must, at a minimum, be reasonable."*Contino v. City of New York,* No. 11–cv–8537 (DLC), 2013 WL 4015816, at *6 (S.D.N.Y. Aug. 7, 2013). Here, Plaintiff has offered nothing more than "conclusory assertion[s] that he feared retaliation if he completed the grievance process," which is insufficient as a matter of law. *Id* . Specifically, Plaintiff does not allege that he was, at any point, threatened or warned about future grievances. Rather, he simply argues that Defendants Dean and Maldonado told him they would prevent him from attending his wedding— a threat that, within hours, Plaintiff learned to be empty—in retaliation for *past* grievances, and that Dean said he would "feed this guy some crap." However, Plaintiffs "generalized fear" of retribution is "insufficient to render the grievance process unavailable."*Carlson v. Parry,* No. 06–cv–6621, WL 5354517, at *9 (W.D.N.Y. Sept. 24, 2013); *cf. Mateo v. O'Connor,* No. 10–cv–8426 (LAP), 2012 WL 1075830, at *8 (S.D.N.Y. Mar. 29, 2012) ("If every plaintiff bringing a retaliation claim could have the exhaustion requirement excused by alleging a fear of further retaliation, it would create a general exception to exhaustion for retaliation claims."(quoting *Harrison v. Stallone,* No. 9:06–cv–902 (LEK) (GJD), 2007 WL 2789473, at *6 (N.D.N.Y. Sept. 24, 2007))).

As to the conduct of Defendants Ramos and Bristow, Plaintiff asserts that the second incident alleged in his Complaint —the false report filed by those corrections officers—was also retaliation for his previous grievances, and has made him unable to file further grievances. But once again, this allegation is nothing more than a "conclusory assertion that he feared retaliation if he completed the grievance process," and is thus insufficient. *Contino,* 2013 WL 4015816, at *6. Indeed, nowhere does Plaintiff allege that Ramos or Bristow ever even *mentioned* grievances or said anything suggestive of retaliation. Plaintiff even acknowledges that he had *never interacted* with either Ramos or Bristow prior to the allegedly

false report, had never filed a grievance against either, and had never seen Ramos or Bristow with Dean or Maldonado. (*See* Deposition of Cesar Mateo, dated Jan. 16, 2014 (attached as Ex. A to Declaration of Kruti D. Dharia, filed Mar. 28, (Doc. No. 43)) ("Mateo Dep,"), at 43–44, 18–19, 31.) Clearly, such "speculation and conjecture" does not create a triable issue of fact as to whether a reasonable juror could find that a person of ordinary firmness in Plaintiff's position could find the grievance procedures unavailable to him. *Harlen Assocs. v. Inc. Vill. of Mineola,* 273 F.3d 494, 499 (2d Cir.2001).

**\*4** Finally, Plaintiff's contention that the grievance procedures were unavailable to him due to his reasonable fear of retaliation is further undermined by his conduct after the incidents in question. Plaintiff testified during his deposition that after he wrote letters complaining to prison officials about Maldonado and Dean, he had a face-to-face meeting with an official at which both Maldonado and Dean were present, and that he "spoke about the incident in [their] presence"—but that he nonetheless *still* did not file a grievance afterwards. (Mateo Dep. at 64:11–65:11.) Plaintiff's assertion that he was chilled from filing a grievance against the corrections officers even though he was willing to complain through official channels while in the presence of the very officers about whom he was complaining strains credulity. Accordingly, the Court has little difficulty concluding that no reasonable factfinder could find that the grievance procedure was unavailable to Defendant in light of this conduct. *See Snyder v. Whittier,* 428 F. App'x 89, 91 (2d Cir.2011) (affirming grant of summary judgment) ("[W]hile Snyder's subjective fear is ... not dispositive, it is nonetheless relevant that two hours after the assault, Snyder complained to Corrections Officer Funnye, who Snyder testified was friendly with [the alleged assaulting officer]."). In fact, even after *filing this very lawsuit,* Plaintiff never attempted to file a grievance, and was apparently unable to "bring [himself] to do it." (Mateo Dep. at 53:3–11.) Surely the grievance process cannot be said to be unavailable because of a reasonable threat of retaliation where Plaintiff filed a lawsuit regarding the very same conduct. *See Mateo v. O'Connor,* 2012 WL 1075830, at *8 ("Mateo's argument is again undermined by his continued filing of grievances and lawsuits during and after the period in question."). Thus, upon a *de novo* review of Plaintiff's claims concerning the unavailability of administrative procedures, the Court concludes that no reasonable juror could find that a person of ordinary firmness in Plaintiff's position would find the grievance procedure unavailable.

Finally, the Court has reviewed the rest of Judge Gorenstein's recommendation and the record, and concludes that the Report is not otherwise clearly erroneous. To the contrary, the Court finds the Report to be thorough and well-reasoned, and would adopt it even upon a *de novo* review. Accordingly, the Court adopts the remainder of the Report in its entirety.

### D. Conclusion

For the foregoing reasons, the Court adopts the Report in its entirety, and HEREBY ORDERS THAT Defendants' motion for summary judgment is GRANTED. Additionally, for the reasons set forth above, the Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Order would not be taken in good faith. Accordingly, IT IS FURTHER ORDERED THAT *in forma pauperis* status is denied for the purpose of an appeal. *See Coppedge v. United States,* 369 U.S. 438, 444–45 (1962). The Clerk of the Court is respectfully directed to terminate the motion pending at docket entry number 40 and close this case.

**\*5** SO ORDERED.

**All Citations**

Slip Copy, 2015 WL 925933

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 1975437
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Danny RIVERA, Plaintiff,

v.

C.O. P. DIANARDO, Defendant.

No. 10–CV–1500 (NAM/CFH). | April 16, 2013.

**Attorneys and Law Firms**

Danny Rivera, Auburn, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State of New York, DAvid L. Cochran, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendant.

**REPORT–RECOMMENDATION AND ORDER** [1]

[1] This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

CHRISTIAN F. HUMMEL, United States Magistrate Judge.

**\*1** Plaintiff pro se Danny Rivera ("Rivera"), an inmate currently in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), brings this action against Dianardo, a DOCCS employee, alleging violations of the Civil Rights Act, 42 U.S.C. § 1983. Compl. (Dkt. No. 1). Rivera contends that Dianardo deprived him of his constitutional rights under the Fourteenth Amendment. *Id.* Presently pending is defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56.Dkt. No. 27.Rivera does not oppose this motion. For the reasons which follow, it is recommended that Dianardo's motion be granted.

**I. Failure to Respond**

Rivera did not oppose defendant's motion although the Court notified him of his response deadline then *sua sponte* granted him an extension to file a response. Dkt. Nos. 28, 30."Summary judgment should not be entered by default against a pro se plaintiff who has not been given any notice that failure to respond will be deemed a default."*Champion*

*v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). Dianardo provided notice in his motion papers as required by the Second Circuit and as normally done by the office of defendants' counsel. *Id.;* Dkt. No. 27–1.Further, the Court provided such notice by mail. Dkt. No. 30.Despite the notices and the extension of time, Rivera failed to respond.

"The fact that there has been no response to a summary judgment motion does not ... mean that the motion is to be granted automatically."*Champion,* 76 F.3d at 486. Even in the absence of a response, defendants are entitled to judgment only if the material facts demonstrate their entitlement to judgment as a matter of law. *Id.;* FED. R. CIV. P. 56(c)."A verified complaint is to be treated as an affidavit ... and therefore will be considered in determining whether material issues of fact exist...."*Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) (citations omitted). The facts set forth in defendant's Rule 7.1 Statement of Material Facts (Dkt. No. 18–2) [hereinafter "Def.'s Statement"] are accepted as true as to those facts that are not disputed in Rivera's complaint. N.D.N.Y.L.R. 7.1(a)(3) ("The Court shall deem admitted any properly supported facts set forth in the Statement of Facts that the opposing party does not specifically controvert.") (emphasis omitted).

**II. Background**

At all relevant times, Rivera was an inmate at the Auburn Correctional Facility ("Auburn"). Def.'s Statement ¶¶ 2–3; Compl. at 2–3.

On November 29, 2010, Rivera filed the complaint to this action, alleging that defendant Dianardo, a correction officer, has "racist issue[s]" with the fact that Rivera is Muslim. Compl. at 4; see Def.'s Statement ¶¶ 1, 3. Rivera alleged that because of his religion, Dianardo (1) "all the time" called him by inappropriate names, (2) denied him three meals, and (3) denied him programs. Compl. at 4.; see Def.'s Statement % 1. Rivera claims that he filed two grievances against Dianardo as well as written complaints to a Superintendent. Compl. at 2. As of October 16, 2012, DOCCS's Inmate Grievance Program records show that Rivera never appealed any grievances. Def.'s Statement ¶ 4; Hale Aff. (Dkt. No. 27–3) ¶¶ 3–4; Dkt. No. 27–4.

**\*2** By Decision and Order, Rivera's Eighth Amendment claim regarding denied meals was dismissed without prejudice and Fourteenth Amendment claim regarding denied

programming was dismissed with prejudice. Def.'s Statement % 3; Dkt. No. 5 at 7. The only remaining claim is Rivera's Fourteenth Amendment equal protection claim alleging that Dianardo discriminated against him on account of his religion by calling him names and denying him meals and programming.Dkt. No. 5 at 4.

### III. Discussion

Rivera contends that Dianardo violated his equal protection rights under the Fourteenth Amendment. Dianardo seeks dismissal of Rivera's complaint for Rivera's failure to exhaust his administrative remedies.

### A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts.*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1223–24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

When, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," ... that a pro se litigant's submissions must be construed "liberally,"... and

that such submissions must be read to raise the strongest arguments that they "suggest,".... At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by pro se litigants,"... and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law...."

**\*3** *Id.*(citations and footnote omitted); *see also Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 191–92 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se,*... a court is obliged to construe his pleadings liberally.' " (citations omitted)). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion; the requirement is that there be no genuine issue of material fact.*Anderson,* 477 U.S. at 247–48.

### B. Failure to Exhaust

Under 42 U.S.C. § 1997e(a), an inmate must exhaust all administrative remedies prior to bringing any suits challenging prison conditions, including federal civil rights cases. *Porter v.. Nussle,* 534 U.S. 516, 524 (2002); *see also Woodford v. Ngo,* 548 U.S. 81, 83 (2006). This exhaustion requirement applies to all prison condition claims. *Porter,* 534 U.S. at 532. "[A]ny deprivation that does not affect the fact or duration of a prisoner's overall confinement is necessarily a condition of that confinement."*Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999). The exhaustion requirement also applies even if the administrative grievance process does not provide for all the relief requested by the inmate. *Porter,* 534 U.S. at 524.

Exhaustion for an inmate in DOCCS custody is generally achieved through the Inmate Grievance Program ("IGP").*See* N.Y. COMP. CODES R. & REGS. tit. 7, § 701.1, *et seq.* (2012). Allegations of staff harassment are subject to an expedited procedure whereupon the complaint is first reviewed by the Superintendent and only if it is not a bona fide claim will be returned to the IGP for normal processing. N.Y. COMP. CODES. R & REGS. tit. 7, § 701.8 (2012). Included within the IGP's exhaustion requirement is the prerequisite that the inmate file an appeal with Central Office Review Committee ("CORC") and receive a response from CORC prior to filing a federal lawsuit. *Torres v. Carry,* 672 F.Supp.2d 338, 344 (S.D.N.Y.2009); see also N.Y. COMP.

CODES R. & REGS. tit. 7 § 701.5(d)(2)(ii) (2012) ("The CORC shall review each appeal, render a decision on the grievance, and transmit its decision ... within 30 calendar days"). Disagreement with the superintendent's decision in the expedited review also requires an appeal to CORC. N.Y. COMP. CODES. R & REGS. tit. 7, § 701.8(g)-(h); *see also Espinal v. Goord,* 588 F.3d 119, 125 (2d Cir.2009) (explaining IGP and the expedited procedure for harassment claims and its appeal mechanism through CORC). Exhaustion must precede filing a lawsuit. *Neal v. Goord,* 267 F.3d 116, 122 (2d Cir.2001) ("Subsequent exhaustion after suit is filed therefore is insufficient."), *abrogated* in part on *other grounds* by *Porter,* 534 U.S. 516.

While the Supreme Court has deemed exhaustion mandatory, the Second Circuit has recognized that "certain caveats apply." *Ruggiero v. Cnty. of Orange,* 467 F.3d 170, 175 (2d Cir.2006) (citing *Giano v. Goord,* 380 F.3d 670, 677 (2d Cir.2004)). The failure to exhaust may be excused in limited circumstances.

**\*4** In determining whether such an exception is applicable, a district court must apply a three-part test: First, the court must determine whether administrative remedies in fact were available to the prisoner. Second, if such remedies were available, the court must determine whether the defendants' own actions inhibited the inmate's exhaustion of administrative remedies, thereby requiring that one or more of them be equitably estopped from raising the failure to exhaust as a defense. Finally, if administrative remedies were available and the defendants are not estopped, the court must determine whether any special circumstances justify the prisoner's failure to comply with administrative procedural requirements.

*Gayle v. Benware,* 716 F.Supp.2d 293, 298 (S.D.N.Y.2010) (internal citations omitted); *see generally Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004) (articulating above test as the appropriate method for excusing failure to exhaust given the present state of all Second Circuit opinions)."Unavailability of administrative remedies ... is an objective [test]: that is, would a similarly situated individual of ordinary firmness have deemed them unavailable."*Kasiem*

*v. Switz,* 756 F.Supp.2d 570, 576–77 (S.D.N.Y.2010) (internal quotation marks and citations omitted). Estoppel occurs when "an inmate reasonably understands that pursuing a grievance through the administrative process will be futile or impossible ... [as evidenced by] prison officials' threats, beatings, ... denials of grievance forms, or by other misconduct deterring [the inmate] from fulfilling the requisite procedure."*Id.* at 577 (internal quotation marks and citations omitted). If an inmate claims estoppel and continues to file complaints and grievances, the exception is inapplicable. *Id.* Special circumstances exist when an inmate's failure to comply can be justified. *Id.* (citations omitted). Justification is found "by looking at the circumstances which might understandably lead usually uncounselled prisoners to fail to grieve in the normally required way."*Giano v. Goord,* 380 F.3d 670, 678 (2d Cir.2004) (citations omitted).

In this case, DOCCS records do not show any grievances which were appealed regarding Rivera's meals and programming or complaints surrounding Dianardo's alleged discriminatory conduct. In Rivera's complaint, he contends that he filed grievances against Dianardo and a written complaint to the Superintendent. However, Rivera fails to respond to Dianardo's affirmative defense of exhaustion or originally include a copy of the complaint, grievance, or subsequent appeals. Rivera also fails to proffer that he ever attempted to engage in administrative appeals. Thus, Rivera's conclusory and unsupported claims are insufficient to defeat the computer print outs generated by the grievance program. Further, Rivera fails to contend that he was unaware of the grievance procedures, that they were unavailable to him, or that special circumstances existed to excuse his failure to exhaust. Rivera has therefore failed to exhaust his administrative remedies.

**\*5** "[W]here a prisoner has failed to satisfy the exhaustion requirement ... [t]he Second Circuit has held ... that dismissal with prejudice, when remedies are no longer available, is required in the absence of any justification for not pursuing such remedies."*Bridgeforth v. Barlett,* 686 F.Supp.2d 238, 239–40 (W.D.N.Y.2010) (internal quotation marks omitted) (citing *Giano v. Goord,* 380 F.3d 670, 675 (2d Cir.2004) (quoting *Berry v. Kerik,* 366 F.3d 85, 87–88 (2d Cir.2004)). Rivera had twenty-one calendar days from the alleged wrongful occurrence to file a grievance, N.Y. COMP. CODES. R & REGS. tit. 7, §§ 701.5(a), 701.8(a) (2012), and seven calendar days from receiving either the Inmate Grievance Resolution Committee's ("IGRC") or the superintendent's response to appeal that decision, *id.* §§

701.5(c), 701.8(h). The lapse in time between Rivera filing the complaint on November 29, 2010 and the IGP records evidencing the lack of any appealed grievances as of October 16, 2012, shows that administrative remedies are no longer available to Rivera. Moreover, as previously discussed, Rivera has not alleged any facts excusing his failure to exhaust. *Rodriguez v. Westchester Cnty. Jail Corr. Dep't,* 372 F.3d 485, 487 (2d Cir.2004) ("a prisoner's complaint should be dismissed with prejudice where administrative remedies were available for a reasonable length of time and were not exhausted 'in the absence of any justification.' " (citing *Berry,* 366 F.3d at 88)). As such, Rivera's suit should be dismissed with prejudice.

Accordingly, Dianardo's motion on this ground should be granted.

### IV. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that Dianardo's motion for summary judgment (Dkt. No. 27) be **GRANTED** and judgment be entered in favor of Dianardo and the complaint (Dkt. No. 1) be **DISMISSED** with prejudice.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 1975437

---

**End of Document**                              © 2015 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 1975435
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Danny RIVERA, Plaintiff,
v.
C.O. P. DIANARDO, Defendant.

No. 9:10–CV–1500 (NAM/
CFH).    |    May 13, 2013.

**Attorneys and Law Firms**

Danny Rivera, Auburn, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the
Assistant Attorney General, State of New York, The capitol,
David L. Cochran, Esq., of Counsel, Albany, NY, for
Defendant.

### ORDER

NORMAN A. MORDUE, District Judge.

**\*1** The above matter comes to me following a Report–
Recommendation by Magistrate Judge Christian F. Hummel

duly filed on the 16th day of April 2013. Following fourteen
(14) days from the service thereof, the Clerk has sent me
the file, including any and all objections filed by the parties
herein.

After careful review of all of the papers herein, including
the Magistrate Judge's ReportRecommendation, and no
objections submitted thereto, it is

**ORDERED** that:

1. The Report–Recommendation is hereby adopted in its
entirety.

2. The defendants' motion for summary judgment (Dkt.
No. 27) is granted, and this entire action is dismissed with
prejudice.

3. The Clerk of the Court shall serve a copy of this Order upon
all parties and the Magistrate Judge assigned to this case.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 1975435

End of Document                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 4716570
Only the Westlaw citation is currently available.
United States Court of Appeals,
Second Circuit.

David ROGOZ, Plaintiff–Appellant,

v.

CITY OF HARTFORD; Chief Daryl K. Roberts,
in his individual and official capacity; Detective
G. Watson, in his individual and official capacity;
Detective Rivera, in his individual and official
capacity; Officer George Water, in his individual
and official capacity; Officer James Rutkauski, in
his individual and official capacity; Officer Brandon
Flores, in his individual and official capacity; Officer
Steven J. Pileski, in his individual and official
capacity; Officer Cesar A. Beiros, in his individual
and official capacity, Defendants–Appellees. *

\* The Clerk of Court is instructed to amend the official
caption to conform with the above.

Docket No. 14–0876. | Argued: April
22, 2015. | Decided: Aug. 10, 2015.

Appeal from a judgment entered in the United States District
Court for the District of Connecticut, Vanessa L. Bryant,
*Judge,* dismissing, on summary judgment, plaintiff's claims
brought principally against defendant police officers under
42 U.S.C. § 1983 for use of excessive force in the course of
arrest, in breaking one of plaintiff's ribs and breaking his spine
in two places after he had unresistingly complied with orders
to lie on the ground face down with his hands behind his back.
*See Rogoz v. City of Hartford,* No. 3:11–CV–00500, 2013 WL
3816580 (D.Conn. July 22, 2013).
Affirmed in part, vacated and remanded in part.

**Attorneys and Law Firms**

A. Paul Spinella, Hartford, Connecticut (Spinella &
Associates, Hartford, Connecticut, on the brief), for Plaintiff–
Appellant.

Nathalie Feola–Guerrieri, Senior Assistant Corporation
Counsel, Hartford, Connecticut, for Defendant–Appellee
City of Hartford.

William J. Melley III, Hartford, Connecticut, for Defendants–
Appellees Watson, Rivera, Water, Rutkauski, Flores, Pileski,
and Beiros.

Before KEARSE, PARKER, and WESLEY, Circuit Judges.

**Opinion**

KEARSE, Circuit Judge:

**\*1** Plaintiff David Rogoz appeals from a final judgment
entered in the United States District Court for the District
of Connecticut, Vanessa L. Bryant, *Judge,* summarily
dismissing all of his claims against defendants City of
Hartford (the "City"), individual detectives and officers in
the City's Police Department (together the "police officer
defendants"), and the City's Chief of Police, arising out of
Rogoz's arrest in May 2009, during which, the police officer
defendants concede for purposes of this appeal, Rogoz's rib
was broken and his spine was broken in two places. On
appeal, Rogoz seeks reinstatement only of (a) his claim under
42 U.S.C. § 1983 against defendant Detective G. Watson for
use of excessive force, (b) his claims under § 1983 against
the other defendant police detective and five defendant police
officers (collectively the "other officers" or the "other police
officers") for failure to intervene to prevent Watson's use
of excessive force, and (c) his claims under state law that
are related to his federal claims of excessive force. Rogoz
contends principally that, in granting summary judgment in
favor of Watson and the other officers on those claims, the
district court, which found that Watson used only reasonable
force and was entitled to qualified immunity, *see Rogoz v.
City of Hartford,* No. 3:11–CV–00500, 2013 WL 3816580
(D.Conn. July 22, 2013) ("D.Ct.Op."), erred in failing to
view the record in the light most favorable to Rogoz as
the party opposing summary judgment. For the reasons that
follow, we agree that summary judgment dismissing the §
1983 claim against Watson for use of excessive force was
error; we vacate so much of the judgment as dismissed that
claim and the analogous state constitutional claim and as
declined to exercise supplemental jurisdiction over Rogoz's
state-law claims relating to the alleged use of excessive force
by Watson, and we remand for further proceedings with
respect to those claims. We affirm the dismissal of Rogoz's
claims against the other police officers.

**I. BACKGROUND**

Most of the facts are undisputed; and certain other facts have been admitted by the police officer defendants for the purpose of defending summary judgment on this appeal.

**A. *The Events***
It is undisputed that on May 8, 2009, shortly after 11:00 a.m., Rogoz drove to the vicinity of Lawrence Street in Hartford, Connecticut (hereafter the "Lawrence Street area"), "a hot spot area for illegal drug activity," D.Ct. Op., 2013 WL 3816580, at *3 (internal quotation marks omitted), and, through the window of his vehicle, bought $50 worth of heroin. Rogoz then turned onto a one-way street and pulled over to the curb. A red Honda pulled in directly behind him. Rogoz promptly drove on and pulled over to the curb farther down the street. The red Honda then pulled in front of Rogoz, and a man exited. In an attempt to get away from the Honda man, Rogoz began to back his car up the one-way street, and the man began running toward him. When Rogoz saw a car coming behind him, he ceased backing up; drove forward over the curb and onto the sidewalk to pass the Honda man before reentering the roadway; and drove off at an unreasonably high rate of speed. He eventually reached a highway, the scene of his arrest.

 **\*2** Rogoz's brief on appeal describes the events after he reached the highway in flight from the Honda man, and the police officer defendants have "no material disagreements" (Brief on appeal for defendants-appellees Watson and the other officers ("Watson brief on appeal") at 5) with the following description:

> [After] Rogoz ... fled through the City of Hartford, [he] eventually dr[ove] onto Route 2 eastbound; ...
>
> Rogoz did not realize that he was being pursued by police vehicles until he saw the police lights and heard the sirens; ...
>
> Upon this realization, Rogoz immediately pulled over onto the shoulder of the highway; ...
>
> When Rogoz stopped the vehicle, Rogoz was directed by an officer to exit the vehicle with his hands up, and *he complied;*...
>
> *Rogoz was ordered by the officers to lay face down on the ground with his hands behind his back, and he complied;*...
>
> *Rogoz complied with each of the officers' commands, and did not resist in any way;*...

> *Rogoz was lying face down on the ground, with his hands behind his back, awaiting to be handcuffed, when one of the officers, believed to be George Watson, jumped onto Rogoz's back, landing knees first....The force of the impact fractured one of Rogoz's ribs and fractured his spine in two places....*

(Rogoz brief on appeal at 5–6 (internal quotation marks omitted) (emphases ours).) Watson and the other officers state in their brief on appeal that they "*accept* for the purpose of this Motion for Summary Judgment Plaintiff's characterization *that Detective George Watson jumped on Mr. Rogoz's back, landing knees first, and fracturing Mr. Rogoz's ribs and spine.*" (Watson brief on appeal at 5–6 (emphases added).)

**B. *The Present Action and Defendants' Motion for Summary Judgment***
Rogoz was charged with three state-law crimes: possession of narcotics, reckless driving, and disobeying an officer's signal to stop in order to escape. He pleaded guilty to the narcotics charge and was fined $300; the other two charges were dismissed.

Rogoz commenced the present § 1983 action in 2011 against the City, its Chief of Police, and the police officer defendants, asserting various claims under, *inter alia,* the Fourth Amendment and state law in connection with his arrest, including false arrest, false imprisonment, and use of excessive force. To the extent pertinent to this appeal, which pursues only the excessive-force-related claims against the police officer defendants and the City, the complaint included allegations that, at the Lawrence Street area, the man who exited the red Honda had "charged toward the Plaintiff's vehicle" and "*failed to identify himself as a police officer in any respect* " (Complaint ¶ 15 (emphasis added)); that Rogoz had fled the area "[b]elieving himself to be in imminent danger" (*id.* ¶ 16); that when Rogoz became aware on the highway that he was being pursued by police officers, he immediately stopped his vehicle on the shoulder of the highway (*see id.* ¶¶ 17–18); and that he "*complied with the Defendant Officers' commands to show his hands, exit his vehicle and lie face down with his hands behind his back, offering no resistance of any sort* " (*id.* ¶ 19 (emphasis added)). Then,

 **\*3** [w]hile the Plaintiff was on the ground, the Defendant Officers subjected his upper back to severe physical assault, causing him to suffer excruciating pain ....

21. After the Plaintiff was placed in custody, he requested but did not receive prompt medical care for two days.

22. Upon finally receiving medical care, the Plaintiff was informed that he had sustained severe muscular strain and multiple fractures to his back and ribs.

(Complaint ¶¶ 20–22.)

In his deposition, Rogoz testified that when he was in the Lawrence Street area he had no idea who the man who exited the Honda was. "He never showed nothing, you know. I had no idea who it was...." (Deposition of David William Rogoz ("Rogoz Dep.") at 86; *see also id.* at 67 ("Q. Do you recall any gesture from the person that was in this Honda at all to you, any arm movement, anything like that? A. No, no.").) Rogoz testified, "[i]t's not the best area over there" (*id.* at 67–68), and that he "was trying to get out of there.... I just didn't know what was going on. I was afraid" (*id.* at 65).

As to his arrest, Rogoz testified that when he had lain face down on the ground as instructed,

> that was when ... someone came up on me, and it was boom. Someone like threw all their weight on me. I could feel like their knees in my back smashed me, smashed my face into the pavement."

(Rogoz Dep. at 79.) "It felt like he like jumped, you know.... [I]t seemed like, you know, he just like jumped on me is what it felt like, just hit so hard."(*Id.* at 80.) "It seemed like he ran up and jumped with his weight onto my back...." (*Id.* at 81.) The officer who jumped on Rogoz's back then handcuffed him; since a police report said that Rogoz was handcuffed by Watson, Rogoz inferred that the officer who jumped on his back was Watson. (*See id.* at 84–85.)

In an affidavit opposing defendants' motion for summary judgment, Rogoz's description of the scene of his arrest on the highway was similar to the allegations in his complaint:

> [w]hen I saw the [police] lights I immediately pulled over onto the shoulder of the highway.

11. After I stopped, the police officers ordered me to show my hands, to exit the vehicle and to lie face down with my hands behind my back, and I complied with their directions, and did not resist in any way.

12. While I was lying on the ground, one or two of the defendant officers jumped onto me with their knees, landing on my back.

13. The force of the impact fractured one of my ribs and fractured my spine in two places, and my face was slammed into the ground.

(Affidavit of David Rogoz dated December 24, 2012 ("Rogoz Aff."), ¶¶ 10–13.) Rogoz said that "although [he] was in horrible pain from [his] injuries [he] initially did not ask for medical treatment because [he] was afraid of the police."(*Id.* ¶ 14.)

Defendants' motion for summary judgment dismissing Rogoz's excessive force claims was accompanied by, *inter alia,* a Statement pursuant to Local Rule 56(a)1 of the facts defendants contended were undisputed ("Defendants' Rule 56(a)1 Statement"), by documents including a police incident report filed by Watson on the date of Rogoz's arrest ("Watson Report" or "Report"), and by a memorandum of law ("Defendants' Summary Judgment Memorandum"). In his Report, Watson stated that he had been surveilling the Lawrence Street area and observed what appeared to be a purchase of narcotics by Rogoz, followed by Rogoz's parking nearby at "a common location where drug users pull over and ingest the recently purchased drugs."(Watson Report at 2.) Watson stated, "I parked my vehicle in front of Rogoz and approached the passenger side of his vehicle. I had my badge displayed while verbally identifying myself as Hartford Police."(*Id.*) The Report contains a description of Rogoz's ensuing flight that is similar, although not identical, to Rogoz's own description. With regard to Rogoz's arrest on the highway, Watson stated in the Report that, after being "stopped by marked Hartford police vehicles[,].... Rogoz was taken out at gun point and laid onto the ground at which time I approached and handcuffed him."(*Id.*) The Report made no mention of any application of force.

**\*4** In their Rule 56(a)1 Statement, defendants described Rogoz's actions in the Lawrence Street area much as those actions had been recounted by Rogoz and the Watson Report. Defendants stated that after Watson exited the red Honda and "approach[ed] Rogoz's" car, "Rogoz tried to get away" (Defendants' Rule 56(a)1 Statement ¶¶ 7–8); but their Rule 56(a)1 Statement did not assert that Watson had identified himself to Rogoz as a police officer. Defendants' Rule 56(a)1 Statement stated that on the highway, Rogoz had complied with officers' directions to exit his car and to lie face

down on the ground with his hands behind his back (*see id.* ¶¶ 16–17); it made no mention of any injury to Rogoz's back.

In their accompanying memorandum of law, defendants argued that "[i]rrespective of whether Detective Watson," as Rogoz alleged, " 'jumped' on him with his weight and knee placed on the plaintiff's back which caused him to suffer a back injury," Watson was entitled to summary judgment on the merits because "it was objectively reasonable for Detective Watson to have used force" (Defendants' Summary Judgment Memorandum at 14) on the basis that Rogoz was charged with serious crimes (*see id.* at 16), "posed an immediate threat to the safety of the officers or others" (*id.*), and that "attempted to evade arrest by flight" (*id.* at 17). Defendants also argued that "[e]ven assuming plaintiff's version of events is true [for purposes of] summary judgment," Watson would be entitled to summary judgment on the basis of qualified immunity because Rogoz did not have "a clearly established right not to be subject to having the force employed by Detective Watson to effectuate his arrest under these circumstances presented to Detective Watson."(*Id.* at 18 n. 1.) And defendants argued that the police officer defendants other than Watson were entitled to summary judgment because Rogoz was unable to show any "personal involvement" in the use of force against Rogoz "by any of the defendant officers[ ] aside from Detective Watson."(*Id.* at 11.)

In his affidavit opposing defendants' summary judgment motion, Rogoz denied having knowingly fled from, or having intended to flee from, law enforcement. He stated:

> 4. I did not know that th[e red Honda that pulled in front of me in the Lawrence Street area] was a City of Hartford police vehicle, or that the vehicle contained police officers.
>
> 5. One of the occupants quickly exited the vehicle and ran toward the passenger door of my car.
>
> 6. *I did not know that the person running toward my car was a police officer,* and *this person did not identify himself as an officer in any way.*

(Rogoz Aff. ¶¶ 4–6 (emphases added).)

## C. *The Decision of the District Court*
The district court granted the motion to dismiss Rogoz's excessive force claims, adopting the arguments put forth by defendants. *See* D.Ct. Op., 2013 WL 3816580, at *12. The court rejected Rogoz's contention that Watson's use

of force was unreasonable because Rogoz was unaware in the Lawrence Street area that Watson was a police officer, and that Rogoz had fled only from an unidentified man who he reasonably suspected was threatening him, not from law enforcement officials. Noting that "Watson recounted in his Report that he 'approached the passenger side of [the] vehicle' with his badge displayed and verbally identified himself as Hartford Police,"*id.* at *3, the court found it "eminently reasonable for Detective Watson to believe ... that Rogoz had fled after Watson had identified himself as a police officer verbally and by displaying his badge,"*id.* at *14. The court found that "[a]lthough Rogoz had complied with the officers' orders to pull over [on the highway], exit his vehicle, and lie face down on the ground, he did so only after having failed to obey Watson's orders to stop [i]n [the Lawrence Street area]...."*Id.* at *15. The court reasoned that,

> **\*5** [b]ased on the totality of the circumstances known to Detective Watson at the time, it was reasonable for Watson to conclude that *quickly transferring his weight to Mr. Rogoz's back and ribs*—after having followed Mr. *Rogoz's urgent flight from law enforcement* through Hartford's streets —in order *to assure that Rogoz did not resume this flight,* to ensure the safety of Mr. Rogoz, the officers on the scene, and other drivers on the side of a busy highway, and to effectuate Rogoz's arrest would not violate Mr. Rogoz's right to be free from the use of excessive force. *[S]ome degree* of physical force is incident, and even necessary, to making an arrest, especially in situations *where the suspect has previously refused to comply with the officers' orders....* Here, *Rogoz had actively resisted Watson's attempt to apprehend him* after he had purchased heroin. *It was reasonable for Watson to employ some force* against Rogoz after Rogoz's traffic stop given that Watson had witnessed first-hand Rogoz's earlier volatility in response to his attempt to stop Rogoz.

*Id.* (internal quotation marks omitted) (emphases ours).

The district court also concluded that Watson was entitled to qualified immunity. It stated that

> Watson ... reported that as he approached Rogoz's vehicle he displayed his badge and verbally identified himself as a police officer. *While Rogoz disputes that Watson provided identification, his dispute is tempered* by the urgency with which Rogoz undertook to flee a perceived dangerous situation and his inability to recall any details as to the individual who approached his car. Given the circumstances, while it was perhaps reasonable for Rogoz to have believed that Watson was *not* a police officer, it was also *reasonable for Watson to believe that Rogoz had attempted to flee from law enforcement* by way of reckless driving and to respond accordingly. Thus, even if Watson's use of force was constitutionally excessive, it was based heavily on a reasonable mistake of fact and thus merits qualified immunity.

D.Ct. Op., 2013 WL 3816580, at *16 ("not" emphasized in original; other emphases added).

The court also stated that it was not clearly established law "that a use of force to subdue an individual in circumstances akin to those in this case, *after* the individual has fled from police but *prior* to the individual being placed in handcuffs on the side of a highway, would violate such an individual's Fourth Amendment rights."*Id.* at *17 (emphases in original). It stated that

> while the right to be free from the use of excessive force under the Fourth Amendment is clearly established, *Green [v. Montgomery],* 219 F.3d [52,] 59 [ (2d. Cir.2000) ], *the right of a potential felon who* has just engaged in a drug transaction and *has fled from law enforcement to be free from an officer's forceful placement of his weight on such suspect's back to effectuate the suspect's arrest* and to

keep him from fleeing is much less clearly defined.

**\*6** D.Ct. Op., 2013 WL 3816580, at *17 (citing *Davis v. Callaway,* 3:05–CV–00127, 2007 WL 1079988 20 (D.Conn. Apr. 9, 2007) (emphases ours)).

"On the other hand," the district court noted, "*courts often find to be excessive similar force* used against an arrestee ...*where the arrestee offered no resistance.*" D.Ct. Op., 2013 WL 3816580, at *17 (emphases added).*See, e.g., id.*(noting that summary judgment has been found inappropriate in a case involving the use of "gratuitous force beyond what [wa]s necessary to subdue" (internal quotation marks omitted)).

The court granted summary judgment dismissing Rogoz's failure-to-intercede claims against the police officers other than Watson on the ground that Rogoz had presented no evidence that the other officers had an opportunity to intervene. It noted that Rogoz claimed that Watson ran and jumped on his back, a single instantaneous application of force, and it concluded that no reasonable jury could "conclude that the officers on the scene of Rogoz's arrest had a realistic opportunity to prevent the injuries he allegedly sustained."*Id.* at *19 (internal quotation marks omitted).

Having concluded that Rogoz's federal excessive-force-related claims against all of the police officer defendants lacked merit, the court dismissed on the merits Rogoz's analogous state-law claims, declined to exercise supplemental jurisdiction over other state-law claims, and found it unnecessary to address his state-law claims against the City for negligent infliction of harm or for indemnification, *see*Conn. Gen. Stats. §§ 52–557n, 7–465. *See*D.Ct. Op., 2013 WL 3816580, at *18, *24–*25.

## II. DISCUSSION

On appeal, Rogoz contends principally that the district court failed to view the record in the light most favorable to him and to draw all reasonable inferences in his favor, and thereby erred in ruling (a) that Watson's jumping on Rogoz's back with sufficient force to break his rib and break his spine in two places was reasonable as a matter of law, (b) that Watson was entitled to qualified immunity as a matter of law with respect to the use of such force, and (c) that the other police officer defendants had no reasonable opportunity to prevent the use of excessive force by Watson. For the reasons that follow,

we conclude that the district court erred in granting summary judgment in favor of Watson.

**A. *Summary Judgment Principles***

"A motion for summary judgment may properly be granted—and the grant of summary judgment may properly be affirmed—only where there is no genuine issue of material fact to be tried, and the facts as to which there is no such issue warrant the entry of judgment for the moving party as a matter of law." *Kaytor v. Electric Boat Corp.,* 609 F.3d 537, 545 (2d Cir.2010) ("Kaytor"); *see* Fed.R.Civ.P. 56(a); *see, e.g., Jasco Tools, Inc. v. Dana Corp.,* 574 F.3d 129, 151 (2d Cir.2009) ("Jasco")."The function of the district court in considering the motion for summary judgment is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Kaytor,* 609 F.3d at 545; *see, e.g., Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50 (1986) ("*Liberty Lobby* ").

> **\*7** In reviewing the evidence and the inferences that may reasonably be drawn, the court "*may not make credibility determinations or weigh the evidence....'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'* " *Reeves [v. Sanderson Plumbing Products, Inc.],* 530 U.S. [133,] 150... [ (2000) ] (quoting *Liberty Lobby,* 477 U.S. at 255... (emphases ours)); *see, e.g., Agosto v. INS,* 436 U.S. 748, 756 ... (1978) ("a district court generally cannot grant summary judgment based on its assessment of the credibility of the evidence presented").

*Kaytor,* 609 F.3d at 545–46.

"Summary judgment is inappropriate when the admissible materials in the record 'make it arguable' that the claim has merit," *id.* at 545 (quoting *Jasco,* 574 F.3d at 151 (other internal quotation marks omitted)), "for the court in considering such a motion ' "*must disregard all evidence favorable to the moving party that the jury is not required to believe,*" ' " *Kaytor,* 609 F.3d at 545 (quoting *Jasco,* 574 F.3d at 152 (quoting *Reeves,* 530 U.S. at 151 (emphasis in *Jasco* ))). And in light of "the fact-specific nature of the inquiry" on an excessive force claim (*see* Part II.B. below), "granting summary judgment against a plaintiff on [such a claim] is not appropriate unless no reasonable factfinder could conclude that the officers' conduct was objectively unreasonable," *Amnesty America v. Town of West Hartford,* 361 F.3d 113, 123 (2d Cir.2004) ("*Amnesty America* ").

In sum, summary judgment is proper only when, if all permissible inferences and credibility questions are resolved in favor of the party against whom judgment is sought, "there can be but one reasonable inference as to the verdict," *Liberty Lobby,* 477 U.S. at 250, *i.e.,* "it is quite clear what the truth is," *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 467 (1962) (internal quotation marks omitted).

**B. *The Fourth Amendment, Excessive Force, and Qualified Immunity***

"Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor,* 490 U.S. 386, 396 (1989). However, it is also well established that law enforcement officers violate the Fourth Amendment if the amount of force they use is " 'objectively [un]reasonable' in light of the facts and circumstances confronting them." *Id.* at 397. "[P]roper application" of "[t]he test of reasonableness" in this context

> requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, *whether the suspect poses an immediate threat to the safety of the officers or others,* and *whether he is actively resisting arrest or attempting to evade arrest by flight. See Tennessee v. Garner,* 471 U.S. [1], 8–9 [ (1985) ] (the question is "whether the totality of the circumstances justifie[s] a particular sort of ... seizure").

**\*8** *Graham,* 490 U.S. at 396 (internal quotation marks omitted) (emphases ours). Further,

> [t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

*Id.* at 396–97. "The 'reasonableness' of" the amount of force used thus "must be judged from the perspective of a reasonable officer on the scene .... at the moment" the force is used. *Id.* at 396; *see, e.g., Maxwell v. City of New York,* 380 F.3d 106, 108 (2d Cir.2004) ("*Maxwell*"); *Amnesty America,* 361 F.3d at 123; *O'Bert ex rel. Estate of O'Bert v. Vargo,*

331 F.3d 29, 36 (2d Cir.2003). In sum, the "standard" to be applied in determining whether "the amount of force" used exceeded the amount that was "necessary" in the particular circumstances is "reasonableness at the moment." *Graham,* 490 U.S. at 396, 397; *see, e.g., Amnesty America,* 361 F.3d at 123 ("In other words, the factfinder must determine whether, in light of the totality of the circumstances faced by the arresting officer, the amount of force used was objectively reasonable at the time.").

The doctrine of "[q]ualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct."*Reichle v. Howards,* 132 S.Ct. 2088, 2093 (2012); *see, e.g., Tracy v. Freshwater,* 623 F.3d 90, 95–96 (2d Cir.2010); *Papineau v. Parmley,* 465 F.3d 46, 55 (2d Cir.2006). Officials are "entitled to qualified immunity [when] their decision was reasonable, even if mistaken,"*Hunter v.. Bryant,* 502 U.S. 224, 229 (1991); the doctrine " 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law,' " *id.*(quoting *Malley v. Briggs,* 475 U.S. 335, 343, 341 (1986)). "[W]hen a defendant official invokes qualified immunity as a defense in order to support a motion for summary judgment, a court must consider two questions: (1) whether the evidence, *viewed in the light most favorable to the plaintiff,* makes out a violation of a statutory or constitutional right, and (2) whether that right was clearly established at the time of the alleged violation." *Tracy v. Freshwater,* 623 F.3d at 96 (emphasis added).

In the present case, we have several problems with the grant of summary judgment to Watson, both on the merits of the excessive force claim—as to which Rogoz of course has the burden of proof—and on the issue of qualified immunity—an affirmative defense on which Watson has the burden of proof either at trial or on a motion for summary judgment, *see, e.g., Gomez v. Toledo,* 446 U.S. 635, 640 (1980). As to the merits, at least two of the *Graham* factors that must be considered in determining whether the force used was necessary or was instead excessive could not properly be found to have been established as a matter of law. Defendants stated as undisputed facts that on the highway, when Rogoz "noticed two Hartford Police cruisers with lights activated," he "pulled over"; that "Rogoz was directed by an officer to exit his vehicle with his hands up, and he complied"; and that "Rogoz was directed by officers to lay face down on the ground with his hands behind his back, and he complied."(Defendants'

Rule 56(a)1 Statement ¶¶ 15–17.) Accordingly, the police officer defendants expressed in their brief on appeal "no material disagreements" (Watson brief on appeal at 5) with Rogoz's assertions that, before Watson broke his back and rib, Rogoz had "complied with each of the officers' commands" and had "not resist[ed] in any way" (Rogoz brief on appeal at 6). Based on these facts a jury could easily infer that Rogoz —out of his car, prone on the ground, and compliant when Watson jumped on his back—did not "pose[ ] an immediate threat to the safety of the officers or others" and was not "actively resisting arrest or attempting to evade arrest by flight,"*Graham,* 490 U.S. at 396. That permissible inference could not properly be rejected as a matter of law.

**\*9** The police officer defendants contend that it is "[im]material" that Rogoz "was complying with officers' directions at the very moment in time that force was used against him."(Watson brief on appeal at 7.) This contention is meritless for two reasons. First, it is contrary to the *Graham* principle that, in the assessment of "[t]he 'reasonableness' of a particular use of force ... from the perspective of a reasonable officer on the scene" in light of the particular circumstances, a "standard of reasonableness at the moment applies,"490 U.S. at 396. While the district court found that "the totality of the circumstances sp[oke] to a level of urgency that preclude[d] a finding in Rogoz's favor,"D.Ct. Op., 2013 WL 3816580, at *15, we cannot agree that that is so as a matter of law. Given the undisputed facts that on the highway, Rogoz had pulled over when he noticed the police vehicles, had complied with officers' orders to exit his car, and had complied with their orders to lie face down on the ground with his hands behind his back, and had done so without any show of resistance, a jury could find that, by that time, there was no urgency that necessitated jumping on Rogoz's back. And if the jury were to find that Watson in fact proceeded to jump on Rogoz's back with such force that he broke Rogoz's rib and/or his spine, it could well find that Watson had used more force than was necessary. Of course, the jury is not compelled to find either that Watson jumped on Rogoz's back—an assertion by Rogoz that is conceded by the police officer defendants only "for the purpose of" defending "Summary Judgment" (Watson brief on appeal at 5–6)—or that the amount of force used by Watson in fact broke Rogoz's spine and rib, an issue that remains in dispute. But if Watson jumped on the back of the prone, compliant Rogoz, breaking his spine and rib, it is surely at least arguable that the force used was excessive.

Second, in seeking to divert focus from the undisputed fact that Rogoz was compliant and prone on the ground

with his hands behind him at the moment Watson jumped on his back, the police officer defendants argue that we must consider "the undisputed facts that led up to the moment of his arrest," which they describe as "including ... Rogoz's attempt *to evade a law officer* " (Watson brief on appeal at 7 (emphasis added)). And indeed, this view of Rogoz as having previously tried to escape capture by law enforcement was a major premise of the district court's grant of summary judgment in favor of Watson. *See, e.g.,* D.Ct. Op., 2013 WL 3816580, at *15 (stating that "Rogoz *had actively resisted Watson's attempt to apprehend him* after he had purchased heroin" (emphasis added); referring to "Rogoz's urgent *flight from law enforcement* through Hartford's streets" (emphasis added); stating that Watson's use of force was reasonable "to assure that Rogoz did not *resume* this flight" (emphasis added); stating that force is reasonable "where the suspect has *previously* refused to comply with *the officers'* orders" (internal quotation marks omitted) (emphases ours)). The court also found, in concluding that Watson was entitled to qualified immunity, that "it was ...*reasonable for Watson to believe* that *Rogoz had attempted to flee from law enforcement....* " *Id.* at *16 (emphases added). Thus, both as to the merits of Rogoz's excessive force claim and as to Watson's defense of qualified immunity, the district court's conclusion that the force Watson used was warranted, or was reasonably believed to be warranted, rested on the premise that Rogoz, in fleeing from the Lawrence Street area, was knowingly fleeing from law enforcement.

**\*10** Yet the only factual foundation for the proposition that Rogoz had fled "from law enforcement" and had "previously" refused to comply with an "officer['s]" orders was the premise that Watson, in the Lawrence Street area, had identified himself to Rogoz as a police officer. That premise, however, was clearly in dispute. Although defendants argue on this appeal that Watson, after exiting the Honda in the Lawrence Street area, "held up his badge and identified himself as a police officer" (Watson brief on appeal at 4; *see also* City brief on appeal at 2), Rogoz stated in his affidavit opposing summary judgment that the man who exited the Honda "did not identify himself as an officer in any way" (Rogoz Aff. ¶¶ 4–6; *see also* Rogoz Dep. at 67, 86 (the man who exited the Honda did not make "any gesture" or "any arm movement," "[h]e never showed nothing")). Thus, defendants' contention that Watson identified himself as a police officer in the Lawrence Street area was nowhere mentioned in their Rule 56(a)1 Statement of undisputed facts. Indeed, defendants' memorandum of law purported to

accept Rogoz's version of the facts (*see, e.g.,* Defendants' Summary Judgment Memorandum at 17 (arguing that Watson was entitled to summary judgment in his favor "[e]ven assuming the facts as Plaintiff presents them are true"); *id.* at 18 n. 1 ("[e]ven assuming plaintiff's version of events is true")); and the "FACTUAL BACKGROUND" section of their memorandum stated that when Watson's Honda pulled in front of Rogoz's car in the Lawrence Street area, "Plaintiff drove quickly away from" the Honda "*[b]elieving he was in imminent danger,*" as the "*detective [who] exited the vehicle* and ran toward the passenger door of Plaintiff's car, ... '*failed to identify himself as a police officer in any respect* ' " (*id.* at 2 (citing and quoting Complaint ¶¶ 14–16 (emphases ours))).

The district court nonetheless found that it was "eminently reasonable for Detective Watson to believe ... that Rogoz had fled after *Watson had identified himself as a police officer verbally and by displaying his badge,*" D.Ct. Op., 2013 WL 3816580, at *14 (emphasis added). But if in fact Watson, in the Lawrence Street area, did not identify himself as a police officer in any way, there was no basis in the record for the district court's findings (a) that Rogoz had previously resisted arrest, or (b) that he had knowingly fled from law enforcement officers, or (c) that Watson could reasonably believe Rogoz had resisted arrest or fled from law enforcement.

The district court disregarded the dispute as to whether Watson had identified himself in the Lawrence Street area, apparently finding Rogoz's affidavit and deposition testimony not credible. The court said that,

> [w]hile Rogoz disputes that Watson provided identification, *his dispute is tempered* by the urgency with which Rogoz undertook to flee a perceived dangerous situation and his inability to recall any details as to the individual who approached his car.

**\*11** D.Ct. Op., 2013 WL 3816580, at *16 (emphasis added). This may explain why the court itself would not credit Rogoz's statement that Watson did not identify himself. But Rogoz's assertions as to this material fact, made under oath in his affidavit and his deposition, clearly created a genuine dispute. The question of Rogoz's credibility was a matter for the factfinder; it was not a matter that the court could properly resolve on a motion for summary judgment.

In addition to making a credibility determination and resolving against Rogoz the material factual issue of whether

Watson had identified himself to Rogoz as a police officer, the district court failed in other respects to view the record in the light most favorable to Rogoz. In finding that it was "reasonable for Detective Watson to conclude that *subduing* Mr. Rogoz quickly and efficiently *by putting his knee or knees on Mr. Rogoz's back* immediately before ... handcuff[ing him]," D.Ct. Op., 2013 WL 3816580, at *15 (emphases added), and that Watson was entitled to qualified immunity because it was clearly established that such action was reasonable, *see id.,* the district court analogized to cases such as *Mongeau v. Jacksonville Sheriff's Office,* 197 F. App'x 847, 851 (11th Cir.2006), in which an officer placed his knee on an arrestee's back to subdue him, after the arrestee had resisted and had refused to exit his vehicle; *Massaro v. Jones,* 323 F. App'x 68, 70 (2d Cir.2009), in which the officers dealt with a suspect who they knew had previously been convicted of crimes involving weapons and who had hesitated before complying with their orders; and *Davis v. Callaway,* 2007 WL 1079988, in which, as the district court here noted, the officers dealt with a suspect who had been involved in an altercation, and who had obeyed an order to sit on the ground but then "jumped up to protest treatment of [an]other arrestee," D.Ct. Op., 2013 WL 3816580, at *15. These cases are not analogous to the present case, however, if the record here is viewed properly, in the light most favorable to Rogoz as the party opposing summary judgment. Viewed in that light, there was no resistance by Rogoz to the officers' orders, no history of crimes of violence, and no disobedience; he was entirely compliant; he was already subdued.

The court also failed to view the evidence in the light most favorable to Rogoz in analyzing the amount of force that was employed against him. In discussing excessive force principles, the court referred neither to any break or fracture of any of Rogoz's bones, nor to any violent conduct such as a jump onto Rogoz's back. Rather, it referred, for example, to the propriety of using "*[s]ome degree* of physical force," *id.* (internal quotation marks omitted) (emphasis added); to whether "[i]t was reasonable for Watson to employ *some* force against Rogoz," *id.* (emphasis added); to "*plac[ing]* a knee (or knees) on [Rogoz's] back," *id.* at *9 (emphasis added); to Watson's "*putting* his knee or knees on Mr. Rogoz's back," *id.* at *15 (emphasis added); to "*put [ting]* his weight on Rogoz's back to effectuate his arrest," *id.* at *17 (emphasis added). The question was not whether "some" force was unnecessary, or whether Watson's "put[ting]" his "weight" and "plac[ing]" his "knee" on Rogoz's back was acceptable; it was whether, with the record viewed in the light most favorable to Rogoz, with Rogoz prone on the ground and

compliant, Watson's jumping on his back with such force as to break his spine and rib was excessive.

**\*12** Having framed the issue as whether "[s]ome degree of force" and "plac [ing]" "weight" on a suspect's back could be reasonable, the court found that Watson was entitled to qualified immunity on the basis that the law was not clearly established that such force would violate a suspect's rights under the Fourth Amendment. However, actions by officers far less extreme than jumping on the back of a prone and compliant suspect, and apparently resulting in injuries far less serious than broken spines and ribs, had long been held sufficient to support a Fourth Amendment claim of use of excessive force. *See, e.g., Maxwell,* 380 F.3d at 109 (a 2004 decision reversing a grant of summary judgment dismissing an excessive force claim where an officer shoved the plaintiff into the back seat of a police car and the plaintiff's head "struck a hard surface of the car" causing "pain in[ ] her arm and lower back and ... a post-concussive syndrome" (internal quotation marks omitted)); *see also id.* at 108 ("we have permitted a plaintiff's claim to survive summary judgment on allegations that, during the course of an arrest, a police officer twisted her arm, 'yanked' her, and threw her up against a car, causing only bruising, *Robison v. Via,* 821 F.2d 913, 924–25 (2d Cir.1987)"). In light of these rulings, no officer in 2009 could reasonably have believed it permissible under the Fourth Amendment to jump on the back of a prone and compliant suspect gratuitously, with sufficient force to break his spine and rib.

Finally, had the district court properly disregarded defendants' contention that Watson had identified himself to Rogoz as a police officer in the Lawrence Street area— as it was required to do on a summary judgment motion, since a jury would be entitled to discredit such trial testimony by Watson—the court could not have found that the law was insufficiently clear for Watson to know he was violating Rogoz's Fourth Amendment rights. Without Watson's identifying himself as an officer, there was no evidence whatever that Rogoz had disobeyed any police order or had in any way resisted arrest. As the court itself noted, "courts often" have found the "gratuitous" use of "similar force" against an arrestee "*where the arrestee offered no resistance,*" to be "excessive." D.Ct. Op., 2013 WL 3816580, at *17 (emphases added).

For the foregoing reasons, we conclude that Watson was not entitled to summary judgment either on the merits of Rogoz's excessive force claim or on Watson's defense of qualified

immunity to that claim. We vacate so much of the judgment as dismissed Rogoz's Fourth Amendment claim against Watson for the use of excessive force.

Given the reinstatement of that claim, we also vacate the district court's dismissals of Rogoz's state-law claims that were related to it, including the analogous state constitutional claim that the court found meritless, the state-law claims as to which the court declined to exercise supplemental jurisdiction because all federal claims were being dismissed, and the claims against the City under Conn. Gen. Stats. §§ 52–557n, 7–465, for negligent infliction of harm or for indemnification, which the court found it unnecessary to address.

### C. *Failure To Intercede*

**\*13** We affirm the entry of summary judgment in favor of the defendant police officers other than Watson substantially for the reasons stated in the district court's opinion. In order for a law enforcement officer to be held liable for another officer's use of excessive force, "there must have been a realistic opportunity [for the former] to intervene to prevent the harm from occurring." *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994).

As Rogoz described his arrest, when he placed himself prone on the ground as instructed, "that was when" Watson "ran up and jumped ... onto my back" (Rogoz Dep. at 79, 81). As Rogoz's counsel stated at oral argument of this appeal, Rogoz described Watson's jumping on his back as "fairly immediate." Rogoz did not proffer any evidence from which a juror could rationally infer that the officers who were present had a realistic opportunity to prevent Watson's jump.

### CONCLUSION

We have considered all of the parties' arguments on this appeal, and, except as indicated above, have found them to be without merit. The judgment of the district court is vacated to the extent that it dismissed Rogoz's § 1983 claim against Watson for the use of excessive force and his state-law claims related to the use of excessive force; in all other respects the judgment is affirmed. The matter is remanded for further proceedings not inconsistent with this opinion.

Costs to plaintiff.

### All Citations

--- F.3d ----, 2015 WL 4716570

**End of Document**                              © 2015 Thomson Reuters. No claim to original U.S. Government Works.